# EXHIBIT 13

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF GEORGIA

3                  COLUMBUS DIVISION

4    _____

5

6                              MDL Case No. 2004

7    IN RE:  MENTOR CORP. OBTAPE

8    TRANSOBTURATOR SLING PRODUCTS

9    LIABILITY LITIGATION

10

11   _____

12

13

14

15                  DEPOSITION OF

16              DANIEL S. ELLIOTT, M.D.

17

18

                Taken on July 24, 2016

19

                Commencing at 8:44 a.m.

20

21

22

23

24    Job No. CS2350044

25   REPORTED BY:    PAULA K. RICHTER, RMR, CRR

Page 2

1    DEPOSITION OF DANIEL S. ELLIOTT, M.D., taken
2  on July 24, 2016, commencing at 8:44 a.m., at the
3  Marquette Hotel, 710 South Marquette Avenue, Canon
4  River Room, Third Floor, Minneapolis, MN 55402,
5  before Paula K. Richter, Registered Merit Reporter,
6  Certified Realtime Reporter, and Notary Public of
7  and for the State of Minnesota.
8
9            **********
10
11         APPEARANCES
12
13  On Behalf of Plaintiff Andrea R. Clinton:
14
15      Mr. Douglass A. Kreis, Esq.
16      AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
17      17 East Main Street, Suite 200
18      Pensacola, FL 32502
19      (850) 202-1010
20      dkreis@awkolaw.com
21
22
23
24
25  (APPEARANCES continued on next page)

Page 3

1  APPEARANCES (Continued)
2
3  On Behalf of Defendant Mentor Worldwide, LLC:
4
5      Mr. John Q. Lewis, Esq.
6      TUCKER ELLIS, LLP
7      950 Main Avenue, Suite 1100
8      Cleveland, OH 44113
9      (216) 592-5000
10      john.lewis@tuckerellis.com
11
12
13
14
15
16
17
18
19
20
21
22
23      NOTE:   The original transcript will be
24  filed with TUCKER ELLIS, LLP, pursuant to the
25  applicable Rules of Civil Procedure.

Page 4

1            INDEX
2
3  WITNESS:   DANIEL S. ELLIOTT, M.D.        PAGE:
4     EXAMINATION BY MR. LEWIS.................... 6
5     EXAMINATION BY MR. KREIS.................... 187
6
7  KREIS EXHIBITS MARKED:            PAGE:
8  EXHIBIT 1   Notice of Deposition        7
9  EXHIBIT 2   Rule 26 Expert Report of       8
10      Dr. Elliott
11  EXHIBIT 3   Case Specific Rule 26 Expert    8
12      Report of Dr. Elliott for
13      Plaintiff Andrea Clinton
14  EXHIBIT 4   Dr. Elliott Litigation Revenue   27
15      for Mesh Products Written by
16      Attorney John Lewis
17  EXHIBIT 5   Dr. Elliott Treatment Female SUI  140
18      Notes Written by Attorney
19      John Lewis
20  EXHIBIT 6   Dr. Elliott - Surgeon's       140
21      Obligations Written by Attorney
22      John Lewis
23  EXHIBIT 7   Risks and Efficacy Written by   140
24      Attorney John Lewis
25  (EXHIBITS continued on next page)

Page 5

1  (EXHIBITS continued)
2  EXHIBIT 8   Info on V494 Transobturator Tape   145
3  EXHIBIT 9   Article "Abscess Formation at the  166
4      Ischiorectal Fossa 7 Moths After
5      the Application of a Synthetic
6      Transobturator Sling for SUI in
7      a Type II Diabetic Woman"
8  EXHIBIT 10  Article "Autologous Transobturator  179
9      Midurethral Sling Placement:  A
10      Novel Outpatient Procedure for
11      Female SUI
12
13  (Original exhibits attached to original transcript;
14  copies attached to transcript copies.)
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1    PROCEEDINGS
2    DANIEL S. ELLIOTT, M.D.
3  duly sworn, was examined and testified as follows:
4
5    EXAMINATION
6
7  BY MR. LEWIS:
8  Q. Good morning, Doctor. How are you?
9  A. Good morning.
10  Q. We met off the record. My name is John
11  Lewis. I represent Mentor in a case that's been
12  brought by Andrea Clinton related to her
13  experience with ObTape transobturator tape.
14      You've been designated by
15  Ms. Clinton's attorneys as an expert in this
16  litigation. Do you have an understanding as to
17  that.
18  A. Correct. That's true.
19  Q. And could you for the record just let the
20  court reporter know your full name and your
21  current business address, please?
22  A. Dr. Daniel Steven Elliott, S-T-E-V-E-N, last
23  name Elliott, E-L-L-I-O-T-T. Address is 200 First
24  Street Southwest, Rochester, Minnesota.
25  Q. And, Doctor, do you have an understanding

Page 7

1  that you're going to be testifying at the trial in
2  this case set for January of next year?
3  A. Correct.
4  Q. All right. And do you plan to appear live
5  for that?
6  A. Yes.
7      (Exhibit 1 was marked for
8  identification.)
9  BY MR. LEWIS:
10  Q. I'm going to show you, just to get a couple
11  things out of the way. This is Deposition Exhibit
12  1. Do you have an understanding that there was a
13  deposition notice issued in this case?
14  A. Yes.
15  Q. And you're appearing subject to that notice;
16  is that right?
17  A. Correct.
18  Q. Do you see that that's requested that you
19  bring documents to the deposition?
20  A. Correct.
21  Q. And have you brought any documents today?
22  A. I have a copy of my reports, the general and
23  then the case-specific report, and that's what I
24  have with me.
25  Q. And as I understand it, there are some

Page 8

1  billing records that can be obtained. You don't
2  have those with you, but you are prepared to
3  testify as to an estimate of your billings in this
4  case?
5  A. Correct.
6  Q. And who has the billing records? Your
7  office?
8  A. Well, no, not my office. It would be
9  probably with Mr. Ben Anderson's law firm in
10  Cleveland, Ohio.
11  Q. All right. I'll swing by on my way home.
12      (Exhibit 2 and Exhibit 3 were marked
13  for identification.)
14  BY MR. LEWIS:
15  Q. So I have two reports of yours that I've
16  marked here as Exhibits 2 and 3. I'm going to
17  show those to you. Exhibit --
18      MR. KREIS: John, we sent over a
19  supplemental reliance to I think Dustin on Friday.
20  Did you have an opportunity to print that out?
21      MR. LEWIS: I did not.
22      MR. KREIS: I've got a copy that I
23  can provide you today.
24      MR. LEWIS: Okay.
25      MR. KREIS: I can also e-mail it to

Page 9

1  you.
2      MR. LEWIS: Okay. I mean, do you
3  have it with you right now?
4      MR. KREIS: It's in here somewhere.
5      MR. LEWIS: Did you e-mail it to
6  Dustin on Friday?
7      MR. KREIS: Yes.
8  BY MR. LEWIS:
9  Q. Doctor, Exhibit 2 is what I'll refer to as
10  your general report in the ObTape litigation; is
11  that correct?
12  A. Yes.
13  Q. And Exhibit 3 is the report specific to
14  Ms. Clinton; is that correct?
15  A. Correct.
16  Q. And other than a supplemental reliance list,
17  are there any changes to the reports, Exhibits 2
18  and 3, that you need to make regarding your
19  opinions in this case as we sit here today?
20  A. There's nothing substantial. I found a
21  couple typographical grammatic errors but nothing
22  that change an opinion.
23  Q. And do you intend to do any additional work
24  in this case -- in Ms. Clinton's case such that it
25  would change or you expect that it would change

3 (Pages 6 - 9)

Page 10

1  your opinions?
2  A.  Only if new material were brought to me.  I
3  last saw her in, was it July 15 -- 25th of last
4  year.  So if new records were presented to me,
5  that would obviously change, but I'm not
6  anticipating searching those out unless something
7  is brought to me.
8  Q.  And do you have plans to perform any physical
9  examinations or otherwise meet with Ms. Clinton
10  prior to trial?
11  A.  I have no plans unless her medical situation
12  were to change.  But otherwise, I have no plans to
13  do that, no.
14  Q.  No current plans at this time?
15  A.  Correct.
16  Q.  Now, let me ask you a little bit about the
17  July 2015 encounter.  Was that the only time that
18  you met with Ms. Clinton in person?
19  A.  Correct.
20  Q.  And could you explain to me the circumstances
21  under which you met with Ms. Clinton?
22  A.  I had been contacted, I believe, by the AWKO
23  Law Office to review records or to determine
24  whether or not I felt individuals were harmed by
25  Mentor.  So I reviewed multiple records, including

Page 11

1  Ms. Clinton.  I then informed them that I felt
2  that there were injuries caused by the product,
3  and then at that point in time an IME was -- an
4  independent medical exam was set up, a date and
5  location.
6  Q.  And how was the IME set up?
7  A.  I don't know how that was done.  I just told
8  them I felt these certain number of individuals
9  that I'd reviewed, there were problems
10  associated -- or caused by the Mentor product, and
11  then I told them dates that I was available and
12  then it was set up in Chicago.
13  Q.  So the independent medical exam took place in
14  Chicago?
15  A.  Correct.
16  Q.  Where?
17  A.  At Rush Medical Center.
18  Q.  And how did you get access to Rush Medical
19  Center facilities?
20  A.  They told me a date and time to show up.  I
21  showed up and I walked up to the exam room -- or
22  the office -- medical office.
23  Q.  "They" meaning the -- Ms. Clinton's lawyers?
24  A.  No, no.  I never encountered any lawyers.  I
25  don't know who represents them.  No.  It was the

Page 12

1  nurse who works at that medical facility.
2  Q.  I'm sorry.  Okay.  So the nurse at Rush
3  Medical Center contacted you and gave you the time
4  and place to go for the examination?
5  A.  No.  The AWKO Law Office said, okay, 8:00
6  a.m. on July 25th, show up at this address.  They
7  will let you in.  "They" meaning the employee of
8  the Rush -- actually, I don't even know who the
9  employee was.  It's a nurse who works there, so I
10  don't know her direct employ is.  So I had no
11  contact with any lawyers or any other individuals
12  besides just Ms. Clinton.
13  Q.  I mean, other than her lawyers -- other than
14  Ms. Clinton's lawyers --
15  A.  No.
16  Q.  -- to set up the appointment?
17  A.  Yes.  But I didn't have any contact on the
18  IME day with anybody legal, let's put it that way.
19  Just Ms. Clinton and then the nurse.
20  Q.  Okay.  And why was Chicago chosen?
21  A.  I don't know.
22  Q.  Do you practice medicine in Chicago --
23  A.  No.
24  Q.  -- or Illinois?
25  A.  No.

Page 13

1  Q.  Did you need to get special permission to
2  conduct the examination in Illinois?
3  A.  No.
4  Q.  Have you ever used the facilities at Rush
5  Medical Center prior to or since that examination?
6  A.  I don't recall since then.  Prior to that
7  time, several IMEs have been set up for various
8  different products, mainly the Ethicon products,
9  at that facility.  I believe Chicago was chosen
10  because it was semi centrally located, somewhat
11  easy to get into, but other than that, I don't
12  know.
13  Q.  So you've performed other independent medical
14  examinations in the context of litigation and have
15  used Rush Medical Center for the place for the
16  examination?
17  A.  Used that specific office and only that one
18  office.
19  Q.  And when you say "specific office", could you
20  describe it for me?  Is it an office that is set
21  aside for physicians who do IMEs in litigation?
22  A.  I have no idea.  It appeared to be a GYN
23  office because they're fully stocked with GYN
24  equipment.  On the walls they had OB and GYN
25  paraphernalia, as far as literature information,

4 (Pages 10 - 13)

Page 14

1 but I don't know whose office it is or why that
2 one was chosen.
3 Q. And you don't remember seeing a name outside
4 the office indicating whose office it was?
5 A. No, no. Just -- no, I did not.
6 Q. Okay. In advance of the independent medical
7 exam of Ms. Clinton, did you need to request that
8 certain things be present or did you bring your
9 own examination equipment?
10 A. No. I just request that we have a vaginal --
11 disposable vaginal speculums available, and that
12 was the only equipment needed.
13 Q. How many IMEs do you think you've done in
14 litigation for mesh products?
15 A. For all of mesh products? That would
16 include, you know, Prolift, TVT, TVT-O, TVT-Secur,
17 Avaulta, Cook and this, so there's probably -- I'm
18 going to have to guess. It's going to be a rough
19 guess. 75 perhaps. But please take that with a
20 grain of salt. That's a rough guess over the past
21 five years.
22 Q. Totally understand.
23       You listed some products there. I
24 just -- so a volume at that is a product that
25 you've testified in litigation regarding?

Page 15

1 A. I performed IMEs, wrote up a report -- a
2 general report and then case specifics. I gave
3 testimony two years, three years ago perhaps, and
4 I've heard nothing since then. And I believe
5 that's a Bard product, but I'm not sure on that
6 one.
7 Q. So Avaulta is one. Another one is TVT-O?
8 A. All the TVT line. The TVT-O, TVT-Secur, and
9 the TVT Classic or Retropubic.
10 Q. Call it Classic or Retropubic?
11 A. Retropubic is what I meant.
12 Q. Yeah. And those are made by Ethicon,
13 correct?
14 A. Correct.
15 Q. What other products have you testified in
16 litigation or otherwise performed examinations for
17 litigation?
18 A. The Prolift line, so anterior, posterior and
19 total, but that would all fall under the umbrella
20 of Prolift, correct.
21 Q. And that was Ethicon, correct?
22 A. Correct.
23 Q. Others?
24 A. The Cook product line, which is an SIS.
25 Q. SIS?

Page 16

1 A. SIS is sub-intestinal mucosa, I believe. It
2 is not a synthetic mesh. It is taken from pig
3 intestines and used as a prolapse or a sling
4 material for anti-incontinence.
5 Q. So SIS is a -- I'm sorry, what --
6 A. Cook Medical, based in Indiana.
7 Q. Okay. Other products? I mean, ObTape,
8 obviously.
9 A. ObTape, yes.
10       Off the top of my head, I do not
11 recall there being another one.
12 Q. Any AMS products?
13 A. No. I've been contacted about doing
14 something but nothing has ever come about. I've
15 not done any reviews, no reports or any
16 depositions on that. Same thing with Coloplast.
17 Q. And Boston Scientific, nothing there?
18 A. Nothing there.
19 Q. So you performed an examination in July of
20 2015. Did you take notes at that examination?
21 A. I have a pre-printed form that covers -- and
22 this would be my standard routine -- all aspects
23 of a female genital urinary exam. Then as I
24 examine her, take pencil notes on that, clarify it
25 with her, and then that day or the next day, put

Page 17

1 that all into a Word document. The original
2 chicken scratch, pencil forms, are shredded
3 because all that data goes into this report which
4 you have before you.
5 Q. And so the form that was used for
6 Ms. Clinton's examination, that is no longer
7 available; is that correct?
8 A. That is correct. But all of that data is --
9 you know, there's lines everywhere and numbers and
10 things and that's put into a logical sequence for
11 the report. But you are correct, that original
12 report is gone.
13 Q. And do you have a blank, if you will,
14 pre-printed form that is -- that you still have
15 access to that you use for the independent medical
16 exams?
17 A. Yes. I don't have it with me, but that could
18 be provided to you.
19       MR. LEWIS: We'll make a request for
20 that blank pre-printed form.
21 BY MR. LEWIS:
22 Q. And what's the process -- how long did the
23 examination take?
24 A. The entire interaction, the IME, usually
25 takes 45 minutes or so. The actual physical exam

5 (Pages 14 - 17)

Page 18

1  will be probably roughly 15 minutes of that. And
2  I don't recall in her case the breakdown of time.
3  Q. Did you do more than one exam that day?
4  A. I don't recall. Usually there are two or
5  three that I do in a given day, but I don't
6  recall.
7  Q. How many trips to Chicago's Rush Medical
8  Center do you think you've made in the
9  litigation -- in all litigation?
10  A. So since 2011, there's probably been five --
11  four or five. Again, that's an estimate.
12  Q. Okay. And you've probably done 75, roughly,
13  exams?
14  A. Correct. But not all in Chicago.
15  Q. Where else have you done exams?
16  A. In Kansas City, Minneapolis. I think that's
17  it.
18  Q. When you do an exam, how are you -- so when
19  you do an independent medical exam -- or so-called
20  independent medical exam in the context of
21  litigation, how are you compensated?
22  A. Hourly.
23  Q. And do you have a rate sheet or some document
24  that you would send to a lawyer? If I say, hey,
25  Dr. Elliott, will you help me out and do an exam

Page 19

1  of my plaintiff, do you have a document that would
2  send to a lawyer that kind of identifies your
3  hourly rate and the cost and things like that?
4  A. Well, the only people that have access to me
5  are through Ben Anderson's office and AWKO office,
6  so I don't interact with any other lawyers. And
7  the rate is a standard $700, regardless of what
8  I'm doing, per hour.
9  Q. Let me ask you a little bit about your
10  relationship with Ben Anderson. So Ben Anderson
11  is an attorney in Cleveland, Ohio; is that
12  correct?
13  A. Correct.
14  Q. And when did you first start working with
15  Mr. Anderson in connection with litigation
16  involving mesh products?
17  A. He contacted me in probably August of 2011.
18  Q. And what do you recall the nature of that
19  conversation?
20  A. He had talked to me about being involved as
21  far as the mesh litigation. I had made several
22  talks around the nation against meshes, written a
23  opinion paper against meshes and then have been
24  contacted by Public Citizen -- Public Citizen --
25  the Ralph Nader Group in DC. He had read those

Page 20

1  and then he contacted me, so that was why he
2  contacted me. And then it was about willingness
3  to be involved as far as the litigation process.
4  Q. And do you have a retention agreement with
5  Mr. Anderson? Is there some document that
6  evidences your agreement to work for him or firms
7  or plaintiffs?
8  A. In August of 2011, or perhaps September, but
9  I imagine it was August, an agreement was
10  signed -- a one-paragraph agreement that we were
11  going to work together at a certain hourly rate,
12  and if you don't get paid on time, we get
13  penalized a percentage, and that was it. So
14  there's no end date to it. Nothing has been
15  signed since that time.
16  Q. And could you describe for me this concept of
17  paying on time and penalized a percentage?
18  A. I informed him that I do not like working
19  with lawyers because they tend to demand my work
20  and then not pay on time. And he says, we will
21  pay you on time. If not, it was -- and I don't
22  recall the percentage. If it's over one month and
23  you have not been paid, then you get -- there's a
24  penalty to us, and it was like a 2 to 3 percent,
25  which I've never had to invoke that.

Page 21

1  Q. Like interest or something?
2  A. Interest. Interest, yes.
3  Q. Okay.
4  A. Interest penalty. Let's put it that way.
5  Q. And that's what you've been operating under
6  since 2011?
7  A. Correct.
8  Q. Has your rate changed over that time?
9  A. No.
10  Q. Now, the funds that you receive in connection
11  with your litigation work, where does that go?
12  A. Where does it go?
13  Q. Does it go to you personally?
14  A. Yes.
15  Q. And do you have a company set up or is it
16  literally just you as an individual?
17  A. Just me. No company.
18  Q. And is there any need to give those funds
19  that you receive in connection with your work in
20  litigation a portion or some of those funds to
21  your current employer?
22  A. No, because that's -- it's all done on my own
23  personal time. Hence the reason we're meeting
24  over weekends and things. And all the IMEs,
25  everything is done over weekends.

6 (Pages 18 - 21)

Page 22

1  Q.  Have you ever testified at trial?
2  A.  Twice.
3  Q.  How did you account for attending trials?
4  A.  Vacation time or personal leave where I don't
5  get paid.
6  Q.  Do you have anyone that you work with on
7  litigation that assists you with reports and
8  research or anything along those lines?
9  A.  No.
10  Q.  And how do you -- how do you bill for your
11  time?  What's sort of the process?
12  A.  Just a basic stopwatch, which is running
13  right now.  So whenever I do my research,
14  documentation review, medical records review,
15  literature review, I bill for that time.  And so
16  whatever client it happens to be for or general
17  product -- and there's a -- it's itemized to that
18  and sent to, again, Mr. Anderson at the end of the
19  month.
20  Q.  And that's your sole contact for purposes of
21  sending bills is Mr. Anderson?
22  A.  Correct.
23  Q.  And the payments that come to you, do they
24  come from all different law firms or just
25  Mr. Anderson's office?

Page 23

1  A.  All different law firms.
2  Q.  So Mr. Anderson is essentially the point
3  person for the administrative aspects of your
4  litigation consultation?
5  A.  Correct.  That's just what I was told to do,
6  for ease sake, I suppose.
7  Q.  Now, with respect to your work in the Clinton
8  case specifically, I understand you haven't
9  brought your billing records here, but do you have
10  an estimate as to the amount of time you've spent
11  on your work on Ms. Clinton's case?
12  A.  On specifically Ms. Clinton, which the work
13  was finished, you know, around the time of her
14  IME, there was 17 hours spent reviewing the
15  medical literature and the physical exam and
16  write-up, which is obviously excluding the general
17  report and the other IMEs on ObTape.
18  Q.  So 17 hours on Ms. Clinton's case
19  specifically?
20  A.  Correct, as of September of 2015.  That's not
21  including with the work that's been done this
22  month.
23  Q.  And the work that's been done this month,
24  excluding today, so let's -- obviously because we
25  don't know how many hours you will spend today --

Page 24

1  but excluding today, how many additional work have
2  you done since September of 2015?
3  A.  Well, it's roughly 45 hours.  However, that's
4  also including the general evaluation, so it's
5  going to be very difficult to delineate
6  specifically Clinton because the general is going
7  to have overlap with her.  But total this month,
8  roughly 45 hours.
9  Q.  And when we say "this month", we're talking
10  July?
11  A.  Correct.  Up to yesterday.  Not including
12  today.
13  Q.  Okay.  So that's general plus Clinton.
14      Other than Ms. Clinton's 17 hours
15  specific and the 45 hours this month for general
16  work in Ms. Clinton's case, what additional amount
17  of hours have you spent on the ObTape litigation,
18  in connection with your consultation work?
19  A.  Essentially, we're just looking at July,
20  August and September of last year because nothing
21  happened up until July of this year.  Thirty-five
22  hours roughly were spent on the general report
23  back, again, that was last year.  And then on the
24  other roughly 10 mentor individuals, it was
25  roughly -- and this is a guesstimate -- about 100

Page 25

1  hours were spent on them.
2  Q.  And that would be non-Clinton work?
3  A.  Correct.
4  Q.  And would Mr. Anderson have those records?  I
5  mean, all the bills that you sent for that work in
6  ObTape, those would have all been sent to
7  Mr. Anderson?
8  A.  Correct.
9  Q.  And with respect to your work in the Avaulta
10  litigation, the hours in revenue could be
11  determined by looking at records that Mr. Anderson
12  has; is that correct?
13  A.  That's correct.  He would have all that.
14  Q.  197 estimate total.
15      And were the 197 -- I roughly did
16  the math here, approximately 197 hours estimate,
17  and I fully understand it's not an exact number,
18  but that would be at the rate of $700 an hour --
19  A.  Correct.
20  Q.  -- all of that time?
21  A.  Correct.  And that's including travel time in
22  there too.
23  Q.  And then the expenses associated with that
24  would be on top of the hourly?
25  A.  Yes.

7 (Pages 22 - 25)

Page 26

1 Q. Do you bill for like out-of-pocket expenses,
2 a hotel room, a lunch?
3 A. The majority of time I pay for those myself.
4 I pay for the air travel and hotel myself.
5 Q. You don't bill that back?
6 A. No. The majority of the time. There are
7 times I do. Usually I do not.
8 Q. So I have that as a -- I just did the math on
9 my calculator. That's $137,900, again,
10 estimating. Again, it's just an estimate. We
11 have to look at the records.
12       Do you have an estimate for the
13 amount of revenue that you've obtained overall
14 from your work in litigation on mesh products?
15 A. No. I don't keep a total of that, no.
16 Q. And I assume that income is reported on your
17 tax returns -- on your individual tax returns?
18 A. Correct.
19 Q. Do you do work in any other litigation other
20 than mesh -- transvaginal mesh litigation?
21 A. Currently? In 2010, I believe, I worked with
22 a patent infringement case. But otherwise, as far
23 as the litigation process, it's only been mesh or
24 transvaginal work, because remember Cook is not
25 technically a synthetic mesh.

