# EXHIBIT B

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF GEORGIA
3              COLUMBUS DIVISION
4    _____
5
6                              MDL Case No. 2004
7   IN RE: MENTOR CORP. OBTAPE
8   TRANSOBTURATOR SLING PRODUCTS
9   LIABILITY LITIGATION
10
11  _____
12
13
14
15              DEPOSITION OF
16          DANIEL S. ELLIOTT, M.D.
17
18
            Taken on July 24, 2016
19
            Commencing at 8:44 a.m.
20
21
22
23
24   Job No. CS2350044
25   REPORTED BY:   PAULA K. RICHTER, RMR, CRR

Page 18

1  will be probably roughly 15 minutes of that. And
2  I don't recall in her case the breakdown of time.
3  Q. Did you do more than one exam that day?
4  A. I don't recall. Usually there are two or
5  three that I do in a given day, but I don't
6  recall.
7  Q. How many trips to Chicago's Rush Medical
8  Center do you think you've made in the
9  litigation -- in all litigation?
10 A. So since 2011, there's probably been five --
11 four or five. Again, that's an estimate.
12 Q. Okay. And you've probably done 75, roughly,
13 exams?
14 A. Correct. But not all in Chicago.
15 Q. Where else have you done exams?
16 A. In Kansas City, Minneapolis. I think that's
17 it.
18 Q. When you do an exam, how are you -- so when
19 you do an independent medical exam -- or so-called
20 independent medical exam in the context of
21 litigation, how are you compensated?
22 A. Hourly.
23 Q. And do you have a rate sheet or some document
24 that you would send to a lawyer? If I say, hey,
25 Dr. Elliott, will you help me out and do an exam

1  of my plaintiff, do you have a document that would
2  send to a lawyer that kind of identifies your
3  hourly rate and the cost and things like that?
4  A.  Well, the only people that have access to me
5  are through Ben Anderson's office and AWKO office,
6  so I don't interact with any other lawyers.  And
7  the rate is a standard $700, regardless of what
8  I'm doing, per hour.
9  Q.  Let me ask you a little bit about your
10 relationship with Ben Anderson.  So Ben Anderson
11 is an attorney in Cleveland, Ohio; is that
12 correct?
13 A.  Correct.
14 Q.  And when did you first start working with
15 Mr. Anderson in connection with litigation
16 involving mesh products?
17 A.  He contacted me in probably August of 2011.
18 Q.  And what do you recall the nature of that
19 conversation?
20 A.  He had talked to me about being involved as
21 far as the mesh litigation.  I had made several
22 talks around the nation against meshes, written an
23 opinion paper against meshes and then have been
24 contacted by Public Citizen -- Public Citizen --
25 the Ralph Nader Group in DC.  He had read those

Page 24

```
 1   but excluding today, how many additional work have
 2   you done since September of 2015?
 3   A.  Well, it's roughly 45 hours.  However, that's
 4   also including the general evaluation, so it's
 5   going to be very difficult to delineate
 6   specifically Clinton because the general is going
 7   to have overlap with her.  But total this month,
 8   roughly 45 hours.
 9   Q.  And when we say "this month", we're talking
10   July?
11   A.  Correct.  Up to yesterday.  Not including
12   today.
13   Q.  Okay.  So that's general plus Clinton.
14             Other than Ms. Clinton's 17 hours
15   specific and the 45 hours this month for general
16   work in Ms. Clinton's case, what additional amount
17   of hours have you spent on the ObTape litigation,
18   in connection with your consultation work?
19   A.  Essentially, we're just looking at July,
20   August and September of last year because nothing
21   happened up until July of this year.  Thirty-five
22   hours roughly were spent on the general report
23   back, again, that was last year.  And then on the
24   other roughly 10 mentor individuals, it was
25   roughly -- and this is a guesstimate -- about 100
```

Page 25

1  hours were spent on them.
2  Q. And that would be non-Clinton work?
3  A. Correct.
4  Q. And would Mr. Anderson have those records? I
5  mean, all the bills that you sent for that work in
6  ObTape, those would have all been sent to
7  Mr. Anderson?
8  A. Correct.
9  Q. And with respect to your work in the Avaulta
10 litigation, the hours in revenue could be
11 determined by looking at records that Mr. Anderson
12 has; is that correct?
13 A. That's correct. He would have all that.
14 Q. 197 estimate total.
15         And were the 197 -- I roughly did
16 the math here, approximately 197 hours estimate,
17 and I fully understand it's not an exact number,
18 but that would be at the rate of $700 an hour --
19 A. Correct.
20 Q. -- all of that time?
21 A. Correct. And that's including travel time in
22 there too.
23 Q. And then the expenses associated with that
24 would be on top of the hourly?
25 A. Yes.

Page 27

1  Q.  So mesh or transvaginal products?
2  A.  Correct.
3          (Exhibit 4 was marked for
4  identification.)
5          MR. LEWIS:  I'm going to set that
6  over here.  That's just my notes for when I read
7  the depo.
8  BY MR. LEWIS:
9  Q.  When did you first start treating -- by the
10 way, let's step back for a second.
11         You treat women for stress urinary
12 incontinence as we sit here today?  I mean, that
13 is part of your practice?
14 A.  Correct.
15 Q.  And how long have you been doing that?
16 A.  Well, technically since I started residency
17 in '93.  I did a fellowship in '99 which was
18 treating females.  It was a voiding dysfunction
19 neurology fellowship.  And then on staff since
20 '99.
21 Q.  And when you say "on staff", that's on staff
22 of the Mayo Clinic?
23 A.  Correct.
24 Q.  And let me just back up for a minute.  So the
25 treatment of stress urinary incontinence, do you

Veritext Legal Solutions
800-567-8658                                    973-410-4040