Page 27

1 Q. So mesh or transvaginal products?
2 A. Correct.
3       (Exhibit 4 was marked for
4 identification.)
5       MR. LEWIS: I'm going to set that
6 over here. That's just my notes for when I read
7 the depo.
8 BY MR. LEWIS:
9 Q. When did you first start treating -- by the
10 way, let's step back for a second.
11       You treat women for stress urinary
12 incontinence as we sit here today? I mean, that
13 is part of your practice?
14 A. Correct.
15 Q. And how long have you been doing that?
16 A. Well, technically since I started residency
17 in '93. I did a fellowship in '99 which was
18 treating females. It was a voiding dysfunction
19 neurology fellowship. And then on staff since
20 '99.
21 Q. And when you say "on staff", that's on staff
22 of the Mayo Clinic?
23 A. Correct.
24 Q. And let me just back up for a minute. So the
25 treatment of stress urinary incontinence, do you

Page 28

1 have an estimate of how many people are diagnosed
2 with stress urinary incontinence in the United
3 States? Whatever numbers you can come up with,
4 either annually or total amount or percentage of
5 the population?
6 A. There's numbers all over the place. It's
7 difficult to ascertain exactly what they're
8 talking about. If it's those treated or those
9 diagnosed, those diagnosed is a very large number.
10 I mean, it's probably well over a million. I
11 don't know -- I can't tell you an exact number.
12 And those treated, I've heard numbers between 300-
13 to 500,000 a year, treated with anti-incontinence
14 procedures. But the numbers vary. And, again, it
15 just depends upon who's doing the reporting and if
16 they're looking at Medicare, all-comers or what.
17 Q. Would you agree with the statement that
18 female stress urinary incontinence is a
19 significant health issue for women?
20 A. I agree and disagree. It is a major impact
21 upon quality of life. It is not life or death.
22 Q. And when you say major impact -- so you would
23 agree with the statement that female stress
24 urinary incontinence has a major impact on the
25 quality of life?

Page 29

1 A. It can in severe cases.
2 Q. In severe cases.
3       And in non-severe cases, can it also
4 have a major impact on the quality of life?
5 A. Typically not.
6 Q. Do you believe that the treatment of stress
7 urinary incontinence is important for female --
8 female health?
9 A. Well, if you're talking about the survival --
10 long-term survival and shortening of life, no.
11 Q. In terms of quality of life, is the treatment
12 of stress urinary incontinence an important
13 function?
14 A. It can be, yes.
15 Q. When you talk about quality of life for women
16 who have stress urinary incontinence, could you
17 describe for me the quality-of-life impact that
18 can occur with women who have stress urinary
19 incontinence?
20 A. There can be issues of embarrassment, worries
21 about odor, unwillingness to do physical
22 activities, go out shopping, walking, aspects
23 along that lines.
24 Q. Can stress urinary incontinence cause women
25 to choose to be less active than they would

8 (Pages 26 - 29)

Page 30

1 otherwise be if they did not have stress urinary
2 incontinence?
3 A. It can be.
4 Q. Can a woman's reduction in activity levels
5 lead to other co-morbidities associated with their
6 health than if they had been more active?
7 A. Theoretically that's possible, yes.
8 Q. Have you seen that in your patient
9 population?
10 A. No.
11 Q. Are you aware of that occurring in other
12 patient populations involving women with stress
13 urinary incontinence?
14 A. Well, we're talking a large generality here.
15 Some women will reduce their activity levels.
16 Does that correspond to shortening of their life?
17 I've never seen any data, no studies done on that,
18 so again, we're talking about a hypothetical.
19 Q. Sure.
20      So 1993 is roughly when you started
21 treating women with stress urinary incontinence?
22 A. Actually, that's when I started residency.
23 It actually had been '94 when I actually started
24 urology. The first year was general surgery,
25 which you have minimal exposure to female urology,

Page 31

1 so '94 would have been more accurate, as a
2 resident.
3 Q. And what products, if any -- surgical
4 intervention products were you using in 1994 to
5 treat female stress urinary incontinence?
6 A. Pubovaginal sling -- autologous pubovaginal
7 sling.
8 Q. PVS stands for pubovaginal sling; is that
9 fair?
10 A. Correct, yes. But this was autologous
11 pubovaginal sling.
12 Q. Could you describe what autologous means?
13 A. Autologous is using the patient's own tissue,
14 so harvesting a piece of fascia from the patient.
15 So it is not synthetic and it is not someone
16 else's. It is their own. So that's where the
17 "auto", meaning self.
18 Q. And is there a particular location where you
19 harvest the autologous sling material when you do
20 a surgery or does it depend on the patient?
21 A. The majority -- well, from my practice, it's
22 always going to be the rectus abdominus fascia.
23 Other individuals will use fascia, a lot of it,
24 but I don't do that, but that has been done and
25 reported.

Page 32

1 Q. And are there risks associated with the use
2 of pubovaginal slings -- autologous pubovaginal
3 slings?
4 A. There are risks with all surgeries.
5 Q. Okay. So would PVS autologous -- by the way,
6 do you quote an efficacy rate for PVS when you
7 talk to a patient?
8 A. When I'm doing that type of a -- yeah. The
9 short answer, yes.
10 Q. And what is that usually quoted?
11 A. 80, 85 percent dry; 10 to 15 percent
12 improved; and whatever the remaining is, 5 percent
13 or so minimal improvement or less-than-ideal
14 improvement.
15 Q. 10 to 15 percent improved?
16 A. Correct.
17 Q. And the risks? What are the main risks of
18 PVS surgery autologous?
19 A. Failure of the procedure.
20 Q. And would that be a need for further surgery?
21 A. For -- possibly. It depends on the severity
22 and the patient's desires.
23      Other risks include bleeding at the
24 harvest site; trocar injury to the bladder; rare
25 but it's been reported, injury to the intestines

Page 33

1 with patches of trocars, so it's usually an
2 avoidable step. Urinary retention has been
3 reported. Urinary frequency/urgency afterward has
4 been reported. That's the -- that's the main
5 complications.
6 Q. Infection?
7 A. Wound-site infection, superficial infection.
8 Usually it would be treated with antibiotics.
9 Q. Erosion or otherwise rejection of the
10 material?
11 A. It doesn't happen because it's self, so you
12 don't have erosions -- I've never once seen an
13 erosion or heard of it with the pubovaginal
14 autologous sling because it's self so there's not
15 the rejection issue of the foreign body issue with
16 it.
17      And the infection I'm talking about
18 is on the abdomen with the harvest site. I don't
19 know if I mentioned that or not.
20 Q. That sounds like a pretty good -- a pretty
21 good surgery to treat stress incontinence, yeah?
22 A. I don't know what you mean by "good surgery".
23 Q. Well, I mean, it's 80 to 85 percent cure --
24 dry, right?
25 A. Correct.

9 (Pages 30 - 33)

Page 34

1  Q. No risk of deep infections, maybe a
2  wound-site infection, some harvest issues at the
3  site, but for the most part, seems like a pretty
4  successful surgery, right?
5      MR. KREIS: Object to form.
6      THE WITNESS: The procedure has been
7  around a long time, has a long track record.
8  There's a lot of data on it. When performed by
9  people who know what they're doing, it's a safe
10 and reliable surgery.
11 BY MR. LEWIS:
12 Q. And you would say that today, right, that PVS
13 is safe and reliable?
14 A. Yes.
15 Q. How many surgeries do you think you've done
16 over the course of your career involving
17 pubovaginal slings autologous?
18 A. Just autologous?
19 Q. Yeah.
20 A. Numbers are going to vary tremendously over
21 the years. For the first few years I was on
22 staff, I was doing 100, 150 a year. Then when
23 mesh slings came out specifically in the urology
24 area of the -- the TOT slings, the transobturator
25 slings, I continued that number of 100, 150, and

Page 35

1  then it progressively became less and less as more
2  general urologists and gynecologists were doing
3  it. Then my practice swung over to be fixing
4  complications of slings.
5      So my numbers of first-time
6  autologous slings are lower. Now I'm doing the
7  reconstruction after failed usually mesh slings
8  elsewhere. So now I'm probably doing about 30 of
9  those a year. For a while there -- for years it
10 was down to zero because the mesh slings were
11 so -- so popular.
12 Q. And this was in your practice?
13 A. Well, my practice and major academic centers.
14 For example, Dr. Webster at Duke who does also a
15 practice very similar to mine who is a
16 reconstructive urologist like myself, the same
17 thing happened when private practice urologists
18 and GYNs started doing more and more of these.
19 Because the pubovaginal sling is a bigger surgery,
20 most urologists shied away from it. Same with
21 GYNs. Mesh slings came out and became available
22 to everybody.
23 Q. So I want to talk just about your practice.
24 So you used pubovaginal slings autologous in your
25 practice since roughly 1994. And have you used

Page 36

1  that same surgery -- or that same product for your
2  entire career?
3  A. Well, yeah. That's an autologous sling but
4  the numbers have varied tremendously over the
5  years.
6  Q. Understood. But I mean, you have never said,
7  I'm not doing that anymore?
8  A. That is correct. That is correct. Never
9  stopped.
10 Q. Never stopped, as in --
11 A. Never chose -- I'm sorry to interrupt. I
12 never chose to say I'm not going to do this
13 because it's a bad procedure.
14 Q. And over the course of time from, you know,
15 '94 to present, you have used PVS autologous in
16 kind of what percentage? What's the variance in
17 your practice? I know it's gone up and down.
18 Would you say anywhere from zero percent of my
19 practice at one point in time to 100 percent of my
20 practice? If that's the answer, that's the
21 answer, but I was kind of looking for a range.
22 A. From '94 to '99 it was 100 percent. I was a
23 resident at that time. The staff I worked with
24 who did this chose only to use this product for
25 fear of the meshes and for fear of ProteGen.

Page 37

1      From '99 to 2000, it was 100 percent
2  cadaveric pubovaginal sling, which we used
3  Tutoplast, T-U-T-O-P-L-A-S-T, from Mentor
4  Corporation.
5  Q. Okay. Let me stop you right there. So from
6  '99 to what period of time? I'm sorry.
7  A. To 2000. So it was the summer of '99 to the
8  summer of 2000, it was 100 percent cadaveric.
9  Q. So that would have been cadaveric. Would you
10 call that CVS? No. How would you --
11 A. Well, you would just call it cadaveric
12 pubovaginal sling, but you would call it, for this
13 sake, CPVS, but...
14 Q. So cadaveric pubovaginal sling.
15     And you used Tutoplast?
16 A. Tutoplast only. Well, we tried some others
17 and had problems, which we wrote up a paper on,
18 but primarily Tutoplast because we found that it
19 worked.
20 Q. And that was Mentor's product?
21 A. Correct, at the time, which then became
22 Coloplast.
23 Q. And that was 100 percent of your practice?
24 A. Pretty much except for some mild variances
25 using dermal slings or something like that. But

10 (Pages 34 - 37)

Page 38

1 it was primarily -- let's say 99 percent cadaveric
2 that year.
3 Q. Okay. Why the switch from autologous to
4 cadaveric in '99?
5 A. I started doing my fellowship at a different
6 institution and that staff liked using cadaverics.
7 They did not want to use meshes but wanted to use
8 cadaverics.
9 Q. What institution were you at prior to '99?
10 A. Well, I did my residency at the Mayo Clinic
11 from '93 to '99. From '99 to 2000, I was at
12 Baylor College of Medicine in Houston doing the
13 fellowship work in advanced reconstructive voiding
14 dysfunction neurodynamics.
15 Q. So that was '99 to 2000 Tutoplast. Okay.
16      Take me now to 2000.
17 A. So when I came back and joined the staff --
18 re-joined; I was hired already -- then it was
19 probably 75 percent cadaveric, 25 percent
20 autologous, and that continued until roughly
21 2003 -- 2002, 2003.
22 Q. So it was -- I'm sorry. It was how much
23 autologous?
24 A. Roughly 25 percent.
25 Q. Okay. And 75 percent, roughly, cadaveric?

Page 39

1 A. Correct.
2 Q. Now, at this point in time, in 2000 when you
3 came back to Mayo Clinic, you now were outside of
4 a residency and fellowship and were now in your
5 own practice; is that correct?
6 A. That is correct.
7 Q. And you were now seeing patients who were
8 coming to you, Dr. Elliott, help me with my stress
9 urinary incontinence, right?
10 A. That's correct. I was not under the umbrella
11 of somebody else as a student, so to speak.
12 Q. And you had the option to choose the
13 treatment for the patient, obviously in connection
14 with informed consent and things along those
15 lines, but you had the option to recommend how to
16 treat stress urinary incontinence for the patients
17 that came to see you, correct?
18 A. That is correct.
19 Q. And between 2000 and 2003, you varied your
20 recommendations to patients. Some patients you
21 recommended autologous pubovaginal slings. Other
22 patients you recommended cadaveric pubovaginal
23 slings; is that right?
24 A. Correct. And I should probably say it was
25 like 2002, because right around that time, 2002 to

Page 40

1 2003, somewhere -- I don't remember exactly when,
2 is when AMS came out with their suprapubic sling.
3 And then so then we -- I swapped over to nearly
4 100 percent to that. So I just wanted to make
5 sure we have a timeline.
6 Q. Sure. I have it 2002, 2003, I think.
7      But I kind of want to go back to
8 this recommendation. So at the time, 2000 to
9 2002-ish, 2003-ish, you were making
10 recommendations that could either be autologous
11 PVS or cadaveric PVS; is that right?
12 A. Correct.
13 Q. When a patient came to see you during that
14 time frame and they wanted to have their stress
15 urinary incontinence cured, what did you do to
16 educate yourself about whether PVS slings were
17 safe for patients?
18 A. Well, by that time the pubovaginal sling was
19 originally described in 1984 or so, '84, by Dr. Ed
20 McGuire at the University of Michigan. So there
21 was at that point, what, 15 or so years of papers
22 out there on the products -- on the procedure, the
23 complications, the long-term benefits, the
24 long-term risks of the autologous.
25      The cadaveric there was much less.

Page 41

1 I wrote up one of the cadaveric papers in '99, or
2 I think it came out in 2000 or so. So there was
3 less information on the cadaverics. But
4 autologous had, again, a 15-year track record or
5 more.
6 Q. Was that important to you?
7 A. Yes, it was.
8 Q. Why?
9 A. A surgeon should know everything possible
10 about a product and the surgery and the risks and
11 benefits to be able to inform the patient
12 adequately -- or "completely" is a better word to
13 use.
14 Q. Let me make sure I get this right. You would
15 agree that a surgeon should know everything about
16 a product or procedure before recommending it to a
17 patient?
18 A. My opinion is that the surgeon has a moral,
19 ethical obligation to know completely how to
20 perform a surgery, to treat essentially all the
21 complications of said surgery, and to inform the
22 patient of the risks and frequencies of that
23 surgery that's been reported in the literature or
24 otherwise and also what their own personal
25 experience is. So it goes beyond just quoting

11 (Pages 38 - 41)

Page 42

1   what somebody at Hopkins does.  What -- in my own
2   hands, what the surgery risks are.  Because the
3   patient is not undergoing a surgery at Hopkins.
4   They're undergoing a surgery with me.
5   Q.  So you would agree that a surgeon has a moral
6   and ethical obligation to know how to conduct a
7   surgical procedure before recommending it to a
8   patient, correct?
9   A.  Yeah.  Not just conduct but to do it well.
10  So it's not just competence.  Surgical competence
11  is the lowest rung.  You have to be, in my
12  opinion, an expert before you do surgeries.
13  Otherwise you're going to harm patients,
14  potentially.
15  Q.  Let me just -- because I want to make sure I
16  get this right.  So this is surgeon's obligations.
17  So a surgeon has a moral and ethical obligation to
18  know how to conduct a surgery well before
19  recommending it?  I want to make sure I get your
20  words right.
21  A.  Be fully competent in performing the surgical
22  technique.
23  Q.  Okay.  To be fully competent in performing
24  the recommended surgical technique?
25  A.  Well, whatever surgery they're going to be

Page 43

1   doing, correct.
2   Q.  So would you agree with "recommended surgical
3   technique"?  In other words, if I'm a surgeon and
4   I'm going to recommend a particular surgery for a
5   physician, you believe that -- or for a patient,
6   you believe a surgeon has a moral and ethical
7   obligation to be fully competent in that surgical
8   procedure?
9   A.  Well, just not to be difficult, but for
10  clarification, if I say I recommend this, it
11  doesn't mean that I'm going to be doing it.
12  Q.  Okay.
13  A.  If it's going to another doctor, they have to
14  be.  So I'm saying personally, doctor/patient
15  relationship and I am going to be doing the
16  procedure, then the procedure that is recommended
17  to be performed by that doctor, just so we're
18  clear.
19  Q.  Right.  That's actually a very good point, so
20  I appreciate the clarification there.
21        So a surgeon has a moral and ethical
22  obligation to be fully competent in the surgery
23  that that surgeon is going to perform?
24  A.  Correct.
25  Q.  Now, let me ask you the -- you may think this

Page 44

1   is a silly question but I'm going to ask it
2   anyway.
3        Why?  Why do you believe that a
4   surgeon has a moral and ethical obligation to be
5   fully competent in surgery that the surgeon is
6   going to perform?
7   A.  I mean, that goes back to the basics of care.
8   First, do no harm.  And in my practice as a
9   reconstructive surgeon, I am picking up the pieces
10  of less-than-ideal surgical technique elsewhere,
11  and had they been performed by an expert, you can
12  avoid certain complications.  There are
13  preventible complications and then there are, for
14  lack of a better phrase, Act of God complications,
15  like a heart attack.  You know, you do everything
16  right and a bad outcome.
17        But the surgeon who is going to be
18  picking up a knife has a responsibility -- or a
19  treating physician, family practice or otherwise
20  who's going to be prescribing medication -- you
21  need to be informed.  We are going to be the point
22  person for that patient, and we have -- so you
23  have to prevent complications.
24  Q.  And you've seen this in your practice in
25  treating patients with complications associated

Page 45

1   with slings and other products, I assume, that
2   there have been less-than-ideal surgical technique
3   issues that have caused a complication?
4   A.  That is correct.  That can happen.
5   Q.  And because surgeons and their technique can
6   contribute to patient outcomes and potentially
7   cause complications, that's one of the reasons you
8   believe that a surgeon has an obligation to be
9   fully competent in the surgery that they're going
10  to perform?
11  A.  A long way of saying it, but yes.  The
12  surgeon better be careful when he picks up a knife
13  because you have a human being you have to
14  protect.  They're trusting you.
15  Q.  And let me ask you this:  So when you were
16  using -- when you were using the PVS autologous
17  and PVS cadaveric in your practice between 2000,
18  2002 and 2003, were you in your mind fully
19  competent in both of those surgeries?
20  A.  The surgeries are -- yes, because I was
21  starting to be trained by a trained female
22  urologist large volume.  So I was -- those first
23  six years from let's say '94 to the summer of
24  2000, I was under the guidance of a fully
25  competent, high-volume surgeon.  So I was trained

12 (Pages 42 - 45)

Page 46

1 by arguably some of the best. That's -- there's
2 no way to prove the best surgeon, but by very
3 high-quality surgeons. Then I went out to do it
4 on my own. So it's not like I just began to do it
5 willy-nilly. And that's also in conjunction of
6 doing fellowship work, which is doing more
7 advanced anatomical studies and things. So yes, I
8 felt fully competent.
9 Q. Now, would you also agree that a surgeon has
10 a moral and ethical obligation to understand the
11 risks and complications associated with a product
12 that they are going to use in a surgery with a
13 patient?
14 A. The surgeon needs to know and need to be told
15 all of the risks of a product, whether it be a
16 heart implant -- heart valve implant, stents, you
17 name it. They need to be -- and if the surgeon is
18 told all of the risks that are known, then the
19 burden is on that surgeon to then relay that on to
20 the patient.
21 Q. So the -- and I just kind of want to
22 understand this -- this nature of knowing of the
23 risks and complications associated with a product
24 to be used in a surgery. Do you believe that a
25 surgeon has an obligation to do independent -- and

Page 47

1 I say independent from the manufacturer of the
2 product -- independent study analysis, diligence,
3 before using a product in a surgical procedure?
4 A. It depends upon the product and how well that
5 product is known. Certain new products in the
6 market, there will be no other independent
7 research out there. Then you are wholly reliant
8 upon the company to tell you those risks. If it's
9 let's say the pubovaginal sling -- well, of
10 course, that's not a -- we'll say the cadaveric
11 sling, okay? Specifically the Tutoplast sling,
12 which had been around a long time. There's a lot
13 of data. In my personal opinion, it's not a new
14 procedure. The surgeon's reliance upon the
15 company is going to be less in that situation and
16 more reliant upon the data that's available. But,
17 again, it's going to be product-to-product
18 dependent.
19 Q. So let me talk about -- let me talk about
20 what I think you said, that a surgeon has to be
21 fully informed of the risks -- a surgeon has an
22 obligation to be fully informed of the risks
23 associated with a product prior to using it in a
24 surgical procedure. I mean, you would agree with
25 that?

Page 48

1 A. Yes. That surgeon, prior to implanting a
2 product, especially if it's a new product, needs
3 to be fully informed of all known risks with that
4 product.
5 Q. A surgeon needs to be informed of all known
6 risks associated with product. And I say before
7 using in a surgery? Does that sound right?
8 A. Correct, correct. If he's using it
9 independently. Now, sometimes they'll be using it
10 under the guidance of a more competent or fully
11 trained surgeon and then the ball game changes.
12 But I'm just saying if you're independently doing
13 it, it is your responsibility, and then to relay
14 that on to the patient.
15 Q. For using in a surgery.
16        Okay. I just want to make sure I
17 have this right. So you would agree that a
18 surgeon needs to be informed of all known risks
19 associated with a product before using in a
20 surgery?
21 A. Correct.
22 Q. And there's a sliding scale -- you would
23 agree there's a sliding scale that with newer
24 products, much of that information is going to
25 come from the manufacturer, and maybe with more

Page 49

1 established products, a lot of that information
2 can come with the experience of other surgeons who
3 have used the product or of the published data?
4 There's sort of a sliding scale there, you would
5 agree?
6 A. Correct. For example, let's just say
7 urethral catheters that have been out for 50
8 years, we're not relying on the product insert. A
9 brand-new product, we're relying on it heavily.
10 Q. Okay. In 2000, when you started using
11 cadaveric PVS Tutoplast in your practice -- and
12 that was 75 percent of your practice between 2000
13 and 2002 -- what did you do to educate yourself
14 about the safety and efficacy of that product?
15 A. The staff that I learned from in Houston had
16 been using it for years, so I had his expertise.
17 But then I wrote up a paper on it, which is out
18 there which is in my CV, on are all fascia
19 latas -- actually, I don't even remember what the
20 title of the paper is, but it came out around 2000
21 or so. So I did a thorough literature search of
22 all available literature out there, which is
23 referenced in the paper, about the product, the
24 known risks and various different complications.
25 Q. So you -- you believe that it was important

13 (Pages 46 - 49)

Page 50

1  that you did a literature search related to the
2  product, cadaveric PVS, prior to using it in your
3  surgery?
4  A. Not necessarily that. I was writing up a
5  manuscript. So it is essential if you're going to
6  write a paper, you have to do a literature search,
7  so that further augmented my learning. I wasn't
8  just taking what my staff said verbatim. However,
9  he had many years of using it. I don't know how
10 many years. So then you talk to them about his
11 various different complications, how he managed
12 them or avoided them.
13 Q. So you used your -- you used the experience
14 of others that you felt were credible physicians
15 in informing of you of whether or not Tutoplast
16 was safe; is that right -- the folks in Houston?
17 A. Yeah, I would say that's correct. This is
18 somebody I knew and worked with for a year and he
19 was using it on his patients and he felt in his
20 hands it was safe and then he taught me how to do
21 it. So it wasn't -- I wasn't trusting the opinion
22 of someone in a different state. It was somebody
23 I was working with.
24 Q. Sure. Understood. And I didn't mean to
25 suggest otherwise.

Page 51

1        One of the things that you did to
2  satisfy yourself that Tutoplast and cadaveric PVS
3  was a safe product for your patients was to
4  consider the experience of other physicians who
5  you respected?
6  A. Correct.
7  Q. And then another thing that you happened to
8  do -- and maybe this isn't required in every
9  instance, but you just happened to do in
10 connection with your research -- was to do a
11 literature search related to that product. Is
12 that fair to say?
13 A. Well, I did. I mean, that was because I was
14 writing up a paper but very, very few people write
15 up papers so that was unique to me.
16 Q. It was unique to you, but that was one of the
17 things that informed your conclusion that
18 Tutoplast is a safe product for your patients?
19 A. That is correct. That Tutoplast specifically
20 was and how it was manufactured. It was aerated
21 and not freeze-dried. So in our paper conclusion,
22 that freeze-dried cadaveric tissue broke apart.
23 So in our research, everything we found out that
24 other products out there were not good.
25 Q. And then the other thing that you considered

Page 52

1  in connection with determining that Tutoplast was
2  a safe product for your patients when you started
3  using it in 2000 with your own individual
4  patients, was information provided to you by
5  Mentor?
6  A. Correct. They had a -- they had a product
7  insert with it and that's where I learned as far
8  as its processing.
9  Q. And do you still use Tutoplast today?
10 A. Yes, but it's changed named names. It's not
11 called Tutoplast. And I still ask for Tutoplast
12 and they give it to me. But it's called
13 Coloplast, which was bought out by Mentor -- the
14 other way around. Excuse me.
15 Q. And in dealing with Mentor with respect to
16 Tutoplast, did you work with the specific
17 individuals at Mentor in the urology group? I
18 mean, were there people that you talked to --
19 specific names and individuals that you talked to?
20 A. Yes. I talked to Terri Oto, spelled -- it's
21 O-T-O. And then main contact person was Chris
22 Sellwood. I also talked with, more socially, Dave
23 Amerson. And I'm not sure if I talked with Ray
24 Tantillo. I can't recall on that. I know the
25 name but I don't know so I can't -- I won't go

Page 53

1  there.
2        And then I also forgot to mention
3  that Mentor did fly me out to New Jersey to
4  work -- to observe surgery with David Chaikin,
5  who's in Short Hills, Jersey -- New Jersey to
6  watch him do the product and also for prolapse.
7  And then also to California with Dr. -- he's at
8  Cedars-Sinai and I'm blanking on his -- oh, Gary
9  Leach, L-E-A-C-H.
10       So above and beyond my training at
11 Mayo and at Baylor, then I saw those two
12 high-volume surgeons perform surgeries, and Mentor
13 paid my way up for that. I forgot to mention that
14 earlier.
15 Q. And that was for Tutoplast?
16 A. Correct. Tutoplast, using it either as a
17 sling or also as a prolapse repair, which I still
18 use today.
19 Q. And do you maintain contact with either Chris
20 Sellwood or Dave Amerson today?
21 A. Zero. Chris Sellwood left the company --
22 actually, I don't recall exactly when he left the
23 company. 2005 or '6 or thereabouts. I don't know
24 on that.
25       And Dave Amerson, last contact I had

14 (Pages 50 - 53)

Page 54

1  with him was maybe 2009. That's a guess. And,
2  again, I don't think he's with the company either.
3  Q. And Terri Oto, I assume you haven't talked to
4  her in many, many years?
5  A. None. She was all of a sudden gone from
6  Mentor and I asked why, and they said it's an
7  internal issue and she's gone. And that was -- I
8  don't recall the date, 2004 or 2005. Chris
9  Sellwood left after that. I do know that. And
10  then also then after that was then Matt
11  Prischmann, who was the regional rep after
12  Sellwood left.
13  Q. With respect to Tutoplast, do you believe
14  that that product is a safe and reliable product
15  for the treatment of stress urinary incontinence?
16  A. I think it is a good product. It is safe.
17  It's reliable. There's a long track record.
18       I think the data has panned out that
19  autologous slings are better and that's why now
20  currently I've gone a shift that cadaveric slings
21  are actually the minority of the slings that I do.
22  So there's an evolution there that's gone on for
23  me.
24  Q. Okay. But I mean, in your experience, would
25  you characterize Tutoplast as good, safe and

Page 55

1  reliable?
2  A. Yes. It is good, it is safe, it is
3  slightly -- if you believe the data, which I do,
4  slightly less efficacious than autologous
5  pubovaginal sling but is not a bad product, by any
6  means. I still use it.
7  Q. And did you feel that, in your dealings with
8  the individuals at Mentor related to Tutoplast,
9  that they were open, honest and trustworthy in
10  disclosing the risks and benefits of Tutoplast to
11  you?
12  A. I thought with my interaction with them, that
13  I was being told everything. That's what I
14  believed.
15  Q. And sitting here today, do you still hold
16  that belief?
17  A. With Tutoplast, I think that has been a fair
18  assessment, especially with Terri Oto, yes.
19  Q. And when you say "especially with Terri Oto",
20  what do you mean?
21  A. In my experience -- just mine, no one
22  else's -- I found that she was seemingly very
23  forthright in her opinions, whether it would be
24  good or bad, and tried to push forward scientific
25  learning. They helped fund a study that I was

Page 56

1  doing with no guarantee it would be beneficial for
2  their product at all, and so I appreciate that.
3  Q. And so do you find that your dealings with
4  Mr. Sellwood and Mr. Amerson with respect to
5  Tutoplast were equally -- found them to be
6  forthright and trustworthy?
7  A. Well, Mr. Amerson I don't recall specifically
8  talking about Tutoplast, so let's exclude him from
9  the equation.
10       Mr. Sellwood, I don't -- looking
11  back on it, I don't believe I was ever told
12  anything that didn't pan out to being true,
13  specifically with Tutoplast.
14       MR. LEWIS: We've been going about
15  an hour. Quick break? Five minutes?
16       MR. KREIS: Sounds good.
17       (Recess taken from 9:57 a.m. until
18  10:07 a.m.)
19  BY MR. LEWIS:
20  Q. Now, Doctor, we were talking about surgeon
21  obligations prior to using a product, and I was
22  sort of talking about those issues in the context
23  of your use of cadaveric pubovaginal slings and
24  autologous PVS and so I kind of wanted to get back
25  onto that topic.

Page 57

1       And I believe that another
2  obligation that you had indicated in an earlier
3  answer, and so I just took some notes on it, was
4  that a surgeon needs to inform the patient of the
5  risks and benefits of the surgery, both from
6  the -- their own experience and from general
7  knowledge; is that correct? Did I get that
8  correct? You said something about your own
9  experience. You mentioned Hopkins, and I just
10  wanted to clarify what you meant by that
11  particular --
12  A. I think it's important for a surgeon, when
13  he's discussing the various procedure with a
14  patient, to inform the patient of what is known
15  out there, not necessarily that surgeon's own
16  experience, but then also include in the doctor's
17  own experience for results and complications.
18  Q. So would you agree that a surgeon needs to
19  inform a patient of known experience and personal
20  experience related to a product before a surgery?
21  A. All known, yes.
22  Q. Okay. To inform patient of -- should I use
23  "risks" or "experience"? What should I --
24  A. Well, "experience", which includes the risks
25  and the success of the procedure. "Experience"

15 (Pages 54 - 57)

Page 58

1  would be an all-inclusive term.  Risks and results
2  would be more specific.
3  Q. So known experience, including risks
4  associated with a product before using on that
5  patient?  Is that fair to say?
6  A. Yes.
7  Q. So a surgeon needs to inform a patient of
8  known experience, including risks, associated with
9  a product before using on that patient.  You would
10 agree with that?
11 A. Yes.
12 Q. Okay.  And the surgeon needs to inform a
13 patient of his or her own experience, including
14 complications associated with a product before
15 using it on that patient?
16 A. Correct.
17 Q. Okay.  I'll just use his or her because we do
18 have both genders in this litigation.
19         And so what did you tell patients
20 with respect to those two topics, known experience
21 and your experience, when you started using
22 Tutoplast in, you know, 2000 through 2002?
23 A. I don't recall what the -- it was a long time
24 ago.  I don't recall what the conversations were,
25 other than there's a long track record with

Page 59

1  them -- these specific ones, and usually discuss
2  what my numbers are.
3  Q. And what were those?  Did they vary over time
4  or did you --
5  A. My numbers?
6  Q. Yeah.
7  A. Well, yeah, my numbers are always going to
8  increase.  They're never going to reduce.
9  Q. Sure.
10 A. Again, I don't know how many I had done at
11 that point in time.  There are probably several
12 hundred.
13 Q. And then as far as -- I guess by numbers I
14 meant like success -- percentage success,
15 percentage complication, that sort of thing --
16 A. Yeah.
17 Q. -- with cadaveric.
18 A. I would have been quoting the numbers that we
19 did in our study from Houston because those are
20 procedures that I did under the guidance of the
21 staff.
22 Q. So with PVS cadaveric, study numbers that
23 were published?
24 A. Correct.  Well, they were in the process of
25 being published.  I don't remember when the paper

Page 60

1  came out, but the paper had already been written
2  and submitted.
3  Q. Okay.  And that would include efficacy and
4  risks?
5  A. Correct.
6  Q. And that's what you pretty much stuck to
7  whenever you talked to a patient about cadaveric
8  PVS?
9  A. Correct.
10 Q. Do you remember what additional complications
11 a cadaveric PVS has that an autologous PVS does
12 not?
13 A. You're not harvesting any tissue, so you
14 reduce those various different risks of wound
15 infection.  The other dissection in the vagina and
16 the risks -- or as far as failures are mainly what
17 we were focusing on.  But the biggest benefit is
18 you don't have to harvest tissue, so there's less
19 pain, less recovery, faster out of the hospital,
20 faster back-to-work time.
21 Q. It's really a separate step that doesn't need
22 to be undertaken during the surgery itself and
23 then another place where the patient doesn't have
24 to heal, essentially?
25 A. Correct.

Page 61

1  Q. And then added risk is things associated with
2  a foreign body?
3  A. Yes and no.  It is foreign, meaning it's not
4  the patient's self, but it's not a synthetic.  So
5  the foreign body risk is essentially nonexistent.
6  The basic risk with these cadaverics is failure,
7  efficacy.
8  Q. Is there a risk of erosion with cadaveric
9  PVS?
10 A. I've never seen it because it's not a foreign
11 body within there, so you don't see that reaction,
12 the immune response to it.
13 Q. Is there a risk of infection?
14 A. On the abdominal incision, yes.  I've never
15 once seen it in the vagina side of it.
16 Q. Have you heard about it in the literature?
17 A. I've never heard of it in the literature, no.
18 But, again, on the abdominal incision side, yes, a
19 superficial infection, cellulitis, can occur.
20 Q. And what would you say the efficacy rates --
21 do you have them kind of in your mind or do you
22 really need to look at your study to --
23 A. Well, they're going to be -- I think with my
24 literature and then with the literature of others,
25 it's been showing that it's slightly less as far

16 (Pages 58 - 61)

Page 62

1  as the dry and improved and slightly more and the
2  minimal improvement. There's going to be a slight
3  lesser efficacy. It's not a huge amount. But,
4  again, there's papers all over the place as far as
5  that goes, so it's -- the general consensus, it's
6  going to be slightly less efficacious. It doesn't
7  mean I don't do it anymore. It just means it's
8  slightly less efficacious.
9  Q. So back in 2000 to 2002 -- let's assume it's
10  slightly less efficacious -- we're still talking
11  close to 80 percent success rate, I would assume?
12  A. Correct.
13  Q. And probably, you know, add another 10-ish
14  percent on top of that for improvement?
15  A. Correct.
16  Q. How did you describe for a patient, okay, you
17  can -- we can go with this route or we can go with
18  this route, autologous versus cadaveric? How did
19  you describe that for a patient or did you make
20  that decision yourself? Did you pick one for the
21  patient and go one path?
22  A. There's not going to be one single right
23  answer to that question. Certain times, if we
24  have a patient who's morbidly obese, we're going
25  to say, here are the two options but you should go

Page 63

1  down the route of cadaveric because it's going to
2  be a very difficult surgery because you have
3  abdominal wall fat of ten inches.
4       Other patients who have had multiple
5  abdominal surgeries, we're going to say, here are
6  the two options but we should go down the
7  cadaveric because your tissues probably aren't
8  going to be very good. If they've had radiation,
9  it would be the same answer. We can do both or
10  either/or but it would be better if we go
11  cadaveric.
12       On an individual who was relatively
13  thin in otherwise good health who would have good
14  tissue if we harvested their own, then we say,
15  here's your choice; here are the pros and cons;
16  and then let the patient decide.
17       Usually they were more likely to go
18  down the cadaveric route, because it was easier,
19  faster, less pain. Others would say they didn't
20  want that. So, again, it was a discussion.
21  Sometimes it's more of a guided discussion based
22  upon the patient's risk factors. Other times it
23  was a completely open decision on their part.
24  Q. Well, let's get to 2002, 2003 time frame.
25  Was there a change in your practice in what

Page 64

1  products you used for surgical treatment of female
2  stress urinary incontinence?
3  A. There was a dramatic change when the SPARC
4  product, S-P-A-R-C, by AMS came out, which is a
5  suprapubic sling. TVT came out when I was a
6  resident in, what, '95, '96, around that time
7  frame. There was in the individuals I worked with
8  a tremendous amount of fear. There were reports
9  of death, unknown. And surgeons, urologists
10  typically did not feel comfortable doing from the
11  vagina up. So when SPARC came out, this was
12  mimicking what we did with the autologous
13  pubovaginal sling or the cadaveric. I mean, the
14  trocars go from the top down.
15       So I was one of the first in the
16  state -- this state, Minnesota -- to do one. And
17  we used specifically the AMS product. And then
18  with that it became an outpatient procedure, which
19  was almost unheard of in urology, and there was a
20  dramatic shift to doing the SPARC, so such that it
21  became almost 100 percent of what I did.
22  Q. Okay. And let me back up. I forgot to ask a
23  question that was spurred by some earlier
24  testimony.
25       When we were talking about -- and I

Page 65

1  think I have this correct so let me see if I have
2  this correct. A surgeon -- when we were talking
3  about a surgeon's obligations, a surgeon needs to
4  inform a patient of his or her experience
5  including complications associated with a product
6  before using on that patient. You agree with
7  that?
8  A. Correct.
9  Q. Okay. Why is it that that's important, the
10  surgeon's own experience versus somebody at
11  Hopkins or somewhere else?
12  A. The patient, from my opinion, needs to know
13  what is a realistic expectation when I am the
14  surgeon. They want -- and so if I quoted Hopkins
15  data, that's not me doing the operation. So I
16  feel that it's the surgeon's responsibility to
17  say, in my hands, this is the risk X, Y and Z.
18  This is the odds of success. This is the odds of
19  minimal success. This is the odds of failure.
20  Because I watch my data. Now, unfortunately most
21  surgeons don't have accesses to the resources I do
22  to be able to do that. It makes it much more
23  difficult. But that's my personal feel, that you
24  have to quote that.
25  Q. And is there -- can there be differences in

17 (Pages 62 - 65)

Page 66

1 the performance of a product in the hands of
2 different surgeons?
3 A. It depends upon the product. Some procedures
4 are highly complicated. Let's say like a hip
5 transplant, okay? That's very difficult to learn
6 and a lot of learning involved with it. Other
7 ones are simple. Catheters, you know, there's not
8 much difference. So it's going to depend upon the
9 product.
10       And there's the data out there that
11 high-volume surgeons at high-volume centers will
12 have good results, and that's in thyroid surgery,
13 prostate surgery, ortho surgery. It's across the
14 board. I've never seen it with incontinence
15 surgeries but other surgeries, yes.
16 Q. But let's talk specifically about surgical
17 treatment for female stress urinary incontinence.
18 Is it your opinion that there can be varying
19 degrees of success with respect to surgical
20 treatment of female stress urinary incontinence
21 from surgeon to surgeon to surgeon?
22 A. The only study that I know of that addresses
23 that would be Jennifer Anger's data out of
24 Cedars-Sinai, that looked at what has been
25 reported in complication various databases in the

Page 67

1 Medicare population. And the lower-volume
2 surgeon -- and it was specific on efficacy and
3 re-admittance to the hospital, lower-volume
4 surgeons had a higher risk than high-volume
5 surgeons and hence, it was that paper's
6 recommendations that a surgeon needs to quote
7 their results, not necessarily the expert's
8 results.
9 Q. And that has informed your informed consent
10 process as well, in addition to your just overall
11 opinions? But that paper is something that's, I
12 guess, meaningful to you?
13 A. Correct.
14 Q. It's a reliable authority, I guess, would be
15 my specific question, in your mind anyway?
16 A. Possibly. That study has not been reproduced
17 by anyone else. So any study that comes out, you
18 have to take with a grain of salt. It needs to be
19 reproduced by others. I have no reason to doubt
20 it. But once it's proven -- there's always going
21 to be initial studies that say one thing and then
22 you need the multiple studies to then back it up
23 or disprove it.
24 Q. All right. So beginning in 2002, you
25 start -- and correct me if my dates wrong but I

Page 68

1 was thinking this is what you said. Beginning in
2 the 2002-ish time frame, you start using the
3 top-down retropubic approach with the SPARC sling?
4 A. Correct. By AMS, yes. And it was in that
5 time frame, and I don't remember exactly when, and
6 it was a dramatic change in my practice.
7 Q. So describe for me the process that you went
8 through in deliberating whether to introduce the
9 SPARC sling in that surgical technique -- that
10 surgical procedure as an option for your patients?
11 What did you do to make sure that this was a safe
12 thing for your patients?
13 A. During that time frame, there was a large
14 push within urology to come up with an outpatient
15 sling. It was already in existence in GYN. GYNs
16 almost exclusively used TVT. The TVT was used
17 minimally within urology. So there was a desire
18 for an outpatient sling. AMS was the first one
19 that I know of that came out with one.
20       AMS is based here in Minnetonka,
21 close by here, so they have easy access to where I
22 work. And they presented their idea. I watched
23 the surgical videos on it. And it is
24 essentially -- it's a fairly simple procedure.
25 And, again, it mimics what we already did with the

Page 69

1 autologous sling or the cadaveric sling, except
2 you don't have to harvest any issues. So it was a
3 tremendously easier procedure to do.
4       And then I read whatever -- there
5 was no data out on it. I read the -- what the
6 company said, the IFUs, as they called them,
7 instructions for use, and watched surgical videos
8 and then did it. And then I also then -- at some
9 point in time I observed or came up here for
10 cadaveric labs with it, and I don't recall the
11 time frame with that.
12 Q. So prior to 2002 -- now, at this point in
13 time in 2002, just to kind of clarify because
14 you've drawn this distinction between gynecology
15 and urology. You're a urologist?
16 A. Yeah. A urologist trained in female urology,
17 female pelvic mesh and reconstructive surgery.
18 Q. Okay. It was your understanding that
19 gynecologists have been using outpatient surgical
20 procedures to treat female stress urinary
21 incontinence prior to 2002?
22 A. Correct. I mean the TVT came out in '96,
23 '97, thereabouts. Ulmsten was a gynecologist. It
24 came out -- and Ethicon was much more involved in
25 GYN than urology, and so it took off and went like

18 (Pages 66 - 69)

Page 70

1  crazy and very poorly accepted within urology
2  communities.
3       Now, that has somewhat changed now,
4  but that's a fair estimate.  And again, a rough
5  estimate that I heard back then it was like 90
6  percent of the TVTs done were done by
7  gynecologists, not urologists, so --
8  Q.  Do you have a view -- sorry.  I didn't mean
9  to interrupt you.
10 A.  No.  I was done.
11 Q.  Do you have a view as to why it was more
12 accepted in gynecology than urology -- the TVT
13 procedure?
14 A.  Well, it was initially introduced to GYN.
15 And so by the time it takes for papers to come
16 out, publications, it's going to take two or three
17 years.  And then there were the reports of three
18 complications, deaths, things from the trocar.
19 Urologists were very -- very comfortable, like
20 myself, of passing the trocars from top down.
21 Didn't like the idea of passing it from the bottom
22 up.  Didn't feel like we had as much control.
23 That may be surgically accurate or bias but it's
24 what it was.  So that's why it just took time,
25 rather than once the SPARC came out, then it was a

Page 71

1  huge adoption within urology, and then the TVT was
2  not needed in urology.
3  Q.  So beginning in 2002 in your practice -- and
4  now you've been -- you've been at this on your own
5  for a couple years by now -- were you having good
6  results with the cadaveric and autologous
7  pubovaginal slings?
8  A.  Yes.
9  Q.  Okay.  Why would you look to move away from
10 that success and try something that had no data?
11 A.  Patients were wanting outpatient minimally
12 invasive procedures.  The pubovaginal sling -- the
13 autologous requires a day or two in the hospital.
14 The cadaveric is a little bit less but still it's
15 an overnight stay in the hospital.  So there was a
16 desire to be able to provide a same efficacious,
17 fewer complications and outpatient procedure.
18 Q.  Yeah.  But I mean, this wasn't even -- you
19 said yourself that there was really no data on
20 this at the time that you started using it.  I
21 mean, wouldn't you want -- how did you satisfy
22 yourself that the use of this synthetic material
23 in a surgical procedure was safe for your
24 patients?
25 A.  The TVT and the AMS mesh, if you hold them up

Page 72

1  side by side, look identical.  There's still the
2  outer wrapping and everything.  And so what we
3  were told from AMS is, hey, it's working in the
4  TVT group, which we had papers out there they were
5  efficacious.  Ulmsten's papers showing it was
6  efficacious.  So saying why not try it.  There
7  were -- all these reports of mesh complications
8  had not been out yet.  We had not heard of them.
9  It was still early on.  So there was nothing
10 presented to us from AMS to say it's bad.  It was
11 all good.  And a lot of that relied upon the TVT
12 data that was out there.  In hindsight, I wish I
13 would have not gone down that route but I did.
14 Q.  Tell me about that.  You wish you hadn't
15 started using SPARC?
16 A.  Correct.  All meshes, except for highly
17 select cases, which are pretty rare now.
18 Q.  So I want to speak specifically to the SPARC
19 sling and its use in your practice.
20      How many patients have you implanted
21 with a SPARC sling?
22 A.  It's a good question.  I don't know exactly
23 because when the Mentor product -- the ObTape came
24 out, I stopped using it completely and then
25 started using it again but still had the same

Page 73

1  problems with it because we had problems with --
2  the adapter was large and was tearing the bladder.
3  So a certain percentage of patients, roughly 5 to
4  10 percent, were having torn bladders.  So that's
5  the whole reason why when ObTape came out I wanted
6  to swap away from it.  So then I used it for a
7  while until Coloplast came out with their Aris.
8       So I can't tell you a number.  It
9  was probably a couple hundred of the SPARCs, but
10 that's really a rough estimate because it's stop,
11 start and...
12 Q.  You've never undertaken to go back and look
13 at your records to see how many you've implanted?
14 A.  No.
15 Q.  Have you undertaken to go back and see how
16 many experienced complications with SPARC?
17 A.  No.  The complications I was referring to
18 were intra-op complications.  I was unaware at the
19 time of long-term issues, so we didn't create a
20 patient registry like I have now.
21 Q.  You have a patient registry now?
22 A.  Well, for the slings that we do -- patient --
23 it's a glorified name for just a database where we
24 keep everybody's name and the procedure we do,
25 correct.  But that's all -- there is no -- I have

19 (Pages 70 - 73)

Page 74

1 not done a mesh sling in -- since the middle of
2 2013, roughly. Roughly three years.
3 Q. But you still have the records from your
4 SPARC patients, I assume?
5 A. That's correct.
6 Q. You could do a retro perspective review of
7 those if you wanted to?
8 A. Correct.
9 Q. You just haven't done that, for whatever
10 reason. Obviously you're a busy man.
11 A. No, we haven't done it. It's expensive. And
12 since I don't use the product anymore, I haven't
13 thought of going back and doing it.
14 Q. So going back to sort of the decision to use
15 the synthetic mesh SPARC sling in your practice, I
16 want to make sure that I understand what you did
17 to satisfy yourself that at that time it was a
18 safe product to implant in women.
19 A. What did I do? I'm sorry. What was the
20 question?
21 Q. Yeah. What did you do to satisfy yourself --
22 as a physician who's supposed to inform patients
23 of risks and complications before using a product
24 in a surgery, what did you do to satisfy yourself
25 when a patient came to see you that the synthetic

Page 75

1 mesh, the SPARC sling, was going to be safe for
2 them?
3 A. Number one, I -- the big issue of surgical
4 understanding, this was just a modification of
5 what we already did, so it was -- it was simpler.
6 So that aspect -- we already passed the trocars
7 behind the retropubic down to your finger into the
8 vagina. You already do that with the pubovaginal
9 slings. So there's less dissection, so that I was
10 not concerned about at all. I watched -- AMS
11 provided surgical videos to confirm that. And
12 then I read the IFU from AMS on their -- on the
13 mesh sling. And they have it a little different.
14 They have a tensioning Prolene suture that runs
15 the length of it of how to tension this
16 appropriately, and that was the only difference.
17 Q. And I understand that's sort of more focused
18 on the surgical procedure. But before you
19 implanted the synthetic mesh into one of your
20 patients who was coming to you, relying on you to
21 tell them about the risks associated with the
22 surgery, I just want to make sure I understand:
23 The only thing you did to satisfy yourself that
24 this synthetic mesh was going to be safe for your
25 patients was to read the IFU?

Page 76

1 A. The IFU and then the understanding of what I
2 observed at the various different meetings on the
3 TVT presentations because I'm a member of the
4 International Continence Society and SUFU, which
5 is Society of Urodynamics and Female Urology. And
6 so the various different presentations I've seen
7 over the years on the TVT product line -- or at
8 that point it was just TVT.
9 Q. So you were able to -- you in your mind when
10 you were thinking about the safety of this
11 synthetic mesh for your patients in the 2002 time
12 frame, you in your mind said, well, this mesh
13 looks a lot -- this AMS mesh called SPARC looks a
14 lot like the TVT mesh and because I've seen good
15 results reported with TVT in the conferences that
16 I've attended, I feel comfortable that this mesh
17 is safe?
18 A. Well, that's one of the components of that.
19 Q. Okay.
20 A. Okay? Definitely when you hold it up, it
21 looks identical except for this suture that goes
22 through the AMS one. The outer plastic sheath
23 looks identical. The trocars are different that
24 you pass because it's a different route --
25 semi-different. So that, with my understanding of

Page 77

1 the surgical procedure, which is probably the
2 largest component, and then what I heard at
3 meetings and what's available in the short-term
4 studies in the literature.
5 Q. So there were some short-term studies in the
6 literature about SPARC that you were aware of?
7 A. No. There was only literature that I -- that
8 I know of, there's only literature that was in --
9 for TVT.
10 Q. And just so I make sure that I capture, you
11 know, the things that you relied upon to make sure
12 that SPARC was safe for your patients when you
13 started using it in your practice, you relied upon
14 the company's instructions-for-use document that
15 listed the risks associated with the product; is
16 that correct?
17 A. Correct.
18 Q. You relied upon information that you obtained
19 when you went to International Continence Society
20 and SUFU conferences when other surgeons reported
21 on their experience with the TVT product, correct?
22 A. Correct. And also what I was told by the
23 company reps too because they were involved in the
24 early days with these procedures.
25 Q. And then information -- a third area is the

20 (Pages 74 - 77)

Page 78

1  information told to you by the company reps, the
2  AMS reps, about the product itself, correct?
3  A. Correct.
4  Q. And then the fourth thing would be the
5  literature that you were familiar with related to
6  the safety of TVT in short-term studies?
7  A. Safety and efficacy, yeah.
8  Q. And am I missing any other categories of
9  information? Did you -- did you talk personally
10 to other surgeons who had used the SPARC product
11 and discussed with them the concept of is this
12 mesh safe to implant in patients?
13 A. At that point in time, there were nobody
14 to -- there was no one to talk to who had any
15 experience in it because it was brand-new.
16        I believe David Staskin has the
17 patent on that one. I spoke to him after I
18 started but not prior to. There was nobody who
19 had any numbers to speak of.
20 Q. Sure. And were you comfortable that the --
21 when you started using SPARC in your practice,
22 were you comfortable, when you represented to the
23 patients that came to you, that the synthetic mesh
24 was safe for them?
25 A. At that point in time, from all that I knew

Page 79

1  and all that I had been told, I thought it was.
2  My opinion has changed on that, though.
3  Q. And at that time when you told patients about
4  the safety of the mesh -- the SPARC mesh, why was
5  it important to you to look at the short-term
6  studies of TVT that were available? I mean,
7  what -- how did that inform your opinion that it
8  was safe?
9  A. Well, we were looking at the efficacy.
10 Safety studies -- well, there is no safety study
11 with endpoint -- with TVT at all now. We were
12 mainly at that point in time looking at efficacy.
13 We knew of the complications of death and vascular
14 puncture with the TVT, but this was a different
15 route. So we're going from top down. We have
16 more control. So we didn't think that was going
17 to be an issue. So that's -- we were looking at
18 that literature. It's not perfect. That's all we
19 had.
20 Q. But you were -- you were -- let me make sure.
21 I'm assuming you didn't mean to say this. You
22 were concerned about the safety of the mesh inside
23 of a woman's body as well, weren't you?
24 A. At that point in time, from everything we had
25 talked about with -- you know, as far as going

Page 80

1  around to the Ethicon -- or it's actually Johnson
2  & Johnson tables at our meetings, there was
3  nothing about efficacy, nothing about degradation,
4  nothing about that. We knew an occasional story
5  of vaginal extrusion would happen. But safety of
6  the mesh was not an issue we even considered. I
7  would talk to them about that. Say, what are the
8  issues? And they said, it's good; it's inert;
9  it's great; it's safe. And I trusted them.
10 Q. But you cared about the safety of the mesh at
11 that point in time?
12 A. Yeah. We'll be very clear. That's a very
13 good point. By all means I wanted to put in a
14 safe product in the individual, but that
15 information was not provided to me. So I never
16 would have put it in had I known what I know now.
17        But yeah, safety of the product was
18 a concern. But what I learned in reading the
19 inserts is that it's an inert product; it's safe.
20 Q. And you satisfied yourself, at least at the
21 time that you implanted SPARC into patients, that
22 the mesh itself was safe for patients?
23 A. It was -- I have to -- you have to compare
24 that to my fundamental knowledge at the time of
25 the autologous and cadaveric slings and then the

Page 81

1  ProteGen sling. ProteGen came out into the
2  mid-'nineties. It was a polyester. Horrible
3  problems happened with that. This was not that
4  ProteGen sling. So this was new and I believed it
5  would be safe.
6  Q. When you started using SPARC in your
7  practice, did you inform the patients who were the
8  first patients to receive it that there was very
9  little long-term safety studies related to SPARC?
10 A. Yes. I don't know when or how my consent
11 changed over the years. Initially it was -- and
12 we have to be honest with them: This is my first
13 time I've ever done this. However, I've done
14 other types of procedures that are quite similar
15 to this. Here is what we're given from the
16 company. Here's a pamphlet from the company.
17 Here's what they say.
18        And then over the years as I did
19 more and more, my consent would change. I'd no
20 longer tell them that they were the first patient,
21 obviously. And we'd say, here's the results on
22 our first 50 patients, here's the results on our
23 first 100 patients.
24        So the consent and my results would
25 evolve over time. But by all means, even now,

21 (Pages 78 - 81)

Page 82

1  which is pretty rare for me to do a first-time
2  procedure, except in 2013 I did one, we're telling
3  them, you're the first one, you're the second one,
4  you're the third one, and here's what happened
5  with the first two, that type of thing.
6  Q. So when you first started doing the SPARC
7  procedure, you did inform patients -- you informed
8  patients that there were no long-term safety
9  studies involving the SPARC sling?
10 A. I don't recall using those exact words.
11 Again, safety pertaining to mesh was a concept
12 that evolved later when we started seeing
13 complications and learning about degradation and
14 mesh contraction. At that point in time I was
15 oblivious that those issues happened.
16        So I don't recall if I told them
17 there are no long-term. I probably told them,
18 much more likely, is we have no long-term
19 efficacious studies with the SPARC. We do have it
20 with TVT, which were relatively short-term still
21 at that point in time. But I highly doubt I told
22 them safety issues with the mesh. I would tell
23 them issues as far as the surgical procedure
24 because that's different.
25 Q. So when you first started using SPARC, you

Page 83

1  would indicate that there were no long-term
2  efficacy studies associated with the mesh,
3  correct?
4  A. Correct. Again, I can't recall word for word
5  what I said way back then, but I would have to
6  say, this is a new procedure. Again, as far as I
7  know, I was the first in the state to do one, and
8  so there just wasn't data out there yet.
9  Q. And you would also inform patients that there
10 were -- that this was a newer product and
11 procedure for you yourself?
12 A. Correct. That was my routine then and my
13 routine now.
14 Q. Now, why would you tell a patient that -- you
15 know, let me just start with the first point. You
16 know, why would it matter to somebody that there
17 were no long-term studies, even if it's efficacy,
18 related to the mesh? Why would that be an
19 important fact to tell a patient during the
20 informed consent process?
21 A. Because we're doing a quality of life
22 procedure. Again, it's different than if there's
23 a heart issue where they're going to die. But
24 this is a quality of life.
25        There is another option available,

Page 84

1  the traditional pubovaginal slings which we have
2  long-term data on, and so I'm saying this is new
3  territory. We don't -- because all patients want
4  to know is how long will this last. That's the
5  biggest question they want to know. How much will
6  it hurt. How long will this thing last. That's
7  their questions. So that's when we'd say there is
8  no long-term data on it say.
9  Q. So you think that's an important fact for a
10 doctor to tell a physician [sic] if that's true as
11 part of a long -- as part of an informed consent
12 process?
13 A. Just for clarification. You said doctor asks
14 physician.
15 Q. Sorry. Let me strike that. I have the
16 question in my mind sometimes and it doesn't come
17 out as I've framed it in my brain.
18 A. I understand.
19 Q. So I appreciate that clarification.
20        You would agree that if the fact is
21 true that there are no long-term studies related
22 to a product to be used in a surgical procedure
23 for stress urinary incontinence, that that fact
24 ought to be told by the surgeon to the patient?
25 A. Yes. You need -- if there is data out -- I

Page 85

1  have been presented by companies with data saying
2  hey, there's this study from Europe or whatever.
3  I said -- what I'll tell them is there's a
4  European study. This is what the results of
5  those. With me, I don't know what my long-term
6  results are. You're the first patient; you're the
7  second patient. So I think it is important to be
8  transparent with the patient.
9  Q. And transparent about the fact that this is a
10 new product or new procedure, right?
11 A. Correct.
12 Q. Because the patient may decide, hey, give me
13 the thing that's proven; I don't want to try
14 something new, correct?
15 A. That can happen, yes.
16 Q. Or the patient may say, I'm willing to try
17 something new. It sounds like I'm -- my -- the
18 surgeries and the recovery is going to be better
19 and that's more important to me than having some
20 long-term randomized control trial?
21 A. More often than not, in my personal
22 experience, the patient is concerned about the
23 short-term issues. And they like the idea, and I
24 think this is ignorant, of something new is
25 better. And so there will be a tendency for a

22 (Pages 82 - 85)

Page 86

1 patient to want to go for newest, latest thing
2 thinking that's better.
3          So the patient's opinion about what
4 they want is important to me, but I also have to
5 serve as somewhat of a parent in saying, "yes,
6 but", so I'll explain it.
7 Q. And so do you feel that the people who
8 received the SPARC sling in a surgery under your
9 care received informed consent?
10 A. They received an inadequate informed consent.
11 Q. Okay. And --
12 A. I'm sorry. I know you -- I paused.
13 Q. I didn't mean to interrupt.
14 A. I gave them the best information that I knew
15 at that point in time. Now that informed consent
16 is insufficient.
17 Q. Now, you still have the contact information
18 for those patients, or at least you have data from
19 medical records, correct?
20 A. The data would be -- I would have to submit a
21 study, IRB, for it and pay for all procedures like
22 that to be retrieved, which there -- another
23 individual, not in my department, has done that
24 but I have not personally done.
25 Q. Who is that in your personal?

Page 87

1 A. That is with the GYN department. My name is
2 on the paper and they're looking at all sling
3 procedures performed at my institution going back
4 however many years. It's roughly, I don't know,
5 it's like 2- or 3,000. That data is in the
6 process of being worked on, but I am not
7 personally one conducting that study.
8 Q. Who's the lead person on that study?
9 A. Dr. Linder, L-I-N-D-E-R, in the GYN
10 department. My name is like the fifth author or
11 something, which doesn't mean a whole lot.
12 Q. When is that set for publication?
13 A. It's still being in the process of gathered,
14 so it's -- it's -- I don't even think there's a
15 manuscript ready.
16 Q. But with respect to the patients -- I mean,
17 you now believe that patients does not receive
18 informed consent about the SPARC sling, just
19 knowing what you know now. What have you done to
20 tell the patients who received the SPARC sling
21 about the new information that you have available
22 related to its safety?
23 A. When the patients come in, we then inform
24 them, because they're usually -- especially in
25 2011 when the FDA warnings came out, a large

Page 88

1 number came in. We would examine them, check them
2 out and say, yes, there are long-term issues as
3 far as degradation, contraction, pain. If you're
4 not having a problem at this point in time, we
5 don't do anything.
6 Q. And do you -- have you seen all of your
7 patients that received the SPARC sling --
8 A. No.
9 Q. -- back?
10 A. No, I have not.
11 Q. You haven't done any systematic notice to
12 patients who received the SPARC sling under your
13 care to notify them of new information that you
14 believe exists to suggest they weren't provided
15 informed consent, have you?
16 A. That is correct. I have not.
17 Q. Do you have any plans to do that?
18 A. No.
19 Q. Why not?
20 A. The main reason is going to be it's a very
21 expensive endeavor to do that, and all of our
22 patients have our contact information. If they
23 experience any complications, they know to call us
24 back, period. They have local care if there's
25 issues. So it's multi-factorial.

Page 89

1 Q. Don't you think that -- I mean, wouldn't it
2 be important to notify all these patients who
3 received the SPARC sling that they've got a
4 product inside of them that you now believe is not
5 safe for them and you don't use?
6 A. Well, at the time we were doing this, you
7 know, there was nothing in the IFU to tell me I've
8 got to follow these patients lifelong. So it was
9 never on our radar. That's why we didn't keep any
10 lists of these patients. Now I do.
11          And so I don't know. I would like
12 industry to help me out because it's a very
13 expensive process to do that. Industry got paid
14 for this. Industry didn't tell me everything.
15 And so I'd like industry to help me out contacting
16 all these patients.
17 Q. Well, I mean, have you even tried?
18 A. I've talked to the various different reps.
19 I've explained with the reps, specifically with
20 Mentor and Chris Sellwood, my extreme
21 disappointment, and you don't get anywhere with
22 that.
23 Q. Have you requested that the Mayo Clinic
24 assist you in notifying your patients about your
25 views on the SPARC sling for those patients that

23 (Pages 86 - 89)

Page 90

1 received that particular mesh?
2 A. I have talked with the legal department about
3 my issues as far as the mesh sling. They drafted
4 up a letter that got sent around to all hospitals
5 owned by Mayo, but we have not specifically gone
6 down the issue of what to do with each individual
7 patient.
8 Q. So there was a letter that was sent to
9 affiliated Mayo hospitals?
10 A. Correct. That was back in 2011. And it was
11 a generic, pertaining to all meshes and basically
12 stating that your informed consent needs to be
13 incredibly thorough, and then we printed off what
14 was published by -- I forget which society. It
15 wasn't the AUA. It was one of the others. IU --
16 not IUTA. I don't recall -- of what a mesh
17 informed consent should be and that you cannot
18 just have a standard informed consent. You need a
19 very specific one with meshes.
20 Q. And is that something that's accessible to
21 you --
22 A. No.
23 Q. -- what was sent?
24 A. No, I never sent that. That was a meeting
25 with the legal department. They drafted it. They

Page 91

1 did something -- they sent it out.
2 Q. Did you -- did you, I guess, provide input
3 into it?
4 A. Yeah. Well, I was one of eight who did. And
5 then there was a consensus letter that was then
6 sent, but my name was not attached to that letter.
7 Q. Who were the folks who provided input, other
8 than yourself?
9 A. The GYN department and urology department,
10 the individuals involved in doing this. It was
11 not a "you should not do this", but you just need
12 to consent your patients very, very well,
13 statement, basically.
14 Q. Did you agree with the letter that was sent?
15 A. Yeah. It was -- it was generic. It was just
16 saying, be careful. And it was just following
17 what the -- whichever GYN society came out with
18 their consent. It was just following that, so it
19 was nothing spectacular beyond that.
20 Q. Now, you do not use synthetic mesh in your
21 practice and haven't used it since 2013; is that
22 right?
23 A. For incontinence procedures. I have done --
24 as I recall, since 2013, there had been one
25 patient we did, and I forget why, but it was a

Page 92

1 unique patient.
2 Q. Are there other members in the Mayo Clinic
3 gynecological or urological departments that do
4 use synthetic meshes today?
5 A. The other female urologists in my department
6 chose never to implant them except for a rare
7 situation. So I don't know how many she's done.
8 Maybe 20 over the years. She chose not to because
9 of her -- she was during the ProteGen era.
10        The GYNs, I cannot speak to how many
11 they do, but they still do the mesh slings.
12 Usually it's the Obtryx -- not usually. It is the
13 Obtryx, I should say.
14 Q. So the Obtryx is a Boston Scientific product
15 for the transobturator technique, correct?
16 A. I'm not sure. It's not one I use, but that
17 sounds right. I have no reason to doubt that
18 being wrong.
19 Q. What gynecologists at the Mayo Clinic do you
20 know use Obtryx?
21 A. I only know of one who does, Dr. Klingele. I
22 don't know if the other ones do or not, because
23 our practices are not being shared, so it's just
24 if we happen to have a combined case and I happen
25 to see it on there.

Page 93

1 Q. So let me ask you a little bit about that. I
2 mean, there's -- you've got one physician at the
3 Mayo Clinic, a gynecologist, who uses synthetic
4 mesh as part of his practice to treat female
5 stress urinary incontinence and you've got, you
6 know, Dr. Elliott on the other side in the
7 urologic department that doesn't use it. And the
8 reason you don't use synthetic mesh is because you
9 don't believe that it's safe for patients, right?
10 A. Correct. There's two of us in urology that
11 don't.
12 Q. That don't.
13 A. The other one chose never to from the very
14 beginning and was mocked early on and now the
15 pendulum has swung back toward her favor, which
16 I've subsequently had to apologize to her about.
17 So I did and then chose not to.
18        But yes, the GYNs. It's not just
19 that ones. It's the other ones too.
20 Q. Use mesh?
21 A. Correct.
22 Q. So how can that be? How can you have
23 physicians who are still implanting synthetic mesh
24 into Mayo Clinic patients and then other very
25 accomplished surgeons believing that that same

24 (Pages 90 - 93)

Page 94

1  product is unsafe?
2  A.  First of all, we're talking about a different
3  product, the Obtryx, which I have done no research
4  on, but let's back up.  The blunt, honest answer
5  with that is once I got involved in this
6  litigation, have signed confidentiality
7  agreements, I've seen what's gone on behind closed
8  doors, whether it be with Ethicon and Mentor and
9  what they knew prior to release of the product.
10  That I cannot tell them.  I cannot tell anybody at
11  Mayo and I have not told.  I regard that as a very
12  strict, and understandably so, issue.  So they
13  don't know what I know, is my basic answer.
14          And they've dealt with the
15  complications.  They've dealt with some of my
16  complications of meshes so they know them, but
17  they don't know the full extent.
18  Q.  What is it that you would disclose to them?
19  I mean, these documents are all non-confidential.
20  They've been admitted at trials, and -- there's
21  been three ObTape trials.  There's been, you know,
22  various unveilings of documents along the way.  I
23  mean, what is it that you can't tell them?
24          MR. KREIS:  I'll object just to the
25  extent that this doctor doesn't know what is or

Page 95

1  isn't confidential.  In fact, many of the
2  documents that we had in our recent punitive
3  damage proffer were not part of early or current
4  litigation trial, so those are still under
5  confidentiality.  So we haven't had a conversation
6  with Mr. Elliott in terms of what is releasable or
7  not.  But if you'd like him to -- us to share that
8  information with him, then we certainly can.
9  BY MR. LEWIS:
10  Q.  Well, let me get to this point, I guess,
11  Dr. Elliott.  I mean, we're talking about patient
12  safety -- Mayo Clinic patient safety, okay?
13  That's the topic right now.  And you are aware
14  that physicians at the Mayo Clinic, gynecologists,
15  are implanting meshes in Mayo Clinic patients,
16  right, and you believe in your mind that that
17  product is unsafe -- that those mesh products, all
18  of them, because you don't use any of them, are
19  unsafe, right?
20  A.  Well, not all meshes are created equal, like
21  Mentor or TVT or Aris.  Those are different --
22  they have polypropylene, which has its own
23  inherent problems, but there's different levels of
24  complications with those.  I do not know and have
25  not been involved in any of the litigation with

Page 96

1  Obtryx.  I don't know any of the internal data.
2          I am also exquisitely sensitive or
3  fearful, let's put it that way, to disclose
4  anything that I've learned because I don't know
5  what is and is not.  I can just see, if I say
6  something, a lawyer freaking out, and I don't want
7  that so that has not been discussed.
8          Yes, patient confidentiality -- or
9  patient safety is very, very important, but also
10  like I can't cross that line.
11  Q.  But I mean this is -- you're not involved in
12  any Obtryx litigation, are you?
13  A.  Correct.  And I don't know of any of the
14  Obtryx internal data so I can't disclose anything
15  there.
16  Q.  There's nothing that you know about Obtryx
17  that's confidential, right?
18  A.  That is correct.
19  Q.  You know that Obtryx is one of these
20  macroporous woven meshes, just like TVT, just like
21  SPARC?  I mean, they're all the same.
22  A.  No, they're not all the same, and I've not
23  done any research on it, so I can't say.  Again, I
24  don't go where I don't have information.
25  Q.  I mean, do you believe that there are certain

Page 97

1  synthetic meshes that are safe for use in the
2  surgical treatment of female stress urinary
3  incontinence?
4  A.  I think there are certain mesh slings that
5  are safer.  There are none that are inert.
6  Q.  Which ones are safer?
7  A.  I think in my hands, the Aris SP or the Aris
8  product, whether it be transobturator or
9  suprapubic, was safer.  And in my experience,
10  because the edges are this woven, non-welded, it
11  did not stretch.  The pore sizes remained
12  relatively stable during implantation and I felt
13  it was a safer product.
14          The Monarc and the SPARC I stopped
15  using specifically because of safety because the
16  adapters were bulky, tearing the bladder.  The
17  mesh was springy.  It sawed through the tissues.
18  It would roll.  All those type of things, so I
19  stopped using it.  The GYN department chose never
20  to use that.  They went down a different route,
21  and so they used the Obtryx.  So, again, I have
22  no -- I've never seen one.  I've never even seen
23  the box or looked into it.  That's why I'm not
24  going to venture into that territory and let them
25  choose -- or tell them what to do.

25 (Pages 94 - 97)

Page 98

1  Q. Sure. But I mean -- let me back up. You
2  care about patient safety, don't you?
3  A. Yes, I do. And the ones that I can
4  influence, which are my patients.
5  Q. But I assume you would care about the safety
6  of all Mayo Clinic patients, wouldn't you?
7  A. Yes, I do. And "all" cardiac patients and I
8  don't get involved in the cardiac care. This is a
9  different department doing implants with highly
10 qualified surgeons. We talk about mesh and mesh
11 complications and what to do but, again, I'm not
12 going to tell them what to do.
13 Q. And what interaction is there between the
14 uros and gynos at the Mayo Clinic specific to
15 synthetic mesh?
16 A. Oh, it will just be casual conversations in
17 between cases. Nothing organized.
18 Q. Has there ever been any -- other than the
19 letter that was sent by the legal department, has
20 there ever been any discussion -- internal
21 discussion at the Mayo Clinic about the safety of
22 synthetic meshes and whether there should be a
23 policy change at the Mayo Clinic?
24 A. No. It was only with Mentor years ago that
25 happened, an ObTape product, because the GYNs took

Page 99

1  care of my patients which was subsequently written
2  up.
3         But the other ones, no. It --
4  except for the pelvic organ prolapse kits where
5  everybody was on the same page, that they should
6  never be used and never were used in my
7  institution.
8  Q. So let's talk about the pelvic organ prolapse
9  kits for a second. How did it come about that
10 there was a policy decision not to use those kits
11 at the Mayo Clinic?
12 A. There was not a coordinated decision: Let's
13 sit down, let's do this. All of us -- all six or
14 seven independently decided we're not going to
15 take care of this -- or we're not going to implant
16 these.
17        I personally, when that first
18 happened, didn't see the reason for it. My
19 repairs were working. I didn't see the reason to
20 use all the extra excess money for that. GYNs had
21 their other reasons.
22        And then we started seeing the
23 complications come in around 2007 or '8, and then
24 we started talking about it because there was a
25 case here and there. And then the -- then there

Page 100

1  was never a formal policy: We do not implant
2  these. It was all just, we weren't implanting
3  them anyway.
4  Q. But was there a meeting or a discussion or
5  something that happened where everybody sat in a
6  room and sort of talked about it?
7  A. No. There was a decision made by the legal
8  department to send out letters to all institutions
9  owned by Mayo concerning the consent.
10 Q. And that was that consensus document we
11 talked about?
12 A. Correct.
13 Q. With ObTape, what was it you -- you indicated
14 that there was some sort of decision not to use
15 ObTape --
16 A. Yeah.
17 Q. -- at the Mayo Clinic group?
18 A. I was the only one using it -- I was the
19 first one to use it in the state and possibly the
20 first one to use it in the United States. That's
21 debatable. So the GYNs were not doing
22 transobturator at all. That was the first one to
23 come out transobturator. So I was doing it. I
24 did 105.
25        And then unbeknownst to me, some of

Page 101

1  my complications that I didn't even know about
2  were going to the GYN department, that they would
3  either inform me of or wrote up papers, or I found
4  out about one recently because I had to get -- was
5  going to give a deposition, along with the GYNs,
6  about an ObTape complication. This was about six
7  or eight months ago. It ended up settling out of
8  court.
9        I found out about it. I looked up
10 the patient's name, realized that the GYN
11 department had operated on her and then the GYNs
12 had written it up, and that's the Occhino paper,
13 O-C-C-H-I-N-O. And that's my patient and I didn't
14 even know about that until, again, six, eight
15 months ago.
16 Q. But with respect -- and is that the only
17 paper that you're aware of that's been written up
18 on outcomes for your ObTape patients?
19 A. Correct. Now -- now, again, there's another
20 Mayo paper, Bobbolo, Bobbalu (phonetic), something
21 like that, which was an ObTape. I don't know
22 where that one came from. I don't know if that's
23 my patient or not. I mean, there's a decent
24 chance it was mine because I was the largest
25 implanter here, but I can't guarantee that. The

26 (Pages 98 - 101)

Page 102

1 only one I know of is the Occhino paper.
2 Q. That's your patient?
3 A. That is my patient, which that paper came out
4 in like 2010 and I didn't know about it until this
5 year or late last year.
6 Q. That wasn't shared with you by the
7 gynecologists that published it?
8 A. No.
9 Q. So the decision to use or not use ObTape, you
10 were the only one who ever used it?
11 A. Correct. And then they wanted to know what
12 my results were -- this is way back in 2004 --
13 because they were incredibly interested in a
14 transobturator sling because it didn't exist at
15 that point in time. TVT-O had not come out yet,
16 and they wanted to know my results. And my
17 opinion about it changed dramatically from -- the
18 initial description of the surgery was I was
19 thrilled with it, and then as time went on, that
20 year to a year and a half when I started having
21 the complications roll in. So that's when there
22 was an informal discussion of saying, I've stopped
23 using it.
24 Q. And that was your personal decision?
25 A. Correct.

Page 103

1 Q. No one else was using ObTape at that time?
2 A. There were a couple chief residents using
3 them. One who had three erosions out of five
4 patients, and he came to me after he did my
5 service, wanting to know what was going on.
6 Q. What doctor was that?
7 A. Dr. Dora, D-O-R-A.
8 Q. All right. Anybody else?
9 A. Not that I know of.
10 Q. Have you ever gone back and looked at what
11 the outcomes were for your 105 patients?
12 A. Yes. As far as I know -- and this was
13 tabulated in roughly 2007 and this is in my report
14 somewhere -- of the 105 patients that I did, I had
15 nine vaginal extrusions. Then in 2014, I believe,
16 seven years after implant -- or eight years after
17 implant -- and, again, I'm not sure; maybe it's
18 2014 or 2012 -- another one of my patients came
19 back with a vaginal extrusion. I had three
20 buttock abscesses, requiring emergency surgery.
21 And I know -- I talked to two physicians -- these
22 are not my experience -- one in Arizona and one in
23 Pittsburgh who called me up, of their bizarre
24 findings, because we had never experienced this
25 before. When the patient called me up from

Page 104

1 Oregon -- that was my implant -- complaining of
2 buttock pain, I'd never heard it before. I told
3 her just to go to your local doctor because I
4 thought it was something else. She decided to
5 come fly to us. We got a film and it showed this
6 huge abscess in the gluteus maximus, and we
7 immediately took her to surgery.
8 Q. So of the 105 patients that you implanted
9 with ObTape, you're aware of ten extrusions?
10 A. That's correct. I am aware of ten, so I
11 don't know if there's more because the majority of
12 patients I don't see back, so the number is not
13 going to be less than that.
14 Q. Sure. So you're aware of ten. And of those
15 ten extrusions, there were three abscesses?
16 A. The three abscesses were separate.
17 Q. On top of the extrusion?
18 A. On top of it.
19 Q. So there were -- so there were abscesses --
20 so you count the extrusions as non-abscess
21 extrusions?
22 A. Well, no. Actually -- that's a very good
23 point. I don't recall if those had extrusion or
24 not -- those three buttock abscesses. I don't
25 recall that, and so I don't know if I've included

Page 105

1 those in the ten known extrusions or not. So we
2 can either say it is or isn't. I just don't know.
3 I didn't tabulate that that accurately.
4 And that was all informed -- I told
5 Chris Sellwood all of those because he was very
6 interested in our results and early on we were
7 exchanging e-mails about it, and then -- they knew
8 all about that. And then I think when we had our
9 third -- second or third buttock abscess, I said,
10 that's it; I'm never using this again.
11 Q. Okay. Now, do you still -- do you still
12 maintain an e-mail address with Mayo Clinic?
13 A. Yes.
14 Q. And is it -- have you ever gone back and
15 searched for e-mails that reflect communications
16 with Mentor about ObTape?
17 A. I've never done that. And the e-mails get
18 deleted after a certain period of time. They get
19 stored and then deleted, so I don't have access to
20 them.
21 Q. What period of time would that be?
22 A. That's a good question. I have no idea. But
23 they do it for storage, saving space. We have the
24 ability to archive them, but you have to do that
25 proactively and I didn't do that.

27 (Pages 102 - 105)

Page 106

1  Q.  Did you ever create a folder that was a
2  Mentor folder or ObTape folder?
3  A.  No.
4  Q.  Is your e-mail address still
5  Elliott.Daniel@mayo.edu?
6  A.  E-D-U.
7  Q.  E-D-U?
8  A.  Correct.
9       Now, can we go off the record for
10 just a second.
11 Q.  Yes.
12      (Off the record from 11:12 a.m.
13 until 11:13 a.m.)
14      MR. LEWIS:  We just had a discussion
15 off the record.  We agreed to a designation of
16 Dr. Elliott's e-mail address as confidential for
17 purposes of the deposition.
18 BY MR. LEWIS:
19 Q.  All right.  Let me try to map out this
20 timeline again.
21      So SPARC in 2002, 2003.
22      When did you first start using --
23 when did you introduce ObTape to your practice?
24 A.  It was in the fall of 2003, and I think in my
25 report somewhere I give you a semi accurate date.

Page 107

1  Maybe I don't.  Oh, approximately October 1st of
2  2003.
3  Q.  Okay.
4  A.  That's a guess, but it's fairly accurate.
5  Q.  So between 2002 and when you started using
6  ObTape in 2003, what percentage of your practice
7  would have been SPARC?
8  A.  Almost 100 percent.  There would be
9  exceptions for complicated reconstruction or
10 redo -- redo surgeries, but otherwise it would
11 have been SPARC.
12 Q.  So in that time frame, you almost completely
13 went away from cadaveric pubovaginal slings and
14 autologous pubovaginal slings?
15 A.  That is correct.
16 Q.  Why did you make the switch from SPARC to
17 ObTape?
18 A.  Two things.  Number one, it's a different
19 procedure going through the obturator foramen,
20 which was revolutionary at the time.
21      But the biggest driving reason is
22 the complications we had with SPARC.  As I
23 mentioned, the connectors -- you were having these
24 bladder tears.  We were -- roughly 5 percent of
25 our patients, we were tearing the bladder.  Had to

Page 108

1  have -- imagine with catheters, because you pull
2  this big connector through.  Even after we did a
3  cystoscopy, no bladder injury.  You pull a
4  connector through and it's so bulky, it just tears
5  through the fragile bladder.  It was an
6  unacceptable complication because the mesh was
7  exposed, everything.
8       Number two, tensioning of the SPARC.
9  It rolls.  It curls.  Just like a taco, roll up
10 like that.  I'm just -- roll up like a taco.  And
11 we had trouble tensioning it, and then you would
12 have this band of mesh in there, so I did not like
13 it.  And we were searching for an alternative and
14 that's when I was presented by Mr. Sellwood of the
15 ObTape.  So it just happened to be we were
16 probably going to be switching back to the
17 pubovaginal sling and then coincidentally, this
18 ObTape -- the transobturator route was presented
19 to me.
20 Q.  So at the time that the ObTape option came to
21 you in 2003, you were looking to move away from
22 SPARC; is that right?
23 A.  Correct, yes.
24 Q.  And chiefly due to intraoperative
25 complications and difficulties with the surgery.

Page 109

1  Is that fair to say?
2  A.  That's -- that's correct, yes.  We were
3  wanting -- we wanted an outpatient procedure
4  without those complications, so we were looking
5  for something else.
6  Q.  So what did you do to satisfy yourself -- in
7  the fall of 2003 when you decided to use ObTape in
8  your practice, what did you do to satisfy yourself
9  that ObTape was a safe product for your patients?
10 A.  Very good, because I remember this well
11 because, again, I was concerned about the
12 ProteGen, so I talked -- all this conversation was
13 through Mr. Sellwood.  And the porosity of this
14 thing looked thick.  He said, no, there's a study,
15 9,000, 10,000 patients from Europe showing it's
16 working; it's great.  So I said, okay, that's
17 good.
18      He showed me the IFU, or the PID as
19 Mentor calls it, which there was no issues, no
20 long-term problems mentioned.  It all looked
21 great.
22      He showed me a surgical video of
23 it -- of the transobturator route because that was
24 an incredibly new approach to dealing with this.
25 I watched the video and said, that's a simple

28 (Pages 106 - 109)

Page 110

1  procedure to do.
2       I at some point in time -- and I
3  don't recall the chronology of this -- I went to
4  Vegas -- no, not Vegas -- Phoenix. Carl Klutke
5  was putting on a course in Phoenix -- an ObTape
6  course, and they had a big pamphlet on it -- not
7  big pamphlet. A big folder of everything. So I
8  did that.
9       I think that's all I did with that.
10 But there was no literature on it at all.
11 Q. Right. So the folder -- do you recall
12 getting a DVD that explained the surgical
13 technique?
14 A. I don't recall that. I do recall exactly
15 where I was standing when Chris Sellwood put it in
16 his computer, laptop, and played it for me. I
17 don't recall if I ever got the DVD or not.
18 Q. Okay. And then the session that you attended
19 in Phoenix with Dr. Klutke, that was like a
20 transobturator technique training session?
21 A. Correct. And as I recall, Klutke was in
22 charge of that and there was a bunch of other
23 physicians. He may not have been the lead person.
24 That's just the one I remember.
25 Q. And as part of that training session, did you

Page 111

1  receive a folder of information?
2  A. Yes.
3  Q. Do you still have it?
4  A. No. Unfortunately, no, I don't. It was a
5  large folder, a lot of data, a lot of -- and
6  everyone's slides who spoke, and that has been
7  thrown away years and years ago.
8  Q. Did you attend that Phoenix training session
9  prior to implanting ObTape in your patients?
10 A. I don't recall. It was hot. That's all I
11 remember, but then that means Phoenix is always
12 hot. It was actually at the Phoenician. I mean,
13 I remember where we were going because it was hot.
14 So, again, it could have been before. It could
15 have been right after. I don't recall.
16 Q. It was in and around the time that you first
17 started using ObTape. Fair to say?
18 A. As I recall, yes. To learn surgical
19 techniques, pearls, all these types of stuff, the
20 data that was available.
21 Q. So to satisfy yourself that ObTape was a safe
22 product for implantation in your patient
23 population, one of the things that you did was
24 look at the product insert, correct?
25 A. Absolutely, yes. And I asked Sellwood for

Page 112

1  that.
2  Q. You specifically requested it?
3  A. Absolutely. He gave it to me. He also, you
4  know, then I think verbally told me about 9,000 or
5  10,000 study patients.
6       But yes, the PID was given to me. I
7  don't have it, obviously. And then the videos on
8  the surgical procedure -- or DVDs at that time.
9  Q. I want to ask you about that. I mean, so the
10 product insert is a document that is contained in
11 the package with the product itself when you
12 receive the product to implant into a patient,
13 right?
14 A. But it was before -- before the procedure.
15 Sellwood presented to me -- outside the operating
16 rooms at St. Mary's Hospital, he said, we've got
17 nothing new. He said, transobturator. I remember
18 very clearly. Through the obturator foramen? No
19 one has ever done that before. I said, I don't
20 think this is going to work. He said, no; look at
21 this video. He showed me the video. And he said,
22 here's the product, so he had the actual -- a
23 sample, and then the PID along with it. And so
24 that's what I looked at, all three at that point
25 in time.

Page 113

1  Q. So I just want to be clear about this.
2  Mr. Sellwood presented you with a hard copy of the
3  product insert outside the operating room, outside
4  of a package of the product, he presented that to
5  you prior to you using the product?
6  A. Correct. He had kind of an introduction
7  packet, let's call it that, where he had -- he
8  showed me the device. And remember, as soon as I
9  saw it, I thought about ProteGen. So I asked
10 him -- because ProteGen was bad, a horrific
11 product. He said, no; this is different. 9,000
12 patients, 10,000, whatever that study was. It's
13 working great, has great efficacy, everything. So
14 I took it at face value. Here's also the product
15 insert, and he maybe gave me some other brochures
16 or maybe told me about the other meeting -- the
17 Phoenix meeting. I don't recall that. And then
18 we watched the video there on his laptop of the
19 procedure. I watched it once and said, that's
20 brilliant, that transobturator.
21 Q. And the reason why I'm asking you these
22 nit-picky questions about the product insert,
23 so you know -- not Mr. Kreis -- other lawyers have
24 presented in this ObTape litigation that the
25 product insert is only available at the time of

29 (Pages 110 - 113)

Page 114

1 the surgery in the -- in the surgical field in the
2 surgical field?
3 A. I would disagree with that -- well, no. I
4 agree and disagree. I agree if I want to get a
5 product insert -- I mean, now I can just -- you
6 can just pull it offline, but then you couldn't.
7 I'm sure you couldn't. Well, I didn't try either.
8         You need to get the product and pull
9 it out. But this was coming from the rep, who is
10 the regional rep -- not just Rochester, Minnesota,
11 but the five-state region, so he's more powerful,
12 came to me because they wanted me to do the
13 procedure so they can then say, the Mayo Clinic
14 approves this procedures. It's a lot of good
15 marketing, which I'm aware of that. I'm not
16 naive. So --
17 Q. You're not naive? Sorry.
18 A. I am not naive that the industry is going to
19 want to use --
20 Q. Sure.
21 A. And I don't know the extent of what they --
22 I've had industry say all these things that I've
23 said and I know I haven't said it, but that's
24 beside the point.
25         But Sellwood would more likely than

Page 115

1 not have access to stuff that I'm going to be
2 asking for and he wants to sell this product to
3 me.
4 Q. And you wanted to see the product insert?
5 A. Absolutely. I wanted to see the product
6 insert, I wanted to see the product, and I wanted
7 to see the surgical video.
8 Q. You're not looking at the product insert for
9 the first time when the patient is under
10 anesthesia?
11 A. I will show the residents when the -- each
12 resident comes on my service, when we're doing a
13 relatively new procedure, I have the residents go
14 over it because -- as a practice.
15         Now, if it's a procedure that's been
16 around forever -- for example, the artificial
17 urinary sphincter made by AMS, which is now owned
18 by Boston Scientific, been around since 1972, Mayo
19 is the world's largest implanter, I don't have
20 them go over that.
21         But a new device, I have them go
22 over, whether it be -- whatever it is.
23 Q. Ahead of time?
24 A. No. In the OR because we can't get it
25 otherwise, unless I save it from a previous

Page 116

1 procedure.
2 Q. But you yourself, when it came to the ObTape,
3 you viewed the product insert before you performed
4 the surgery?
5 A. Correct.
6 Q. And you asked for it -- you asked for that
7 product insert or otherwise Mr. Sellwood had it
8 with them?
9 A. Yeah. I don't recall if I asked for it or
10 not. It was given to me. It was provided to me.
11 Q. And that was something that you wanted to see
12 before you started implanting --
13 A. Yes.
14 Q. -- ObTape?
15 A. Yes.
16 Q. Fair enough.
17 A. Again, because it's a new procedure. I don't
18 do that for a procedure that I perform 1200 of.
19 Q. Understood.
20         Well, in that product insert, you do
21 recall that Mentor said that one of the things
22 that has been reported is erosion of the device,
23 right?
24 A. Well, we have to be very careful now how we
25 define "erosion" versus "exposure", okay? This is

Page 117

1 just for clarification of this purposes.
2         Yes, they do say erosion. Erosion
3 means going into an organ -- another organ,
4 urethra or bladder. At that point in time, the
5 terms were interchangeable. So yes, in their PID,
6 they talk about -- well, I'd have to pull out the
7 PIDs to make sure it says it exactly. It said
8 there is a very rare risk of vaginal erosion, or
9 which should be correctly termed "exposure".
10 Q. You understood that to mean "extrusion"?
11 A. That -- you're absolutely right. I just want
12 to be clear because it's been up -- people argue
13 about it, so I'm using the terms. We're
14 communicating.
15 Q. Sure. It also indicated that infection was
16 reported. Do you recall that? I mean, I --
17 A. Yeah. I'd have to --
18 Q. I can pull out the product insert. And if
19 you prefer that, that's fine.
20 A. I have one here. I don't know if we want to
21 admit it. Well, it says Exhibit B. I don't know
22 why it says that. This is something you guys sent
23 me and I copied off.
24         MR. KREIS: John, for the record,
25 this would have been from a prior deposition.

30 (Pages 114 - 117)

Page 118

1    MR. LEWIS: Okay.
2    MR. KREIS: And it's Rev A.
3    MR. LEWIS: And I don't need to mark
4  it. I don't think there's any dispute about what
5  the adverse reactions reported are in there, and
6  what it says, it says.
7        THE WITNESS: And it says -- just so
8  we're clear, it says it can trigger an existing
9  infection. I don't think it says it can be
10  responsible for an infection. It's right down
11  there.
12 BY MR. LEWIS:
13 Q. Then it says, "The following events have been
14 reported very rarely," and then it has the three
15 bullets.
16 A. I'm sorry. Yes, it does say "infection"
17 there, yes.
18 Q. So infection, vaginal erosion, and urethral
19 erosion is also noted there?
20 A. Yes. It should be with normal, or modern
21 nomenclature, vaginal exposure. Urethral erosion
22 is correct. And then infection, yes.
23 Q. When you reviewed the product insert, did you
24 remember at that time seeing those potential
25 adverse reactions and did it have an impact on

Page 119

1  you?
2  A. Absolutely it did. I saw that, and my frame
3  of reference at that point in time is going to be
4  the TVT and, much more likely, the SPARC, okay?
5  That mesh, that polypropylene. Vaginal erosion --
6  or vaginal exposure happened in my hands 2 to 3
7  percent, roughly. That's a guess -- very much of
8  a guess. Urethral erosion never happened.
9  Infection, I had one patient out of several
10 hundred with a superficial cellulitis which was
11 with topical antibiotics.
12 Q. With the SPARC sling?
13 A. With the SPARC sling, correct.
14      So that was my frame of reference.
15 I saw that and thought that's no big deal at all.
16 We treated those. No sequelae.
17 Q. And you understood that the ObTape had
18 potential adverse reactions that did not exist
19 with the autologous pubovaginal sling?
20 A. Well, it's a foreign body and it's a -- it's
21 a polypropylene, so I put it in the same reaction
22 that would happen with a TVT or a SPARC in my
23 hands.
24 Q. Fair enough.
25      So the product insert was one of the

Page 120

1  things that you reviewed prior to using ObTape.
2  The surgical video was one of the things that you
3  used prior to using ObTape. And then you recall
4  verbal discussion from Mr. Sellwood about the
5  number of patients who had been -- who had
6  received ObTape, and the product was performing
7  well?
8  A. That is correct. And the reason why I
9  remember it carefully -- or well is 9,000 is a
10 gigantic number. You're lucky if you get a study
11 of 100 or 200 patients. 9,000 is an astronomical
12 study, and he says they're doing well. So I said,
13 okay, good. If that many patients have had it and
14 they're doing well, that's great.
15      So it was -- it was -- if he gave me
16 a number of 100, I'm not going to remember that
17 because that's just like everything else.
18 Q. And do you have an understanding today that,
19 in fact, there were actually more patients than
20 that who had received ObTape or its prior
21 generation, EuroTape, prior to launch in the
22 United States?
23 A. I don't know the numbers on EuroTape. I know
24 it was used for a while, but I've never, that I
25 recall, seen the numbers. And then I know ObTape

Page 121

1  was introduced and, again, I don't recall seeing
2  those numbers, other than this 9,000 I was told
3  about.
4  Q. And, again, you recall that being a verbal
5  discussion at that time?
6  A. Correct. I never saw that paper. I just
7  said, well, what are the studies out there? And
8  he said, well, there is this paper, 9,000, and he
9  says it's working great.
10 Q. He said there was a paper?
11 A. I don't recall. That's too specific. I
12 don't recall. It's been done in 9,000 and here
13 are the results.
14 Q. Okay.
15 A. So, again, I don't think there was an actual
16 paper because I would have asked for it.
17 Q. That's what I was going to follow up with
18 you.
19      Did you ask for written materials
20 that reflected the performance of ObTape prior to
21 using it?
22 A. Very good question. I always -- well, first
23 of all, now I have zero interaction with reps.
24 They don't even get into my office. They don't
25 talk to me. They can't e-mail me, nothing.

31 (Pages 118 - 121)

Page 122

1  Because they're like used car salesmen.
2        Then I was different.  And with
3  Sellwood it was different.  Sellwood was a nice
4  guy.  I would ask, what have you got as far as
5  literature?  I don't recall what the answer was.
6  Whatever it was, it satisfied me at that point in
7  time.  Now, that would not be now, but that
8  satisfied me then.
9  Q.  And you don't recall what you received?
10  A.  No.  Just what I've already --
11  Q.  What you've already said.  Okay.
12  A.  Yes.
13  Q.  And then you received a packet of materials
14  from the Phoenix -- one of the other things you
15  did at or around the time that you first started
16  using ObTape was to attend a session that was led
17  by Dr. Klutke in Phoenix?
18  A.  Correct.  I'm pretty sure it was the
19  Phoenician in Phoenix.
20        MR. KREIS:  John, when you have a
21  second.
22        MR. LEWIS:  Yeah.
23        (Recess taken from 11:31 a.m. until
24  11:42 a.m.)
25  BY MR. LEWIS:

Page 123

1  Q.  I think we were talking a little bit about
2  the information that you used to satisfy yourself
3  that ObTape was safe prior to using it in your
4  practice.  I believe I've covered four things.  I
5  just want to make sure that -- did you -- prior to
6  using ObTape in your practice, did you review any
7  abstracts, literature publications, related to
8  ObTape or its European predecessor, EuroTape?
9  A.  I don't recall what was given to me.  I may
10  have, but I just don't recall.  I would ask for it
11  and if something were there, I would have reviewed
12  it.
13  Q.  Do you recall getting any slide decks or
14  PowerPoint presentations about ObTape or the
15  surgical procedure, transobturator tape, as part
16  of your diligence before using ObTape in your
17  practice?
18  A.  The meeting I went to in Phoenix, they gave a
19  big handout with a lot of slides and then, of
20  course, attending the lectures.  I don't recall if
21  Chris Sellwood gave me that, but I don't think he
22  gave me those, though.
23  Q.  You used ObTape between the fall of 2003 and
24  what time frame?
25  A.  It would have been -- I don't know exactly.

Page 124

1  It would have been the end of '04, early '05
2  because, again, I did roughly 100, 150 slings a
3  year at that point in time, and I stopped at 105
4  because that's when the complications were coming
5  in.  And so I'm just -- this is on recall, so I
6  can't tell you the exact time frame.
7  Q.  Between the time frame of the fall of 2003
8  and when you stopped using ObTape at the end of
9  '04, early '05, what percentage of your practice
10  would you say you did ObTape?
11  A.  As far as -- well, I think what you're asking
12  for is for female stress urinary incontinence.
13  Q.  I'm sorry.  Correct.
14  A.  And that would have been nearly 100 percent.
15  Q.  And is there a way that you could look and
16  determine when you actually placed your last
17  ObTape patient?
18  A.  I would probably be able to find that
19  information.  Again, that would require I would
20  have to go -- I would have to submit an IRB form
21  to get access to patient records and have our
22  surgical people pull it up.  That information
23  would be able to be found -- the last one I
24  implanted.
25  Q.  And just sitting here today, you haven't done

Page 125

1  that?
2  A.  No, I have not.
3  Q.  Do you have a recollection -- I mean, I'm
4  trying to find some reference points to when you
5  switched, and so I'm trying to think of -- did you
6  start using another product instead of ObTape?
7  A.  I went back to the SPARC.  And then somewhere
8  in there AMS came out with their Monarc, which is
9  their transobturator sling, and so I used that for
10  a short period of time until AMS came with their
11  with Aris and their transobturator Aris.
12  Q.  Aris would be Mentor and Coloplast?
13  A.  Mentor and Coloplast, yes.
14  Q.  And when Aris came out -- and I'll just
15  reference you, that was roughly May of 2005 in the
16  United States, just to give you a reference
17  point -- do you recall whether you used Aris
18  pretty soon after it came onto the market or not?
19  A.  I was -- I was still very much in
20  conversation with Chris Sellwood because I liked
21  working with AMS [sic].  I felt --
22  Q.  You mean Mentor?
23  A.  Yeah.  What did I say?
24  Q.  You said AMS.
25  A.  Yeah.  I'm sorry.  I don't like working with

32 (Pages 122 - 125)

Page 126

1  AMS. And you can quote me on that one. I don't
2  like them.
3         The Mentor people, at the time I
4  felt that they were good people and I enjoyed
5  working with them. Now my opinion has changed as
6  far as the data that I was given, but then I liked
7  them and I wanted to continue to work with them if
8  they had a good product. So I very clearly
9  remember telling Chris Sellwood, this ObTape is
10  bad; I've had unacceptable complications; I'm
11  switching over to AMS. It was a big deal for me.
12         And then he informed me -- I don't
13  remember the date, but I remember when he informed
14  me that this Aris was come out. And they call it
15  Aris and Aris SP, so it was kind of confusing on
16  their names. And I would have used it probably
17  very rapidly because, again, as I mentioned
18  earlier, I did not like using the AMS product
19  because of those connectors, and it was worse for
20  the operator because you'd pull it through this
21  canal and it tore. We had patients with a
22  horrible amount of pain. So it was a big deal for
23  me to switch over back to at that time, when
24  Coloplast or I don't know if it was Mentor -- I
25  thought it was Coloplast.

Page 127

1  Q. So Mentor sold Aris -- just to kind of
2  reference you, sold Aris beginning in May of 2005.
3  And then in March of 2006, that's when Coloplast
4  purchased Mentor and then continued selling the
5  Aris product line. Many doctors have trouble
6  orienting themselves because it was pretty
7  seamless. Most of the people came over and they
8  just sorted of picked up the product line. It was
9  ongoing at that time.
10  A. Correct. And I do remember when that sale
11  happened because they asked me to come up there to
12  give a summary on stress urinary incontinence,
13  which that has a Bates number attached to it, the
14  lecture I actually gave to them, summarizing my
15  ObTape experience, which has just mirrored what
16  I've told you today, and what my experience of the
17  other products were because they wanted to have a
18  semi-honest opinion of what's gone on.
19  Q. So would you think that sometime in 2005
20  would be a good -- and I'll just kind of roughly
21  put it 2005, somewhere along there, you went back
22  away from SPARC and Monarc and started using Aris
23  at that time?
24  A. Yeah. Again, it was -- I did 105, and I'm
25  going based upon me doing 100 to 150 per year. I

Page 128

1  started in the fall of '03. So somewhere in there
2  is when it happened. So late '04, early '05.
3  Q. And then you went to SPARC and Monarc for a
4  while?
5  A. For a short period of time, and then swapped
6  over to Aris, and then had not changed until I
7  stopped in 2013.
8  Q. So Aris was picked up. And then you used
9  Aris until 2013?
10  A. Correct.
11  Q. And during the time that you used Aris, what
12  percentage of your practice was Aris for female
13  stress urinary incontinence?
14  A. Well, the number of slings that I did
15  progressively decreased from that time, so -- but
16  the percentage-wise for the run-of-the-mill,
17  straightforward, you're probably looking at 95, 99
18  percent, were going to be the transobturator or
19  the suprapubic Aris, with a few complicated
20  reconstructions being the autologous or cadaveric.
21  That was always the fallback. And then beginning
22  in 2011 with the FDA warnings and patient
23  awareness increasing, that's when the pendulum
24  started swinging back towards autologous.
25  Q. So at least through 2011, perhaps 90 percent

Page 129

1  or so of your practice?
2  A. That would be fair, yeah, 90 percent or
3  higher.
4  Q. And then in 2011 you would say maybe -- it
5  would eventually reduce between 2011 and 2013 to
6  zero?
7  A. Correct.
8  Q. And did you attend the FDA panel hearing on
9  mesh?
10  A. No. My comments with Public Citizen --
11  they're the -- Michael Carome, C-A-R-O-M-E,
12  contacted me in 2010 because I had made -- given
13  lectures anti -- well, against mesh and somehow he
14  had picked up on that and then wanted me to give
15  an opinion for the FDA hearing. I did not attend
16  but my comments were supposedly -- in fact, I know
17  they were read, but I was not there.
18  Q. And those are comments that were -- that were
19  a letter or what -- what exactly -- when you say
20  "comments" --
21  A. Yeah. You can actually -- if you just search
22  my name and Public Citizen, the actual document
23  will come up. And it was written on my
24  letterhead. It's a full page long just
25  summarizing my opinions on meshes. There was

33 (Pages 126 - 129)

Page 130

1  another doctor from St. Louis. I'm blanking on
2  his name. And then Michael Carome had a long
3  dissertation on meshes. But mine was just one
4  page. But that is retrievable. I don't have it
5  with me, but it's easily retrievable.
6  Q. Now, let me ask you about the Aris product
7  for a minute. What was your -- what was your
8  patient outcomes with Aris, roughly speaking?
9  A. The adapters -- let's talk about inter-op
10 versus long-term.
11 Q. Sure.
12 A. Inter-op, remember with the AMS product I
13 hated because they had large connectors tearing in
14 the obturator foramen and tearing the bladder,
15 which is unacceptable because of patient pain.
16        So the adapters -- or there is no
17 adapter with the Aris, so they eliminated that, so
18 you had a very small profile going through.
19        Surgical procedure is identical
20 otherwise.
21        We still had bladder perforations
22 which happened with the suprapubic or retropubic
23 approach. That was around 10 percent. So that
24 was an unacceptable problem, from my angle.
25        Vaginal extrusion rate was fairly

Page 131

1  low that I can think of. We've had 2 or 3 percent
2  with the transobturator route.
3        We've had problems with dyspareunia
4  because you'd have mesh at the sulcus, which is --
5  the vaginal sulcus bilaterally. So it makes you
6  modify how you do the procedure, take extra-deep
7  bites.
8        We had some scarring and things. It
9  was relatively -- overall experience, relatively
10 minor. Never had an infection -- never had a
11 wound infection with it.
12 Q. Okay. So your relative experience with Aris
13 you would say was -- would you call it positive?
14 A. I would have -- the best way to describe it
15 is it was the least of the evils. It was -- it
16 was less mesh extrusion, less dyspareunia, less
17 bladder perforation, less obturator foramen pain
18 or groin pain. I didn't have any infection, no
19 cellulitis, no vaginal breakdown that I know of.
20 And this is -- again, the experience with Aris,
21 let's just say 500, thereabouts. That is a guess.
22 So, again, I know I'll keep saying that over and
23 over and I understand you know that, but just so
24 we're clear, I'm guessing. Somebody could pull
25 out a number and say 300. That could be 600.

Page 132

1  Roughly 500. We did not have those problems that
2  I saw with the AMS product, definitely with the
3  ObTape.
4  Q. So would you agree that Aris was the best
5  performing synthetic sling that you've ever used
6  personally?
7  A. Framing it in that way, not to condone it,
8  but it was -- I had the least complications with
9  it. Now, I still had the dyspareunia, which
10 was -- it's a pain to deal with it. It's very
11 difficult. We can't fix it. But, again,
12 comparing it to the other products, it was the
13 least.
14 Q. And you stopped using it because you stopped
15 using all synthetic meshes in your practice to
16 treat incontinence?
17 A. Yes and no. I stopped using it because I was
18 still having complications, okay? And patients
19 were coming in refusing meshes, adamant against
20 meshes, because this is when the FDA came out with
21 their warning. There was a huge uproar about it,
22 but I -- we were struggling for an alternative.
23 Patients wanted an outpatient procedure that was
24 non-mesh. At that point in time, it did not exist
25 and we came up with one.

Page 133

1  Q. And what one is that?
2  A. Transobturator autologous sling.
3  Q. And did you start using transobturator
4  autologous slings -- or I guess autologous tissue,
5  right?
6  A. Rectus fascia, yeah.
7  Q. So a pubovaginal sling used through the
8  transobturator route?
9  A. Well, no. I mean, the pubovaginal is like
10 saying a Chevy. The Transobturator is like Ford.
11 They're different. They're different procedures.
12        So we're using a small sliver of
13 autologous tissue, compared to -- for a
14 pubovaginal sling you use a 2-by-12 centimeter
15 long piece of fascia, a large piece of fascia. We
16 are using a one-and-a-half centimeter wide by
17 5-to-7 centimeters long. We have modified -- we
18 continue to modify the procedure. So we're
19 harvesting a much smaller piece of tissue so
20 there's less pain, and then we're delivering it
21 through the obturator foramen, so that now we're
22 avoiding the complications that can happen when
23 you go through the belly. So it's kind of a
24 modification of the two, a hybrid of the two. And
25 we've published that now three times, I think --

34 (Pages 130 - 133)

Page 134

1  three different studies which are out there.
2  Q.  On the performance?
3  A.  Autologous transobturator, yes.  I think it's
4  in the -- it just came out in Urology, which is
5  the Gold Journal, which is our semi-long-term.
6  We're still calling it short-term even though we
7  have a year follow-up.  We have a surgical video
8  which is in International Urology Journal.  And
9  then a preliminary early surgical description
10  under surgical techniques in Journal of Urology.
11  Q.  And are you teaching or otherwise
12  demonstrating the surgical procedure to other
13  surgeons at this time?
14  A.  To just residents.
15       Now, we have -- we have published
16  the video so it's out there through the
17  International Urology Journal.  It's retrievable
18  there.  Somebody can watch it, which is actually
19  great.  And then we've spoken at multiple
20  different meetings on the results and then the
21  journal articles.  So if you call that teaching,
22  then yes, but it's not like we're bringing
23  individuals into my institution to show them how
24  to do it, but -- besides residents -- my own
25  residents.

Page 135

1  Q.  Do you know of anyone else who's using that
2  procedure?
3  A.  Yes, in Europe.  A doctor in London who I
4  speak to came up to me at a meeting says he's done
5  it and had it work on a very complicated patient,
6  which is good news.
7  Q.  Is that your sole -- is that the chief
8  treatment that you undertake for women who now
9  present to you with stress urinary incontinence
10  when they need a surgical procedure?
11  A.  Yes and no.  The most common surgical
12  procedure I'm performing are going to be on
13  complicated reconstructions who have multiple
14  surgeries elsewhere.  That is still going to be
15  the pubovaginal sling.  So for those complicated
16  redos, it's the old-fashioned autologous sling.
17       For the new patient who's coming in,
18  first-time treatment, run-of-the-mill stress
19  urinary incontinence, then the autologous
20  transobturator is my go-to procedure, with a full
21  consent, et cetera.
22  Q.  So first-time treatment, you typically go
23  with --
24  A.  Transobturator autologous sling, yes.  So
25  instead of in the past going with the

Page 136

1  transobturator synthetic, now I'm going with the
2  transobturator autologous.
3  Q.  Is that an outpatient procedure?
4  A.  Yes.  We've had one or two patients stay
5  overnight.  Usually it's when we're doing a
6  combined prolapse repair.
7  Q.  Is the procedure itself relatively -- I mean,
8  it's a smaller piece to handle, but is it
9  relatively the same procedure as you would place
10  synthetic mesh?
11  A.  Correct, except for the harvesting of the
12  tissue on the belly.  We do a 5-centimeter
13  incision on the belly and harvest it, so there
14  will be more discomfort with that.  However, we
15  are following our patients at three months and a
16  year with pain surveys to see if they have any
17  persistent pain.  And so we are not seeing that at
18  all, which is in our published data.
19  Q.  And you still have the -- essentially the
20  three incision marks?  Two on the groin area and
21  then one in the vaginal wall?
22  A.  Yeah.  The vaginal incision is the same
23  length as the synthetic.  We go slightly deeper
24  into the tissue, just because we want to kind of
25  make sure we get a better snug fit.  On the

Page 137

1  outside of the vagina, on the labia, we'll make a
2  5-millimeter to 7-millimeter incision which will
3  be slightly larger than the synthetics.
4  Cosmetically, pain-wise, there's no difference
5  there.  The main difference there be the abdominal
6  incision, which will be 5 centimeters, that you
7  don't do with synthetic.
8  Q.  The abdominal due to the harvesting of the
9  tissue?
10  A.  That is correct.
11  Q.  Let me ask you this:  Why hasn't anybody
12  thought of this before you?
13  A.  We had a problem.  Patients refuse --
14  patients coming in with stress urinary
15  incontinence who were adamantly refusing anything
16  synthetic put in their body, and so we had a
17  problem.  I knew the mesh literature.  I didn't
18  like putting in meshes.  And so we said, well, why
19  don't we just do this combined.  So all it is is
20  doing is combining the pre-existing knowledge,
21  putting them two together.  It's like saying
22  didn't someone come up with the iPhone before they
23  did?  I don't know.  I mean, it's just we had a
24  problem, we thought about it, and we came up with
25  this option.

35 (Pages 134 - 137)

Page 138

1  Q. Would you agree that the treatment for female
2  stress urinary incontinence has evolved over the
3  course of time that you've been practicing in the
4  area of urology?
5  A. It's changed tremendously. When I started in
6  '93, it's gone through multiple different waves of
7  pubovaginal slings, then synthetic slings, then
8  transobturator slings, and now the pendulum is
9  swinging away from anything synthetic. And so
10 yeah, it's changing and five years from now it
11 will probably be different.
12 Q. Would you agree that one of the goals that's
13 always been in existence -- for the treatment of
14 female stress urinary incontinence, one of the
15 goals is to have a treatment that cures
16 incontinence?
17 A. That is safe. That is correct. That it
18 cures incontinence, but because that's a quality
19 of life problem, it has to be concurrently safe.
20 Q. One goal -- maybe there's -- try and make a
21 list of multiple goals.
22        One goal is to actually cure
23 incontinence or to improve it. You'd say that's
24 one goal of the surgery?
25 A. Correct.

Page 139

1  Q. Another goal is to avoid complications; is
2  that fair?
3  A. Yes, but you can't separate those two goals.
4  They have to go hand in hand. So it's not like
5  one or the other and say, hey, we have 50 percent
6  because we've got a procedure that cured the
7  incontinence but there's major complications.
8         So that's why I said it has to be
9  efficacious, meaning it works to cure the problem
10 they're treating and at the same time be safe.
11 Q. So efficacy, safety are two related goals for
12 the treatment of stress urinary incontinence. Is
13 that fair to say?
14 A. Yeah. It has to be -- from my opinion, it
15 has to be used in the same sentence. Efficacious
16 and safe.
17 Q. Would you agree that lower -- or shorter
18 surgery and recovery time is also a goal of the
19 treatment of stress urinary incontinence?
20 A. That would be a much more secondary goal. If
21 I had a procedure that was going to be 100 percent
22 efficacious, 100 percent safe but was a 3-hour
23 surgery, women would go for it because they're
24 all, now, very concerned about safety. It's a
25 long discussion now compared to when I started my

Page 140

1  career. When I started my career, it was easy.
2  Now it's a much more detailed discussion, usually.
3  Q. And why do you think that's the case?
4  A. Because of awareness with the mesh
5  litigation, no question. And the FDA warning was
6  part of it in 2011 and now it's they can't turn on
7  a TV or a newspaper without seeing mesh warnings.
8  So the patients, in my experience, are coming in
9  much more educated and much more wary than they
10 were in the past.
11 Q. All right. I'm going to ask you about a
12 couple of documents. I think I got the timeline
13 down pretty well here. In fact, this is just --
14 again, I just do this for my -- when I go to
15 prepare for your examination at another point in
16 time, this helps me. So that's why I do this.
17        (Exhibits 5, 6 and 7 were marked for
18 identification.)
19 BY MR. LEWIS:
20 Q. I want to ask you about a couple of
21 documents, articles really.
22        MR. KREIS: If you're in a
23 transition here, at the very beginning of this
24 deposition, I thought we had put on the record
25 that this deposition is both for the MDL and cases

Page 141

1  coming out of the MDL in terms of his general
2  opinions but also the Clinton case from a general
3  ANK-specific opinion standpoint.
4         MR. LEWIS: Yeah. I guess I -- my
5  understanding is that this depo is -- we've
6  noticed it in Ms. Clinton's case, which is the
7  case that's set to go to trial in January, and
8  that's my understanding.
9         MR. KREIS: I've got an e-mail back
10 and forth with either yourself or Dustin where you
11 agree with me that -- just like we had this issue
12 that came up earlier in Dr. Zipper's deposition,
13 you guys had a Clinton style and I said, wait a
14 second, this is an MDL general expert deposition
15 and it's going to be used or can be used in
16 Clinton, and I sent you guys an e-mail and made
17 that very point, that this deposition that we're
18 having today -- so we can -- you know, it's
19 basically asking what style should we use. This
20 deposition is a general MDL deposition but it also
21 includes the case-specific for Clinton.
22        MR. LEWIS: Right.
23        MR. KREIS: And you said I agree or
24 Dustin said agree. So we're not intending to have
25 a second deposition on Dr. Elliott's general

36 (Pages 138 - 141)

Page 142

1  opinions.
2       MR. LEWIS:  But he's been named in
3  other specific cases.
4       MR. KREIS:  Right.  So if he's a
5  case-specific expert in any other individual
6  litigation, then he's going to avail himself to
7  more depositions.  But for this purpose, our
8  understanding and our purpose of being here is to
9  both give opinions that are general opinions to be
10  used in the MDL, including any cases that were
11  remanded out of the MDL, and case-specific
12  specific to Clinton, would you agree?
13       MR. LEWIS:  Well, I guess I'm
14  reserving the right to depose him as a general
15  expert in other cases in which he's been named,
16  again, subject to a reciprocal discussion on how
17  experts are treated and deposed in the litigation.
18  So I'm not making a conclusion one way or the
19  other as to future depositions except to say for
20  purposes of this depo, I am taking his deposition
21  as specific causation expert in Clinton's case and
22  as a general expert which I understand that he's
23  also going to testify in Clinton's case.  And to
24  the extent that there's some protocol that's
25  worked out about future depositions of general

Page 143

1  experts that have been deposed and it works on
2  both sides of that -- you know, our experts and
3  your experts -- then, you know, we'll follow that
4  protocol for purposes of Dr. Elliott.
5       So I think I'm saying the same
6  thing, but I'm not restricting my ability to
7  depose him any more than you're restricted -- or
8  any less, I guess, than you're restricted to
9  depose our experts.
10       MR. KREIS:  So our understanding
11  coming into this deposition was that this
12  deposition also covered the MDL general
13  deposition.  And I know that in your -- the
14  position that you just enunciated sounds like
15  you're limiting him to Clinton only, and that's
16  where the rub is.
17       MR. LEWIS:  Well, I mean, look, we
18  can -- we're not probably going to resolve this.
19  We can discuss that protocol for how to deal with
20  general experts at another time.  What I'm saying
21  is is that whatever rule we're going to apply to
22  Dr. Elliott is the rule that we're going to apply
23  to our experts as well.  I'm not applying any
24  special rule to Dr. Elliott that restricts my
25  ability to depose him without also limiting your

Page 144

1  ability to depose our experts.
2       MR. KREIS:  That's all understood.
3  And I would just point you back to the e-mail that
4  I sent that you agreed to that made this point
5  very clear, that this was supposed to be a general
6  MDL expert deposition and Clinton case-specific,
7  and we had that agreement coming into this
8  deposition and I can pull it up on my iPhone if I
9  need to.
10       MR. LEWIS:  Like I said, I'll honor
11  any agreements that were made to the extent
12  they're clear and then we're going to apply the
13  same rules to Dr. Elliott as we'll apply to, you
14  know, Dr. Carl Klutke, for instance, or someone on
15  our side in that respect.  So I guess that's what
16  I'm saying.  I just don't want to get tied up and
17  have my deposition of Dr. Elliott in the future
18  restricted but, you know, you guys get to take
19  Dr. Klutke's deposition and do whatever you want.
20  I mean, the same rules are going to apply to
21  experts similar to Dr. Elliott; Dr. Klutke, those
22  types of experts.
23       MR. KREIS:  Let me ask you this.  So
24  by way of example, other cases that we have in
25  this litigation in the district of Minnesota, this

Page 145

1  deposition is good for those cases?  For example,
2  the Bromley case or the Rector (phonetic) case or
3  any of those 10 cases that we have in the district
4  of Minnesota.  Those are cases that have trial
5  dates coming up from January all the way through
6  the summer of 2017.  And so those are examples of
7  cases that we understand that this deposition
8  covers, his general opinions relating to those
9  type of cases.
10       MR. LEWIS:  Okay.  Well, like I
11  said, I'll abide by whatever protocol and
12  agreement that's been previously, you know, stated
13  on our end.  I don't have the information in front
14  of us, and so whatever.
15       MR. LEWIS:  Okay.
16       MR. LEWIS:  I guess we'll just deal
17  with it that way.  I'm sure we'll be able to
18  resolve that.
19       MR. KREIS:  Okay.  Thanks, John.
20       (Exhibit 8 was marked for
21  identification.)
22  BY MR. LEWIS:
23  Q.  Let me show you, Doctor, what's been marked
24  as Deposition Exhibit 8.  I will represent to you
25  that this was cited in your CV as an abstract.

37 (Pages 142 - 145)

Page 146

1  A. Correct.
2  Q. In the upper left-hand corner, it appears to
3  be published by the Journal of Urology in May of
4  2005. Do you see that?
5  A. Correct. This is -- this is the supplement
6  for the AUA. So all it is is all the videos or
7  abstracts they're presenting, so it's not a --
8  it's not a peer-reviewed process.
9  Q. Sure. So the AUA is American Urological
10  Association --
11  A. Association meeting, yes, correct.
12  Q. And when would that meeting have taken place?
13  A. I don't recall. This is 2005. Usually it's
14  in May -- late April or early May, so this is
15  probably after the meeting.
16  Q. And you see here that V496, that is a brief
17  description of what, a presentation that you made?
18  A. It's a video. I'm assuming. "V" almost
19  always means that we presented something in a
20  video session. And so we present this -- or
21  excuse me, we submit in October of the year prior
22  and it gets accepted and then we present it. So
23  this is -- this is representing our work from
24  October. And then -- so to do a video, this is
25  data that we did probably four months prior,

Page 147

1  because it takes time to prepare it, submit it and
2  that. Again, I'm assuming that's what the video
3  is.
4  Q. Is this something that -- did you attend the
5  AUA in 2005, to the best of your knowledge? Would
6  you have attended a video presentation that you
7  did?
8  A. Yeah, I would assume I would. I don't recall
9  the 2005 meeting at all, but I would assume I
10  would be there. I very, very rarely ever miss. I
11  think I missed once all these years.
12  Q. Does the fact that this is presented by
13  video, does that mean that you were there live and
14  presented by video to a group of physicians or
15  what does that actually mean?
16  A. That you submit -- you either have three
17  different ways of presenting data at the AUA: A
18  poster, which is a typed-up poster of your data; a
19  podium presentation, which is slides; or a video
20  presentation.
21       The video presentation is the lowest
22  bar of data. It's basically how we do it type of
23  a thing, so -- or complications or something like
24  that. It's a surgical technique thing. And so
25  that's what this would have been submitted to.

Page 148

1       And then I don't go up -- it's
2  almost always the residents. That's why I'm
3  saying it's Dr. Hawatmeh, H-A-W-A-T-M-E-H, who did
4  the video with me and he would be the one to go up
5  front, though I would be in attendance, or at
6  least I would fully expect I would be there.
7  Q. And you see that this was presented in 2005
8  at some point in time related to the ObTape sling,
9  correct?
10  A. That is correct, yes.
11  Q. Did you tell people at this meeting that you
12  had stopped using ObTape?
13  A. I don't know. I don't recall. This is not I
14  forum when you're -- you're not -- this is not a
15  discussion forum. This is present a video; thank
16  you; next. So I don't recall. I don't recall if
17  I did any speaking at all on this.
18  Q. But you would have -- you would have known
19  that this was going to be presented at the
20  meeting?
21  A. Correct.
22  Q. And if you had some kind of a concern about
23  the safety of ObTape at this point in time, why
24  wouldn't you have, you know, pulled this down?
25  A. Well, we don't have the -- once we submit --

Page 149

1  we submit this in October of the year prior, so
2  six months, eight months prior, which represents
3  data that we collected four months prior to that,
4  probably when we did the video because it takes
5  that long to do th editing and everything. So
6  this is representing, let's just say at the
7  latest, June of '04. And so we don't have the
8  ability to pull -- not -- or retract it. And we
9  don't have the ability to edit this either once
10  it's submitted to the AUA.
11  Q. You can't call the folks at the AUA and say,
12  hey, this product is -- I'm sorry, I've learned
13  that this product is not safe and I don't really
14  want my name associated with this presentation?
15  You can't do that?
16  A. We don't have the ability, no. It's
17  submitted and it's gone so that it -- and then it
18  goes a part of the AUA record at that point in
19  time. So there's no editing. You don't have to
20  show up to the meeting, but it's going to be
21  played whether you're there or not. This is
22  different than a poster or a -- then that data is
23  dynamic because you can change it up until the day
24  before, especially the podium. The posters you
25  can't as much.

38 (Pages 146 - 149)

Page 150

1  Q. Sure. I mean, maybe you can't change a video
2  but I mean, you certainly could have contacted
3  somebody at the AUA and said, look, I don't
4  support the use of this product any longer. I
5  mean, there was nothing preventing you from
6  writing a letter to the people running the
7  conference and saying, I don't support the use of
8  this product; let's put a little tag line on it?
9  A. Well, there's nobody to do that to. And also
10 I don't know what was said during this meeting.
11 Dr. Hawatmeh was up front and he could have said,
12 we don't do it anymore; there was a problem. I
13 don't recall. I mean, I don't remember what was
14 done then. Clearly we had stopped using the
15 product by then.
16 Q. But you were still presenting on the surgical
17 technique to peers, right?
18 A. Yes. And so was Gona (phonetic). He was
19 presenting on it too.
20       Yeah, it was presented. But, again,
21 this is representation from really June of '04,
22 five or six months into my using it, when we were
23 very much favorable. I would completely agree
24 with you if this were a poster and definitely a
25 podium presentation because that you can state up

Page 151

1  in front, and I've done that. But this is set.
2  Q. Okay. But at least, to the best of your
3  recollection, you don't recall seeking to take any
4  steps -- regardless of what the procedures are,
5  you don't recall affirmatively seeking to take
6  steps to tell anyone at this meeting or associated
7  with this meeting that you don't use ObTape any
8  longer?
9  A. Again, I don't recall what happened at
10 that -- what happened during the presentation.
11 And we do say we had successful outcomes,
12 short-term outcomes. That we do state.
13 Q. Sure.
14 A. But other than that, I don't recall.
15 Q. I guess if I'm reading this, I'm not seeing
16 that there's a problem in your practice with
17 ObTape. If I'm reading this, V496 in Exhibit 8,
18 I'm personally -- there's nothing here that would
19 tell me that there's a problem with your use of
20 ObTape?
21 A. You are 100 percent, and that is the
22 terrifying aspect of this. The complications
23 rolled in after we did this video.
24       But you are correct. Eyeballing
25 this here, there is nothing other than I say it's

Page 152

1  short-term follow-up, but we were successful in
2  short term.
3  Q. And I've done a pretty good search of our
4  document database, and I have e-mails. That's how
5  I got that e-mail address before. And I'm not
6  seeing an e-mail from you to Mentor saying I've
7  got a problem with this product.
8  A. It was verbal discussion with Chris Sellwood
9  over lunch. I don't recall sending an e-mail
10 saying I'm not going to. I talked to Chris
11 Sellwood.
12 Q. Did you ever -- do you know what -- you
13 obviously know what an Institutional Review Board
14 is, right?
15 A. Correct.
16 Q. An Institutional Review Board is a board of
17 individuals at a medical institution that is
18 responsible for allowing a physician at that
19 medical institution to perform a clinical study,
20 among other things, right?
21 A. That is one of the roles, to maintain proper
22 ethics, protect patients, yes, and to approve
23 studies, yes.
24 Q. And when you have published your data related
25 to patients, you have had -- at the Mayo Clinic,

Page 153

1  you have had to get Institutional Review Board
2  approval; is that correct?
3  A. Now we do. We didn't used to have to do
4  that. When I was a resident and a fellow and in
5  the early part of my career, you didn't have to.
6  That became a very strong, very much enforced rule
7  over time. So yes.
8  Q. When? What do you think, roughly?
9  A. That's a good question. I don't recall. It
10 was an evolution of what the rules became. We
11 used to -- they said -- we used to be able just to
12 do any data search we wanted in the records, no
13 problem. Then they said, no, you've got to get
14 approval before you do that. Then they said
15 you've got to have approval before you do
16 anything. And so it became much more strict over
17 time.
18       Now we can't do anything without
19 having an IRB. I've got an idea for a study, I've
20 got to get an IRB to pursue it any further. Then
21 it has to be approved, which becomes a very
22 stringent process. But during my residency, it
23 didn't exist at all.
24 Q. And one of the reasons that IRB,
25 Institutional Review Board, approval is necessary

39 (Pages 150 - 153)

Page 154

1  to publish data on your cohorts is to protect
2  patient confidentiality; is that correct?
3  A. Confidentiality and to assure ethical study
4  practices.
5  Q. What do you mean by "ethical study
6  practices"?
7  A. Meaning, as a grotesque example, if somebody
8  wants to inject TB in individuals to find out if
9  medications work, okay, it's unethical. You can't
10  do that. And so they will review your study,
11  looking at multiple different factors. I mean,
12  it's like a ten-page process we have to go through
13  to get a study approved, and they're looking at
14  many things: Patient protection, patient
15  confidentiality, what's going to happen with the
16  results, are you going to publish this, what
17  journals are you going to publish this? And it's
18  a long, drawn-out process.
19  Q. Would you agree that Institutional Review
20  Board approval is also present and required to
21  ensure scientific integrity?
22  A. Well, I guess I don't know what you mean by
23  "scientific integrity". They don't have the
24  ability to review studies and say, is the
25  researcher being honest with the data. That's

Page 155

1  not -- they don't have that ability. I could --
2  you would never do this; you would lose your
3  job -- but you could tell them, here are the
4  results; everything is fine. And they don't have
5  a way of looking at that. Or the opposite,
6  something like that.
7         They also are screening is their
8  financial bias in the study, those type of things.
9         So, again, there's multiple things.
10  But they -- they -- scientific fraud or scientific
11  integrity cannot be guaranteed by the IRB process.
12  Q. Is it something that's looked at? I mean, if
13  they notice something --
14  A. Well -- I'm sorry. I keep interrupting you.
15  Q. That's all right.
16  A. Yes, if they notice something, but that's not
17  part of the -- they would have no ability to
18  notice an indiscretion. They wouldn't have that
19  ability to do that.
20  Q. Unless it's obvious from the submission
21  itself?
22  A. Unless it's obvious from the submission
23  itself, then they would.
24  Q. So with respect to your opinions formed in
25  this litigation related to ObTape, you have not

Page 156

1  subjected your methodology that you've used to
2  Institutional Review Board approval at the Mayo
3  Clinic, have you?
4  A. I'm not following your question. I'm sorry.
5  Q. Sure. I mean, you've obviously published --
6  it's not a journal, but I mean, you've published
7  your results -- or at least you've talked about
8  your results with Mentor's -- with the Mentor
9  ObTape patients in your reports and also other
10  opinions that you've formed in this case. You
11  haven't subjected -- your work in this litigation
12  related to ObTape, you haven't subjected that to
13  Mayo Clinic IRB review, have you?
14  A. No, because I'm not performing a study. This
15  would be just a retrospective --
16  retrospectively -- prospectively gather,
17  retrospectively reviewed, but it's not going to go
18  for a publication, so that has not gone through
19  IRB. If I were going to publish the data, then I
20  would have to do it.
21  Q. Is there anything preventing you from
22  subjecting the work that you're doing in the
23  ObTape litigation or other mesh litigation to IRB
24  review? Is there anything preventing you from
25  that?

Page 157

1  A. Again, I'm not following your question. I'm
2  not doing any research or studies -- produced any
3  studies. If the data that I have gathered of my
4  personal experience with patients, if I'm going to
5  submit that to a journal, then yes, we would. And
6  I've done that with the mesh sling because we
7  wrote up a paper. I think Clinton was the senior
8  author on that -- Marissa Clinton and Leitner and
9  then myself, where we talked about mesh sling
10  complications. That data had to go through IRB to
11  be approved.
12  Q. But that hasn't been done with respect to
13  your work in the ObTape litigation; is that fair
14  to say? You have not sought IRB approval or IRB
15  review at the Mayo Clinic for your work in the
16  ObTape litigation?
17  A. Yes, because I'm not publishing anything. If
18  I were to publish, I would have to, yes.
19  Q. And is it also fair to say that you have not
20  subjected your work in other mesh litigation to
21  Mayo Clinic IRB review or approval?
22  A. Well, again, the closest would be our mesh
23  sling data that we did get an IRB approval for, so
24  the TVTs were included in there, among others. So
25  they're included in there.

Page 158

1    But only if I'm going to be
2 submitting it to a journal, publishing it somehow,
3 that has to go through IRB. And, again, I have
4 not done that, so it has not been done.
5 Q. Okay. Let me ask you just a few questions
6 about Ms. Clinton.
7    In your specific expert report,
8 Exhibit 3, you talk about a concept of
9 differential diagnosis. Do you recall that?
10 A. Yes.
11 Q. That's on page 8. And in your report on page
12 8, you list -- and I guess it's on page 8 and 9 --
13 you list, I guess, potential causes of
14 Ms. Clinton's injuries that you ruled out as part
15 of your differential diagnosis; is that correct?
16 A. These are some, a representative of the
17 differential diagnosis that I included. It's not
18 meant to be a comprehensive but just an example of
19 the ideologies that I go through when I evaluate
20 any patient, regardless if it's litigation or not.
21 Q. So how do I find what your -- what you ruled
22 out in Ms. Clinton's specific case? Let me ask
23 you this. Let me back up. Strike that.
24    Did you do a differential diagnosis
25 as part of your specific causation testimony in

Page 159

1 and Andrea Clinton's case?
2 A. Yes.
3 Q. Okay. Where do I get the list of things that
4 you ruled out as part of the specific differential
5 diagnosis that you did in Ms. Clinton's case?
6 A. Well, we have a partial list here of some 25
7 things on page 8, extending into 9. The
8 comprehensive list won't exist because that will
9 include everything, including tuberculosis,
10 colicystitis, cardiac issues, angina. But very
11 rapidly somebody who does this all the time can
12 eliminate those. So the comprehensive list is
13 going to be in the thousands, literally.
14    This is more -- the list I provided
15 to you is a more specific but not comprehensive
16 list of the various different processes that I
17 would consider more seriously.
18 Q. Did you review Ms. Clinton's medical records
19 as part of your work in this case?
20 A. Yes. There were over 3,000 pages and I
21 reviewed them.
22 Q. Okay. Did you see in the medical records
23 occasions where physicians attributed her problems
24 to things other than the ObTape?
25 A. In reviewing all of her records and in

Page 160

1 reviewing specifically ID and general surgeons who
2 were unaware that she had an ObTape sling in, yes,
3 their differential diagnosis was different but,
4 again, they were unaware that she had that sling
5 in place.
6    So yes, by all means, I agree with
7 you. That's what I think is the sad part, which
8 delayed her diagnoses, because buttock abscesses,
9 necrotizing fasciitis was known but it was not
10 known to those physicians.
11 Q. But I guess my point is is that did you
12 review and identify, from the medical records in
13 Ms. Clinton's case, specific potential causes of
14 her complications that were identified by those
15 treating physicians? Did you list them out
16 somewhere?
17 A. I don't believe I listed them out, per se,
18 because some of them were not within the realm of
19 possibility; i.e., a bug bite on the contralateral
20 buttocks, you know, a mosquito bite, that's not
21 going to cause contralateral groin abscesses and
22 necrotizing fasciitis. So I did not include it
23 because it wasn't within the realm of possibility,
24 okay? We have a polymicrobial infection, bug
25 bites will cause a type 2 necrotizing fasciitis.

Page 161

1 She had type 1.
2    Anything like a brown recluse
3 spider, that will cause a tissue necrosis, okay?
4 It will not cause the infectious process. Again,
5 if anything, that would cause a secondary type 2
6 necrotizing fasciitis. She had type 1.
7    Things like dental caries, okay?
8 That can cause a polymicrobial infection. But to
9 the best of my knowledge, dental caries,
10 abscesses, will cause local infections: Head/neck
11 fasciitis, which has been described, but she did
12 not have that.
13    So those things I did not include in
14 there because they are beyond the realm of medical
15 possibility. I tried to limit it to the most
16 likely, most logical, most scientific basis.
17 Q. Okay. So do you believe that in -- on pages
18 8 and 9 of Exhibit 3, you have identified the
19 medically possible alternative causes for the
20 complications suffered by Andrea Clinton and then
21 ruled them out?
22 A. Well, we'd have to go through them one by
23 one. Endometriosis, no, that's not going to cause
24 an abscess. That's not going to cause a
25 necrotizing fasciitis.

41 (Pages 158 - 161)

Page 162

1 Gynecologic malignancies, no
2 evidence of that. That's not going to cause
3 necrotizing fasciitis.
4 Pelvic congestion syndrome, that's a
5 vascular. It causes pain. It doesn't cause
6 infection.
7 Pelvic inflammatory disease, that's
8 an ovarian -- or a fallopian tube problem. It's
9 not in her.
10 Tubo-ovarian abscess is a variant of
11 pelvic inflammatory disease. She doesn't have
12 that.
13 Endocervical causes is along the
14 lines of malignancies. That's not going to do it.
15 Pelvic adhesions, no evidence of
16 pelvic adhesion disease.
17 Uterine leiomyomas, that's a benign
18 process. Does not cause infection.
19 Dysmenorrhea is a uterine problem.
20 It's not going to cause infections.
21 Adnexal cysts, same thing.
22 Ectopic pregnancy, no evidence of
23 pregnancies.
24 Gynecologic skin disorders, lichen
25 sclerosus would be one of those. She doesn't have

Page 163

1 that.
2 Mucosal atrophy, at on her age
3 group, there's no reason to suspect. My physical
4 exam said no.
5 And I can go through the whole list
6 if you want. It's going to take a long time, but
7 I don't mind doing it.
8 Q. And I guess this is -- my question was a
9 little bit different.
10 A. Okay.
11 Q. I'm really looking for -- I need to
12 understand the list of -- not things that aren't
13 medically possible, but the list of medically
14 possible alternative causes for the complications
15 that Andrea Clinton suffered from that you have
16 ruled out.
17 A. Okay. Specifically to that, as a physician
18 who has dealt with necrotizing fasciitis as a
19 medical student and as a staff, who's used to
20 dealing with Fournier's gangrene which is a subset
21 of necrotizing fasciitis, the ideology of her
22 infections that I have ruled out -- I have ruled
23 out the bug bites. I have ruled out penetrating
24 trauma. I've ruled out trauma. I've ruled out --
25 off the top of my head, that's the only thing I

Page 164

1 can think of I've ruled out because this is a
2 situation, based upon my experience as a surgeon
3 in a high-volume center who understands the
4 complications and have treated the complications
5 of ObTape, who has dealt with buttock abscesses in
6 patients -- fortunately none of mine developed
7 necrotizing fasciitis -- I have reviewed the
8 medical literature, I've talked to my colleagues
9 in the GYN department and at national and
10 international meetings, then reviewed the
11 literature -- the medical records on Ms. Clinton,
12 this is due to ObTape.
13 Q. Have you identified for me all of the
14 medically possible alternative causes other than
15 ObTape that you believe you have ruled out for
16 purposes of your specific causation opinions in
17 Ms. Clinton's case?
18 A. Well, off the top of my head, I gave you a
19 decent list. There's going to be more.
20 IV drug abuse ruled out.
21 Q. Well, and this is --
22 A. No. That's actually a very good question.
23 Rectal pathology, which you can have
24 as a cause of Fournier's, she doesn't have.
25 Urethral diverticulum or urethral

Page 165

1 strictures she does not have.
2 And so you rule out those big things
3 and then you're only left with ObTape. So if
4 there's something else, I'd be happy to discuss
5 it. But it looks like a duck, it quacks like a
6 duck, everything pointing towards it, I don't have
7 to go looking for a zebra. But I did look for a
8 zebra as far as the bug bites, brown recluse
9 spider -- or mosquito I should have said first, or
10 idiopathic in an immuno-stable person is unheard
11 of.
12 Or the dental caries too. That's
13 the other one. Ruled that out.
14 Q. Why did you rule out the dental injuries?
15 A. Because she has no -- I will be perfectly
16 willing to be corrected. Every single case that I
17 know of of a tooth abscess causes local head and
18 neck fasciitis and devastating consequences from
19 that. We have no evidence of this being a
20 metastatic, so to speak, seating into the groin
21 because we have no primary. She had a tooth
22 infection but we have no local infection spreading
23 to that. She never developed necrotizing
24 fasciitis of the head and neck, so it doesn't fit.
25 And she had no positive blood cultures, okay? The

42 (Pages 162 - 165)

Page 166

1  only way for an infection to get down to the groin
2  would be a positive blood culture. Blood cultures
3  are typically going to be held off until you
4  have -- or excuse me, the antibodies are going to
5  be held off until you do the blood cultures, and
6  so I have no evidence of a positive blood culture.
7         And when I consider this, if she had
8  a devastating head and neck fasciitis and she had
9  a blood culture that was positive, then by all
10  means I'd reconsider. But see, she didn't have
11  that. So I have to have everything fit. It has
12  to be very logical.
13         (Exhibit 9 was marked for
14  identification.)
15  BY MR. LEWIS:
16  Q. I'm going to show you what's been marked
17  as deposition Exhibit 9. Exhibit 9 is an article
18  from 2007, lead author, Benassi, B-E-N-A-S-S-I,
19  titled "Abscess formation at the ischiorectal
20  fossa 7 months after the application of a
21  synthetic transobturator sling for stress urinary
22  incontinence in a type II diabetic woman."
23         Doctor, are you familiar with this
24  article?
25  A. I don't recall it, per se. I may have

Page 167

1  reviewed it, but I just don't recall it. The
2  article -- that's what I'm trying to find out is
3  what type of sling they put in.
4  Q. If we go to the third page of this article --
5  of this three-page article.
6  A. And if it were a TVT or TVT-O, I reviewed
7  them but did not put them into the reliance list.
8  Q. The second paragraph down in the left-hand
9  column of page 3.
10  A. Monarc sling.
11  Q. So do you understand that the Monarc sling is
12  a macroporous monofilament polypropylene used in
13  the transobturator technique?
14  A. It is a macroporous when you follow the Amid
15  system, which is archaic. No one follows it
16  anymore. So it is a microporous when we follow
17  the modern nomenclature.
18         But I'll agree with you it's larger
19  pores than seen with the ObTape.
20  Q. And did you use the Monarc sling as part of
21  your practice for a short period of time?
22  A. Correct.
23  Q. Did you have infections and erosions with
24  Monarc?
25  A. I had dyspareunia, sulcus injury. I do not

Page 168

1  recall if I had any mesh exposure with it.
2  Q. Go to the paragraph that starts, "Studies
3  have shown".
4  A. Okay. I'm there.
5  Q. "Studies have shown" it says, "that meshes of
6  this kind", meaning greater than 75 microns which
7  is what -- the pore size, which is the paragraph
8  before, "carry a lower incidence of erosion due to
9  their larger pore size but make the sling more
10  difficult to remove because the larger pores
11  facilitate the migration of macrophages and
12  leukocytes."
13         Do you see that sentence?
14  A. Yes, I do.
15  Q. Do you agree with it?
16  A. No.
17  Q. Why not?
18  A. Because it's not difficult to get out because
19  of the migration of macrophages and leukocytes.
20  It's more difficult to get out because of the
21  fibrosis. It anchors it in and it's very
22  difficult to get out.
23         So I agree it's difficult to get out
24  but not by the reasons they say.
25  Q. And in this case -- you can take some time

Page 169

1  reporting -- reviewing it, but it's -- the title
2  of it indicates that this individual suffered an
3  abscess seven months after implantation of the
4  Monarc sling through the transobturator route and
5  they theorize about the potential causes in next
6  sentence that I'm going to read to you.
7  A. I -- you know, that's why I don't use mesh
8  slings, period. So I agree with their conclusion
9  and it was a delayed presentation which I agree
10  with because of the biofilm, et cetera. So I have
11  no problem with this, and that's one of the
12  reasons I stopped using the sling.
13  Q. Sure. It says, "in our case, the possible
14  causes of erosion and infection could be due to:
15  Rejection of the sling material by the surrounding
16  tissue."
17         Do you agree that that is a possible
18  cause of erosion and infection in any sling?
19  A. Well, rejection -- this is -- this does not
20  have DNA associated with it. Rejection -- the
21  true medical definition of rejection is the body
22  views it as non-self, like a kidney transplant.
23  So it is -- it does not integrate, and
24  subsequently causes reaction and inflammation and
25  potentially infection. So I just have trouble

43 (Pages 166 - 169)

Page 170

1  with the "rejection" term. I don't think that's a
2  good choice of terms.
3  Q. What would you use in instead?
4  A. I would say failure to integrate within the
5  surrounding tissues, causing, you know, scarring
6  and things like that.
7        So this is a semantics difference.
8  This paper was way back in '07. That's the dark
9  ages of all of our mesh understanding. So I don't
10 fault them for it. It's just not the best term
11 for it because, again, if you talk to most
12 physicians, rejection is an immunologic response,
13 which you don't have that with meshes.
14        But I agree with their conclusion.
15 Just not to the logic of how they got that point.
16 Q. So a host response to the sling material
17 could be a possible cause of erosion and
18 infection?
19 A. Then I would agree with that wording.
20 Q. Okay. Then number 2, "a higher risk of
21 infection in a patient suffering from diabetes
22 mellitus," if I said that correctly.
23 A. Yeah. That's --
24 Q. Do you agree with that?
25 A. The data will be all over the chart on that.

Page 171

1  And so diabetes and immunocompromised state due to
2  diabetes will most likely increase the risk of the
3  body's inability to fight off the infection.
4        So I don't agree or disagree, but
5  you can pull papers out that say it either way. I
6  don't have a problem with it, let's put it that
7  way.
8  Q. All right. And then thirdly, "Sling
9  placement resulting in too much stretch on the
10 vaginal wall."
11        Do you agree with that?
12 A. Yes. Yes, I do.
13 Q. And then they go on to say, "In conclusion,
14 we can say that infectious complications are
15 possible after transobturator sling procedures."
16        Do you agree with that?
17 A. Yes, I do.
18 Q. All slings, right?
19 A. No. Disagree.
20 Q. Not possible with all slings?
21 A. No. When we're using -- you do not see this
22 vaginal complications -- they say infectious
23 complications. I'll modify what I'm saying.
24        They're just saying infectious
25 complications can occur after transobturator

Page 172

1  slings. You can have that. You can reduce it
2  tremendously. We have had zero in our nearly 100
3  of transobturator autologous. We have no foreign
4  bodies in there.
5  Q. So --
6  A. But it can occur.
7  Q. I'm sorry to interrupt. Let me ask you if
8  you agree with this statement because I think this
9  is what they mean, but -- because this is before
10 your autologous transobturator usage.
11        In conclusion, infectious
12 complications are possible after transobturator
13 synthetic sling procedures. Would you agree with
14 that statement?
15 A. Yes, I do. That modification I agree with,
16 sure.
17 Q. And would you agree that patients should be
18 informed about the risks of erosion and infection
19 and be warned that the appearance of pain and
20 foul-smelling vaginal discharge may be the first
21 symptom of subsequent and more severe infectious
22 complications? Do you agree with that statement?
23 A. Yes and no. The more severe infections are
24 going to happen when you're not getting that
25 because when you have a vaginal erosion -- or

Page 173

1  vaginal extrusion, there's a chance for pus to get
2  out, so the only treatment for abscess is to drain
3  it. And so -- but with this, if you have a
4  vaginal discharge, yes, that needs to be reported
5  to your doctor, but absence of vaginal discharge
6  does not exclude infection.
7  Q. And, again, I know this is just a case
8  report. There are limitations on a case report,
9  fair to say, as far as scientific rank versus a
10 randomized control trial and a case report. There
11 are differences in those two types of
12 publications.
13 A. There are differences. Its use still can be
14 very helpful.
15 Q. Okay. You would agree with me that synthetic
16 slings with pores greater than 75 microns can
17 cause abscesses or be responsible or associated
18 with the development of abscesses in patients
19 being treated with stress urinary incontinence?
20 A. My angle is is all meshes placed in the
21 vagina are wrong and increase the risk for
22 infection. So by stating that, yes, the larger
23 porous can have -- they do have an increased risk
24 for infection. The smaller pore size increases
25 that.

44 (Pages 170 - 173)

Page 174

1  Q. So would you agree with me that if
2  Ms. Clinton had a Monarc sling instead of an
3  ObTape sling, she might have had the same result?
4       MR. KREIS: Object to form.
5  BY MR. LEWIS:
6  Q. She could have had the same result?
7       MR. KREIS: Object to form.
8       THE WITNESS: At a much less risk
9  frequency, yes.
10  BY MR. LEWIS:
11  Q. Sure.
12  A. All slings that are made of meshes have
13  increased risk for infections, but not all slings
14  are created equal.
15       And so the Monarc has that risk.
16  There is one case report, versus ObTape having
17  many case reports. But yes, it is a lesser risk
18  with ObTape -- excuse me, Monarc, but can still
19  can occur. I agree with you.
20  Q. So I just want to make sure I get squared
21  away with the answer to my question.
22       So if in just Ms. Clinton's case,
23  the only thing you change is a Monarc versus an
24  ObTape, she could have had this very same outcome?
25       MR. KREIS: Object to form.

Page 175

1       THE WITNESS: With a much less risk
2  of it, less frequency.
3  BY MR. LEWIS:
4  Q. But the answer would be yes?
5       MR. KREIS: Object to form.
6       THE WITNESS: Just as I answered,
7  with a much less frequency, it could have
8  occurred.
9  BY MR. LEWIS:
10  Q. Okay. But in her specific case. This is one
11  time -- you know, it's Ms. Clinton's one time.
12  She's not a percentage. She's a one-time thing.
13  If Ms. Clinton's case, if she would have had a
14  Monarc instead of an ObTape, it's possible she
15  could have had the same outcome, correct?
16       MR. KREIS: Object to form.
17       THE WITNESS: As I stated, I'm very
18  careful with what I'm saying. All slings have
19  increased risk for infection. She could have had
20  a Monarc and she could have had it, but the odds
21  of it occurring are much less likely.
22  BY MR. LEWIS:
23  Q. But it still could have occurred with
24  Ms. Clinton in her case, her complications, if she
25  had had a Monarc, correct?

Page 176

1       MR. KREIS: Object to form, asked
2  and answered.
3       THE WITNESS: At a much less
4  frequency with the Monarc compared to the ObTape.
5  BY MR. LEWIS:
6  Q. In your opinion?
7  A. No. My opinion and the medical literature
8  support that.
9  Q. You haven't done any studies to compare the
10  risk of infection or abscesses in ObTape versus
11  other slings yourself? You haven't done any
12  independent Dr. Elliott-spearheaded studies that
13  have been published or peer reviewed or presented
14  to demonstrate the relative frequency of
15  infections and abscesses between ObTape and other
16  slings?
17  A. I have not conducted a formal study. I've
18  only done an informal study of my ObTape
19  experience versus all the other slings, where all
20  the other slings, so roughly 1,000, I have zero
21  incidents of abscess and with ObTape's 105, I had
22  three. That was not published. I'm relying on
23  the results of others. Boyles, et al., did a
24  comparative study in metaanalysis. So I'm relying
25  on published of other people's data.

Page 177

1  Q. Not your own study, correct?
2  A. As I stated that already.
3  Q. Now, you know that there have been other
4  physicians who have had different and much more
5  successful experience with their patient
6  populations than you have?
7       MR. KREIS: Object to form.
8  BY MR. LEWIS:
9  Q. Correct?
10  A. I would have to see that data.
11  Q. Have you looked at the published data from
12  physicians who have reported on their outcomes
13  with ObTape?
14  A. Yes, I have. Like Juma, et al., a paid study
15  by a Mentor, showing on short term, less
16  complications.
17  Q. Two years, that's short term?
18  A. Absolutely. Because this is a permanent
19  implant so we have to talk about the life of the
20  patient, because remember my one patient seven
21  years later came back with a mesh -- an ObTape
22  mesh extrusion. So yeah, that was a short-term
23  study. We'd need to full pull that out because
24  not all patients were followed for two years.
25       But I am unaware of any independent

45 (Pages 174 - 177)

Page 178

1  non-industry-supported study with long-term
2  results that show a good outcome.
3  Q.  When you say "industry reported", I mean, you
4  understand that Dr. Juma's study was peer
5  reviewed, right?
6  A.  Correct.
7  Q.  And just because a study is funded doesn't
8  mean that it's biased, does it?
9  A.  It doesn't mean that it's biased, but
10  articles out there showing that there is the
11  potential for bias.  If there weren't the
12  potential for bias, journals and otherwise would
13  not require us to state is it funded or not.  If
14  there were no bias, no one would care.  But we
15  know that bias is introduced.  Therefore, journals
16  require us to say it.  And every talk we give now
17  we have to state is there industry funding or not.
18  Q.  And why is that?  What's the potential for
19  bias?
20  A.  There is always the potential for bias if
21  money is involved, whoever is funding it.  There
22  is a study -- I will not be able to give you the
23  name.  I can't recall it.  I don't know if it's my
24  report or not, but it's in my reliance list,
25  showing that if a company funds a study -- this

Page 179

1  was a medication study -- there is more likely
2  going to be a 75 percent chance of positive
3  outcomes for that product versus a non-industry.
4       So I'm not saying all
5  industry-funded studies are bad, by no means.  It
6  raises the potential for it.  That's why we have
7  to document that.
8  Q.  Let me just ask you about this last document.
9       (Exhibit 10 was marked for
10  identification.)
11  BY MR. LEWIS:
12  Q.  I show you what's been marked as Deposition
13  Exhibit 10.  Do you recognize this article?
14  A.  Yes.  This is our very first patient or
15  autologous transobturator so we're -- this is the
16  video for it.
17  Q.  And by the way, when you do a surgery using
18  autologous transobturator midurethral sling
19  placement, you get paid for that, correct?
20  A.  No.
21  Q.  You get compensated?
22  A.  No, I do not.
23  Q.  The clinic does?
24  A.  Yeah.  I'm paid salary, so I don't get more
25  money if I do or do not do a case.  I technically

Page 180

1  make more money if I don't operate because I don't
2  have to work.
3  Q.  Fair enough.
4       In the conclusion of this article,
5  you indicate that based on short-term, this
6  autologous mid-urethral sling procedure seems to
7  be feasible and is effective in the short term?
8  A.  Correct.  The purpose of this study -- it's a
9  feasibility study -- is can it technically be
10  done.  We're not touting it should be done, but
11  we're saying it can be done.
12  Q.  And you indicate that it may become a
13  suitable option for patients and surgeons
14  concerned with potential mesh complications,
15  right?
16  A.  That is correct.
17  Q.  Because you knew at this point in time that
18  there was -- that patients were being impacted by
19  some of the media attention given to mesh
20  complications and they were asking for other
21  options, correct?
22       MR. KREIS:  Object to form.
23       THE WITNESS:  No.  I was aware very
24  much.  Anything after 2011 is when we saw a spike
25  in patient awareness, so yes, I was aware of that.

Page 181

1  BY MR. LEWIS:
2  Q.  And at this time, you -- as far as you know,
3  other than someone in London, you were the only
4  person before me autologous transobturator
5  technique surgeries, correct?
6  A.  This was, as far as we know, the world's
7  first procedure like this, yes.
8  Q.  And at this point in time in 2014, you were
9  retained as an expert in litigation involving mesh
10  complications, correct?
11  A.  That is correct.
12  Q.  And you don't disclose in this article, do
13  you, that you are a paid consultant for plaintiff
14  lawyers in mesh litigation, correct?
15       MR. KREIS:  Object to form.
16       THE WITNESS:  No, we do not because
17  we were not -- we're not required to, nor does it
18  have an impact upon our outcome.
19  BY MR. LEWIS:
20  Q.  Why wouldn't it have an impact on your
21  outcome?
22  A.  Because I've been anti-mesh for a long time
23  and stated it before this litigation process.
24  That's how I was contacted, because I had the
25  statements for Public Citizen, newspaper

46 (Pages 178 - 181)

Page 182

1  publications, others being against the
2  complications that are -- or against meshes, okay?
3  So my opinion has not changed. It's been
4  strengthened by this. So there's not impact.
5  There's not change in my opinion.
6  Q. I mean, I'm reading this. I think I'm
7  getting some objective viewpoint here from
8  Dr. Elliott and, in fact, at this point in time,
9  you're receiving money from plaintiff lawyers to
10 testify against manufacturers of mesh, right?
11        MR. KREIS: Object to form,
12 argumentative.
13        THE WITNESS: Yeah. This is is -- as
14 we state in there, this may become a suitable
15 option for patients and surgeons concerned about
16 potential mesh. That does not impact upon my
17 income at my intuition, nor my involvement in
18 this. We're just saying this is a potential
19 option.
20 BY MR. LEWIS:
21 Q. I understand, but you're saying -- look at
22 this second page. "Conflicts of interest," what
23 does that mean to you?
24 A. That means am I getting money from industry
25 to do this? No. That's what that means.

Page 183

1  Q. Well, you're getting money from somebody at
2  this point in time, aren't you?
3  A. Yes, but --
4        MR. KREIS: Object to form.
5        THE WITNESS: But that has nothing
6  to do with this conflict of interest as they're
7  asking it. This is from industry, which there are
8  no -- I'm not getting paid by any outside sources
9  to do this study.
10 BY MR. LEWIS:
11 Q. Well, conflict of interest, isn't that --
12 does this -- is there the potential that -- this
13 person publishing this science, is there the
14 potential that this person is receiving some
15 financial benefit for saying the scientific things
16 that they're purporting to say in this article.
17 Isn't that really what conflict of interest is all
18 about?
19        MR. KREIS: Object to form.
20        THE WITNESS: Well, no, because that
21 is not pertinent for this. This is an option for
22 patients who are concerned about mesh, okay? So
23 I'm not coming out here -- nowhere in here do I
24 state anything negative against mesh, other than
25 there's patient concerns and known complications,

Page 184

1  which is in the literature. I am following all
2  the rules. This has no financial bearing upon me.
3  I don't get a penny more by doing this paper or
4  treating these patients.
5  BY MR. LEWIS:
6  Q. Well, let's think about that for a minute.
7  So if -- if this transobturator autologous sling
8  procedure catches on in the United States and
9  people start flooding into the Mayo Clinic because
10 you folks are the only ones who do it, you've got
11 to agree with me that there would be some
12 financial benefit through your salary or to the
13 Mayo Clinic?
14 A. I get --
15        MR. KREIS: Object to form.
16        THE WITNESS: I get nothing. I am
17 pure salary. I don't get a penny more if I do a
18 procedure or not.
19 BY MR. LEWIS:
20 Q. Yeah, but you get raises every year, don't
21 you?
22        MR. KREIS: Object to form.
23        THE WITNESS: We get cost-of-living
24 raises only.
25 BY MR. LEWIS:

Page 185

1  Q. No merits raises?
2  A. None. None at Mayo since 1920 when the Mayo
3  brothers instituted that. So I don't get -- so it
4  eliminates financial incentive. So I have none.
5  By me doing this, I actually potentially increase
6  my workload, which has not panned out, by any
7  means. We are still publishing on this and
8  warning that we don't have the long-term results
9  yet, so we have to pan that out. So we're not out
10 there touting it. I am not like Delorum
11 (phonetic) or Ulmsten who gets $1.2 million or
12 more for doing something depending upon the
13 results. I don't get anything for this.
14 Q. Well, you get paid by plaintiff lawyers who
15 are suing mesh manufacturers to say that mesh is
16 bad?
17        MR. KREIS: Object to form.
18        THE WITNESS: No. I am being paid
19 for my opinion that was established prior to my
20 involvement in the litigation process. They would
21 not have come to me had I not already had an
22 opinion, which is -- clearly if you look up that
23 comment, that is prior to any contact with any
24 lawyer. So in my opinion, if you look at that and
25 you look at now, if anything, that's become more

47 (Pages 182 - 185)

Page 186

1 firm because I know more. So, again, it has not
2 changed.
3 BY MR. LEWIS:
4 Q. Let me ask you this: Of the 75 IMEs that
5 plaintiff lawyers have had you do patients in
6 their litigation, how many of those did you call
7 back and say, you know what? This was not caused
8 by the mesh?
9 A. I can't give you an exact number because I
10 don't recall, but there have been some. I tell
11 them this patient is malingering.
12        We had a drug-abusing psycho three
13 or four weeks ago, not associated with this one,
14 that I said, this person is nuts; I can't give you
15 that.
16        Also I have rejected many once I
17 reviewed their records saying, this is not
18 legitimate. If it's not legitimate, I don't even
19 do an IME. Then once I do the IME, if I feel
20 they're nuts, I tell them. And I have refused to
21 give testimony on certain one of those because I
22 said, I'm not sticking my neck out for that. So
23 every one that I've given testimony on there has
24 been legitimacy to it, bar none.
25        MR. LEWIS: Give me two minutes.

Page 187

1        MR. KREIS: I've got a couple of
2 questions. Not much.
3        MR. LEWIS: Okay. Well, why don't
4 you ask your questions now and I think I'm pretty
5 much wrapped up. And give me a chance to ask a
6 question or two if I missed it.
7        MR. KREIS: Of course.
8
9        EXAMINATION
10
11 BY MR. KREIS:
12 Q. Dr. Elliott, you were asked questions earlier
13 about the instructions for use, or what they call
14 the PIDs in this litigation. Do you recall that
15 testimony?
16 A. Yes, I do.
17 Q. And you testified that the sales rep,
18 Mr. Smallwood [sic] had provided you a PIDs --
19        MR. LEWIS: Sellwood.
20 BY MR. KREIS:
21 Q. -- Sellwood had provided you a PIDs prior to
22 your first implantation, correct?
23 A. That is correct. On the introduction of this
24 idea, he provided me with the PID, the
25 instructions for use, surgical video, and I don't

Page 188

1 recall what else.
2 Q. And that was in the context of the Mentor
3 sales representatives trying to gain your interest
4 in this procedure, correct?
5        MR. LEWIS: Object to foundation.
6        THE WITNESS: That is correct. It
7 was -- it was -- well, ultimately their goal was
8 to make me -- want me to do that project. It was
9 an introduction that this is now available -- or
10 will be available.
11 BY MR. KREIS:
12 Q. And I think if I'm correct on this factually,
13 you testified that it wasn't that you had reached
14 out to him and said, hey, give me the Mentor
15 ObTape PIDs but rather, it was part of a
16 presentation that he made to you, correct?
17 A. I mean, I -- we're going a long ways back. I
18 don't recall if I asked for it. What I usually do
19 is ask for all information that you've got, and
20 this is what was presented to me.
21 Q. Okay. And so at that same period of time,
22 you were provided with a video -- or at least you
23 observed a video that was on his laptop; is that
24 correct?
25 A. That is correct, yes. A DVD video.

Page 189

1 Q. A DVD video. And that was of the
2 transobturator technique?
3 A. That is correct, using the Mentor -- the
4 ObTape.
5 Q. And you had indicated earlier that I think
6 this is information that you don't have access to
7 now, but that he also had a packet of information
8 that he reviewed with you, along with the PIDs and
9 along with this video, correct?
10 A. Again, I can't recall what else he gave me
11 besides that. I don't know if there was
12 manuscripts or whatever. I just don't recall. I
13 do recall getting the big booklet when I went to
14 the meeting in Phoenix.
15 Q. Okay. And with respect to what you relied on
16 to make this change in your clinical practice,
17 which included starting to implant the ObTape, you
18 relied on Mentor to provide you with thorough
19 information, both with respect to the obturator
20 approach and also any risks associated with their
21 product and the approach, correct?
22        MR. LEWIS: Object to form.
23        THE WITNESS: I think it's fair to
24 say with specifically this product -- it varied
25 with other products -- I relied nearly 100 percent

48 (Pages 186 - 189)

Page 190

1  upon them and I trusted them.
2  BY MR. KREIS:
3  Q.  Okay.  And you were asked a question about
4  the PIDs, and the PIDs makes reference to there
5  being a very rare risk of various things.  Do you
6  remember that testimony?
7  A.  Yes, I do.
8  Q.  And those rare occurrences -- those very rare
9  occurrences include erosion, correct?
10  A.  They say vaginal erosion, which correctly
11  should be called "extrusion".  But it's okay at
12  that time to call it erosion, yes.
13  Q.  There's also reference there to infection?
14  A.  Correct.
15  Q.  And at the point in time when you were being
16  presented with this PIDs, was it your impression
17  that that infection dealt with superficial
18  surgical-related infection?
19       MR. LEWIS:  Object to form.
20       THE WITNESS:  Correct.  At that
21  point in time, I was aware of the medical
22  literature.  I'd wear my own clinical experience.
23  And the superficial skin infection of cellulitis,
24  I remember there was one patient that I had with
25  it that we were able to treat.  I remember it very

Page 191

1  well because a staff pulmonologist's mother, so
2  it's burned in my mind and I have to deal with
3  that.  But it was a minor infection treated with
4  antibiotics and it went away.
5  BY MR. KREIS:
6  Q.  And at this point in time, you would not have
7  known that there would be a significant risk of
8  abscess formation, correct?
9       MR. LEWIS:  Object to form.
10       THE WITNESS:  I was completely
11  unaware.  I'd had never heard about it, never
12  heard it in the literature, never seen a patient
13  with it.  Never even knew abscess was even
14  possible with these things.
15  BY MR. KREIS:
16  Q.  And so --
17  A.  In the absence -- sorry to interrupt you, but
18  in the absence of a bowel perforation, like with
19  the TVT or suprapubic sling.
20  Q.  Okay.  So both from the standpoint of your
21  being a clinician at the point in time when you
22  received the PIDs and also as an expert in this
23  case, is it your opinion that their reference to
24  "infection" in the PIDs is inadequate based on the
25  information you have now?

Page 192

1       MR. LEWIS:  Object to form and
2  foundation.
3       THE WITNESS:  Wholly misleading,
4  because you have to look at the frame of reference
5  of every doctor in the nation -- well, just to
6  myself, who was aware of the mesh sling issues
7  with TVT and SPARC, which I had already used, that
8  was my frame of reference.  I understood
9  infections in that realm.  I did not understand
10  nor expect the complications I found in my own
11  patients, like the buttock abscess I mentioned.
12  Q.  And you told this Mentor sales representative
13  about the buttock abscess, correct?
14  A.  I told about each one as they occurred.  I
15  also told them about the vaginal extrusions,
16  because remember, very rarely -- I remember a few
17  that I was seeing with the other products.  So as
18  these were coming in, I was telling them, hey,
19  we're seeing this thing; this is different.
20  Q.  Did you ever see a change made by Mentor to
21  their PIDs specific to the serious abscess
22  formation risk at any point in time?
23       MR. LEWIS:  Object to form.
24       THE WITNESS:  No.  When this was
25  occurring and I was telling Mr. Sellwood -- I

Page 193

1  don't recall if I told Terri Oto or not or Dave
2  Amerson.  Dave Amerson I had very little contact
3  with.
4       I told them about this.  I was
5  somewhat under the impression I was the only one
6  in the world who was experiencing this.
7  BY MR. KREIS:
8  Q.  Did Mentor ever tell you about conversations
9  they had with, for example, Dr. Kassan (phonetic)
10  in May of 2004 relating to serious infections that
11  he saw with the ObTape?
12       MR. LEWIS:  Hold on a minute.  This
13  is an expert deposition, not a factual deposition,
14  number one, and so this has nothing to with any of
15  the questions that I asked this expert.  These are
16  all brand-new issues being raised here.  So I'm
17  objecting to any examination into these areas.  I
18  mean, I'm moving to strike them.  This is my
19  deposition.  I'm paying for it.
20       MR. KREIS:  I understand.
21       MR. LEWIS:  This isn't a
22  clarification.
23       MR. KREIS:  I understand your
24  clarification.
25       MR. LEWIS:  So how much more of this

49 (Pages 190 - 193)

Page 194

1  do you got?
2      MR. KREIS: Not much.
3      MR. LEWIS: Well, I mean, like a
4  question or two.
5      MR. KREIS: On this topic -- I've
6  got no more questions on this topic if you'll let
7  the doctor answer the question.
8      MR. LEWIS: Go ahead. But I still
9  object on those bases.
10     THE WITNESS: I'm sorry. I forgot
11 what the question was.
12 BY MR. KREIS:
13 Q. Do you recall if Mentor ever provided you
14 information relating to Dr. Kassan's advising
15 Mentor about the abscess formation that he was
16 seeing in his practice in May of 2004?
17 A. I don't recall that.
18 Q. Okay. Did you review Dr. Manian, the
19 infectious disease doctor expert for Ms. Clinton,
20 did you review his expert report?
21 A. His expert report and his deposition. I've
22 read them.
23 Q. Okay. And by "expert report", that includes
24 his supplemental expert report, correct?
25 A. Well, that's a blur in my mind. I saw all

Page 195

1  the documents. I can't say which one was on
2  supplemental and which one was on --
3      MR. LEWIS: Is that referenced in
4  his report?
5      MR. KREIS: Yes. It's referenced in
6  his supplemental reliance list.
7      MR. LEWIS: Well, so here's the
8  point on this. I'm reserving my right to ask him
9  questions about this supplemental reliance list.
10 I just got it. It should have been provided,
11 including any questions about Dr. Manian. So I
12 mean, I'm just letting you know. I mean, you can
13 ask all the questions you want, but --
14     MR. KREIS: You've had -- certainly
15 you've had Dr. Manian's expert, his supplemental
16 expert report. You've got his deposition
17 transcript. We sent you Dr. Elliott's
18 supplemental reliance list.
19     MR. LEWIS: You just sent it to me.
20 It was not sent with the actual report, and
21 Dr. Manian's information was not included in the
22 original reports of Dr. Elliott and I'm going to
23 reserve my right to strike any reliance on
24 Mr. Manian or I'm going to open this deposition
25 back up so I can fully examine him. I didn't come

Page 196

1  here today to prepared to talk about Dr. Manian's
2  opinion because I was wasn't provided -- it's not
3  in the four corners of his report.
4      But I don't -- I'm objecting to this
5  line of examination. This is stuff that you can
6  get out of him at trial. This isn't related. I
7  didn't ask him anything about Dr. Manian. So I'm
8  prohibiting this line of questioning.
9      MR. KREIS: I've got very few
10 questions on this. Your objection is understood.
11     MR. LEWIS: Okay.
12     MR. KREIS: Let's let this proceed a
13 couple more questions, okay, John?
14     MR. LEWIS: Okay.
15 BY MR. KREIS:
16 Q. Dr. Elliott, you had an opportunity to review
17 Dr. Manian's expert report and his supplemental
18 expert report and his deposition transcripts,
19 correct?
20 A. Correct.
21 Q. Okay. You're aware that Dr. Manian holds the
22 opinion that Ms. Clinton suffered an abscess to
23 her left thigh caused by colonization of the
24 material at the time of implant and there was a
25 delay in the presentation due to biofilm

Page 197

1  formation, correct?
2  A. Yes, that's correct.
3  Q. And would it be accurate that your opinion is
4  that the ObTape caused her thigh abscess in her
5  left leg and her right leg?
6      MR. LEWIS: Object to form.
7      THE WITNESS: Correct.
8  BY MR. KREIS:
9  Q. Okay. And is it -- and that would be either
10 through an undiagnosed erosion causing the
11 infection to the ObTape, or colonization at the
12 time of the implant, correct?
13     MR. LEWIS: Object to form.
14     THE WITNESS: Either or both,
15 correct.
16 BY MR. KREIS:
17 Q. In terms of things that you've ruled out, one
18 thing that Mr. Lewis didn't ask you about and I
19 wanted to make sure and clarify for the record,
20 you reviewed the implant operative records,
21 correct?
22 A. Correct. Dr. Saba's from December of 2005.
23 Q. 2004?
24 A. 2004. Excuse me.
25 Q. And did you rule out any implantation

50 (Pages 194 - 197)

Page 198

1  technique or other issues with respect to
2  Dr. Saba's implant as part of your opinion?
3  A. I read over his report. It appeared to
4  follow the standard of care. There was no
5  suspicious issues with the report.
6  Q. Okay. And all of the opinions that you gave
7  today are to a reasonable degree of medical
8  certainty?
9          MR. LEWIS: Object to form.
10         THE WITNESS: Correct.
11         MR. KREIS: I've got no further
12  questions.
13         MR. LEWIS: I'm just going to
14  reserve my right to further question the witness
15  based on recent information that was provided to
16  us and also any information that's revealed
17  between now and the time of trial.
18         Otherwise, I have no further
19  questions for the witness. I appreciate your
20  time, Dr. Elliott.
21         MR. KREIS: Plaintiffs do not waive
22  their objections to any further deposition and do
23  affirmatively object to leaving this deposition
24  open but will take the issue up with counsel at
25  the close of this deposition.

Page 199

1          Thank you.
2          (The deposition was concluded at
3  1:15 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 200

1          REPORTER'S CERTIFICATE
2
    STATE OF MINNESOTA  )
3                       ) ss.
    COUNTY OF RAMSEY    )
4
5      I hereby certify that I reported the
    DEPOSITION OF DANIEL S. ELLIOTT, M.D., on July 24,
6  2016, in Minneapolis, Minnesota, and that the
    witness was by me first duly sworn to tell the whole
7  truth;
8      That the testimony was transcribed by me and
    is a true record of the testimony of the witness;
9
       That the cost of the original has been
10 charged to the party who noticed the deposition, and
    that all parties who ordered copies have been
11 charged at the same rate for such copies;
12     That I am not a relative or employee or
    attorney or counsel of any of the parties, or a
13 relative or employee of such attorney or counsel;
14     That I am not financially interested in the
    action and have no contract with the parties,
15 attorneys, or persons with an interest in the action
    that affects or has a substantial tendency to affect
16 my impartiality;
17     That the right to read and sign the
    deposition by the witness was reserved.
18
19     WITNESS MY HAND AND SEAL this 3rd day of
    August, 2016.
20
21
22
                          _____
23
       Paula K. Richter, RMR, CRR
24     Notary Public, Ramsey County, Minnesota
       My Commission Expires January 31, 2021
25

Page 201

1          ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS
2          800-567-8658
    ASSIGNMENT NO. CS2350044
3  CASE NAME: Clinton, Andrea Rachelle v. Mentor Worldwide LLC
    DATE OF DEPOSITION: 7/24/2016
4  WITNESS' NAME: Daniel S. Elliott
5
    PAGE/LINE(S)  CHANGE      REASON
6  ____/____ /_____ /_____
7  ____/____ /_____ /_____
8  ____/____ /_____ /_____
9  ____/____ /_____ /_____
10 ____/____ /_____ /_____
11 ____/____ /_____ /_____
12 ____/____ /_____ /_____
13 ____/____ /_____ /_____
14 ____/____ /_____ /_____
15 ____/____ /_____ /_____
16 ____/____ /_____ /_____
17 ____/____ /_____ /_____
18 ____/____ /_____ /_____
19 ____/____ /_____ /_____
20
           Daniel S. Elliott
21 (Notary not required in California)
    SUBSCRIBED AND SWORN TO
22 BEFORE ME THIS_____ DAY
    OF_____ , 2016.
23
24  NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

Page 202

```
 1              Veritext Legal Solutions
                290 W. Mt. Pleasant Ave. - Suite 3200
 2              Livingston, New Jersey 07039
                Toll Free: 800-227-8440  Fax: 973-629-1287
 3
 4  _____, 2016
 5  To: Douglass A. Kreis, Esq.
 6  Case Name: Clinton, Andrea Rachelle v. Mentor Worldwide LLC
 7  Veritext Reference Number: 2350044
 8  Witness: Daniel S. Elliott      Deposition Date: 7/24/2016
 9
    Dear Sir:
10
    Enclosed please find a deposition transcript.  Please have the witness
11  review the transcript and note any changes or corrections on the
    included errata sheet, indicating the page, line number, change, and
12  the reason for the change.  Have the witness' signature at the bottom
    of the sheet notarized except in California where they are signing
13  under penalty of perjury and forward the errata sheet back to us at
    the address shown above.
14
15
16  If the jurat is not returned within thirty days of your receipt of
17  this letter, the reading and signing will be deemed waived.
18
19
20  Sincerely,
21
22  Production Department
23
24  Encl.
25  Cc: John Q. Lewis, Esq.
```

52 (Page 202)

1                    REPORTER'S CERTIFICATE

2

     STATE OF MINNESOTA    )
3                          ) ss.
     COUNTY OF RAMSEY       )
4

5          I hereby certify that I reported the
   DEPOSITION OF DANIEL S. ELLIOTT, M.D., on July 24,
6  2016, in Minneapolis, Minnesota, and that the
   witness was by me first duly sworn to tell the whole
7  truth;

8          That the testimony was transcribed by me and
   is a true record of the testimony of the witness;
9

10         That the cost of the original has been
   charged to the party who noticed the deposition, and
   that all parties who ordered copies have been
11 charged at the same rate for such copies;

12         That I am not a relative or employee or
   attorney or counsel of any of the parties, or a
13 relative or employee of such attorney or counsel;

14         That I am not financially interested in the
   action and have no contract with the parties,
15 attorneys, or persons with an interest in the action
   that affects or has a substantial tendency to affect
16 my impartiality;

17         That the right to read and sign the
   deposition by the witness was reserved.
18

19         WITNESS MY HAND AND SEAL this 3rd day of
   August, 2016.
20

21                    _Paula Richter_

22

23         _____

     Paula K. Richter, RMR, CRR
24   Notary Public, Ramsey County, Minnesota
     My Commission Expires January 31, 2021
25